IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

DAVID McCHESNEY,

                    Plaintiff,

                                        Civil Action No.
          v.                            9:08-CV-0163 (FJS/DEP)

MICHAEL HOGAN, Ph.D; DONALD
SAWYER, Ph.D.; JEFFREY AMODON, M.D.;
BARBARA STAPHOLZ, R.N.; MAUREEN
ADAMS, R.N.; EDWIN GWYTHER;
CHRISTOPHER MAYER; CHARMINE BILL, R.N.;
SAM LILLY, R.N.; TERRY MAXYMILLIAN;
JEFFREY NORWICKI; MARY BULLIVANT, R.N.;
and T.A. POTTER, Individually and in Their
Official Capacities,

                    Defendants.

_____

APPEARANCES:                     OF COUNSEL:

FOR PLAINTIFF:

DAVID McCHESNEY, *Pro Se*
#25527
CNY Psychiatric Center
PO Box 300
Marcy, NY 13403-0300

FOR DEFENDANTS:

HON. ANDREW M. CUOMO            ADELE TAYLOR-SCOTT, ESQ.
Attorney General               Assistant Attorney General
State of New York
The Capitol
Litigation Bureau
Albany, NY 12224-0341

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff David McChesney, a convicted sex offender who has been civilly committed to the Central New York Psychiatric Center ("CNYPC" or "Center") for in-patient sex offender treatment, has commenced this action pursuant to 42 U.S.C. §1983 claiming that he was deprived of his civil rights during the course of his confinement at the Center.  In his complaint, which purports to be brought on behalf of himself as well as other similarly situated patients, plaintiff complains of various policies at the Center ranging from those addressing receipt of food packages and telephone access to mail censorship and the use of short chain restraints. Plaintiff maintains that the adoption and implementation of those policies by the various defendants named in his complaint, all of which are present or former employees of the New York State Office of Mental Health ("OMH"), has resulted in violation of his rights under the First, Fourth, Eighth, and Fourteenth Amendments.  Plaintiff's complaint seeks recovery of $1 million in compensatory damages, $5 million in damages for mental anguish and emotional distress, and $5 million in punitive damages from each of the named defendants.

2

Currently pending before the court in connection with this action is defendants' motion for summary judgment dismissing plaintiff's claims on a variety of grounds.  Having reviewed the extensive submissions offered in support of that motion, which plaintiff has not opposed, I recommend that it be granted.

I.   BACKGROUND[1]

Plaintiff, who has been adjudicated a sex offender requiring mental health treatment, was involuntarily committed to the care and custody of the New York State OMH and designated to the CNYPC on or about December 6, 2007, pursuant to the mandates of the New York Mental Hygiene Law ("MHL") Article 10.[2]  *See generally* Amended Complaint (Dkt. No. 5); *see also McChesney v. Hogan*, No. 9:08-CV-1186 (NAM/DEP), Dkt. No. 23 at pp. 4-6; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 46-1) ¶ 1.[3]  The Center is an adult psychiatric facility located in Marcy,

---

[1]      In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[2]      Enacted in 2007, Article 10 of the Mental Hygiene Law provides for civil commitment and treatment of certain individuals convicted of committing sex crimes, recognition of the danger that recidivistic offenders present when released into the community.  *See* N.Y. Mental Hyg. Law § 10.01.

[3]      As will be seen, by failing to respond in opposition to defendants' motion plaintiff is deemed to have admitted the facts set forth in Defendants' Local Rule 7.1(a)(3) Statement .  *See* pp. 9 - 11, *post*.

New York.  Amended Complaint (Dkt. No. 5) ¶ 3; Defendants' Local Rule

7.1 (a)(3) Statement (Dkt. No. 46-1) ¶¶ 7-8.  The treatment prescribed for

the plaintiff has been administered through a sex offender treatment

program ("SOTP"), operated in a secure treatment facility on the grounds

of the CNYPC but separate from the Center's general psychiatric

population.  *Id.*   As a patient at the Center, plaintiff is subject to various

policies related to such matters as receipt of food packages, telephone

usage, access to media, the purchase of clothing, patient searches, a

motivation on deck ("MOD") disciplinary program, a treatment modality

designed to segregate and provide treatment for individuals demonstrating

aggressive tendencies, and access to legal materials.   Amended

Complaint (Dkt. No. 5) ¶¶ 19-26.  Those policies were developed following

adoption of MHL Article 10 in 2007 in order to insure that the Center

operates as a "secure treatment facility" as contemplated under that

statute.  Sawyer Decl. (Dkt. No. 46-10) ¶¶ 5-18.  The policies at issue

were developed by the CNYPC Cabinet, a multi-disciplinary body

responsible for review of draft operating policies proposed for

implementation at the Center.  *Id.* at ¶ 12.  Once adopted, policies for the

CNYPC SOTP are submitted to OMH counsel for a determination of

whether they conform to applicable state and federal law.  *Id. at* ¶ 16.

4

Such proposed policies are also reviewed for compliance with the Joint

Commission accreditation standards for ethics and patient rights.  Sawyer

Decl. (Dkt. No. 46-10)  ¶ 17.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on February 11, 2008, and at the

court's direction subsequently filed an amended complaint – the operative

pleading now before the court – on May 23, 2008.[4]  Dkt. Nos. 1, 3, 4, 5.

Named as defendants in plaintiff's amended complaint are various present

or past OMH employees including Dr. Michael F. Hogan, the agency's

Commissioner; Dr. Donald Sawyer, the Executive Director of the CNYPC;

Dr. Jeffrey Amidon, the former Director of Medicine for the Center's

SOTP; Maureen Adams, the former Director of In-Patient Operations at

the CNYPC; Barbara Stapholz, the former Chief of Mental Health

Treatment Services for the Center's SOTP; Jeffrey Nowicki, the Chief of

Mental Health Treatment Services for the SOTP at the CNYPC;  Dr. Terri

---

[4]        Plaintiff's complaint, both initially and as amended, purports to raise claims on behalf of himself and "all others similarly situated".  *See* Amended Complaint (Dkt. No. 5).  Noting the well-established principle that *pro se* plaintiffs cannot act as class representatives, in his order approving the filing of plaintiff's amended complaint Senior District Judge Frederick J. Scullin, Jr., noted that the court would deem plaintiff only to have brought this action to redress alleged violations of his civil and constitutional rights, and not those of other similarly situated individuals.  *See* Memorandum-Decision and Order dated May 28, 2008 (Dkt. No. 6) at p. 2 (citing Fed. R. Civ. P. 23(a)(4); *McLeod v. Crosson*, No. 89 CIV. 1952, 1989 WL 28416, *1 (S.D.N.Y. Mar. 21, 1989) and *Philips v. Toban*, 548 F.2d 408, 412-15 (2d Cir. 1976)).

5

Maxymillian, Director of the Center's SOTP; Charmaine Bill, a Registered Nurse and Treatment Team Leader for the SOTP; Edwin Gwyther, a Social Worker and Primary Therapist for the Program; Christopher Meyer, a Social Work Supervisor I at the SOTP; Sam Lilly, a Registered Nurse at the facility; Denise Potter, a Secure Care Treatment Aide ("TA") within the program; and Mary Bullivant, a Nurse Administrator for the program.[5]  Dkt. No. 5.  Plaintiff's complaint seeks both monetary and injunctive relief.  *Id.*

Now that discovery in the action is closed all of the defendants, with the exception of Edwin Gwyther, who has neither been served nor appeared in the action, have moved for summary judgment dismissing plaintiff's claims on a variety of grounds.  Dkt. No. 46.  In their motion, *inter alia*, defendants argue that 1) any damage claims against them in their official capacities are barred by the Eleventh Amendment; 2) certain of the defendants were not sufficiently involved in the violations alleged to support a finding of liability against them; 3) plaintiff lacks standing to challenge the Center's policies and practices regarding the use of mechanical restraints; 4) plaintiff's claims, whether analyzed under the

---

[5]      It appears from their declarations that plaintiff has incorrectly identified four of the defendants:  Jeffrey Norwicki should be changed to Jeffrey Nowicki; Christopher Mayer should be changed to Christopher Meyer;  Jeffrey Amodon should be changed to Jeffrey Amidon; and, Charmine Bill should be changed to Charmaine Bill.  The clerk will be asked to amend court records to reflect the correct spelling of these defendants' names.

Eighth Amendment or the substantive due process clause of the

Fourteenth, lack merit; 5) plaintiff has failed to adduce evidence to support

a cognizable claim for denial of court access; and 6) defendants are

entitled to qualified immunity.[6]  *See generally* Dkt. No. 46.  Despite

passage of the November 30, 2009 deadline for responding, plaintiff has

failed to submit any opposition to defendants' motion, which is now ripe for

determination and has been referred to me for the issuance of a report

and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and the

Northern District of New York Local Rule 72.3(c).  See Fed.R.Civ.P. 72(b).

III.   DISCUSSION

   A.   Summary Judgment Standard

   Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, summary judgment is

warranted when "the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of*

---

   [6]   In their motion defendants also seek dismissal of any pendent state law claims asserted by the plaintiff.  Dkt. No. 46.

7

*Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S.Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.   Legal Significance of Plaintiff's Failure To Oppose Defendants' Motion

Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to summary judgment dismissing McChesney's complaint.

This court's rules provide that

9

> [w]here a properly filed motion is unopposed and the
> Court determines that the moving party has met its
> burden to demonstrate entitlement to the relief requested
> therein, the non-moving party's failure to file or serve any
> papers as this Rule requires shall be deemed as consent
> to the granting or denial of the motion, as the case may
> be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3).  Undeniably, *pro se* plaintiffs are entitled to some

measure of forbearance when defending against summary judgment

motions.  *See Jemzura v. Public Serv. Comm'n,* 961 F. Supp. 406, 415

(N.D.N.Y. 1997) (McAvoy, C.J.).  The deference owed to *pro se* litigants,

however, does not extend to relieving them of the ramifications associated

with Local Rule 7.1(b)(3).  *Robinson v. Delgado*, No. 96-CV-169, 1998 WL

278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.)[7]; *Cotto v.

Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23,

1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980 F. Supp.106, 106-

07 (N.D.N.Y. 1997) (Pooler, J. & Hurd, M.J.).  Accordingly, absent a

showing of good cause defendants' unopposed summary judgment

motion should be granted, if determined to be facially meritorious. *See

Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 231-

32 (N.D.N.Y. 2000) (Scullin, C.J.); *Leach v. Dufrain*, 103 F. Supp. 2d 542,

---

[7]      Copies of all unreported decisions cited in this document have been
appended for the convenience of the *pro se* plaintiff.

545-46 (N.D.N.Y. 2000) (Kahn, J.).

It should also be noted that the plaintiff's failure to properly oppose defendants' summary judgment motion is not without further consequences.  By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statements unchallenged, thus permitting the court to deem facts set forth in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement.[8] *See Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

Based upon plaintiff's failure to oppose defendants' motion I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, and that the motion be granted if determined to be facially meritorious.

---

[8]     Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  *See* N.D.N.Y.L.R. 7.1(a)(3)(emphasis in original).

C.    Eleventh Amendment Immunity

Plaintiff's claims are asserted against the various defendants both as individuals and in their official capacities as OMH employees.  And, as was previously noted, plaintiff's complaint seeks recovery of damages in substantial amounts against each of those defendants. In their motion, defendants argue that the damage portion of plaintiff's claims against them as state officials are subject to dismissal under the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought.  *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58 (1978).  This absolute immunity that states enjoy under the Eleventh Amendment extends both to state agencies and state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[9]  *Richards v. State of New York Appellate Division, Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (citing *Pugh* and *Cory v. White*, 457 U.S. 85, 89-91,

---

[9]      In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State.  As the Supreme Court reaffirmed in *Northern Ins. Co. of New York v. Chatham County*, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment.  547 U.S. 189, 193, 126 S.Ct. 1689, 1693 (2006).

12

102 S.Ct. 2325, 2328-29 (1982)).  To the extent that a state official is sued for damages in his or her official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[10]  *Kentucky v. Graham*, 473 U.S. 159, 166-67, 105 S.Ct. 3099, 3105 (1985);  *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 361 (1991).

Since plaintiff's damage claims against the named defendants in their official capacities are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, they are subject to dismissal.  *Daisernia v. State of New York*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.).  I therefore recommend that this portion of defendants' motion be granted, and that plaintiff's damage claims against the defendants in their capacities as state officials be dismissed.

D.    Personal Involvement

In their motion, defendants next assert that several of them, including defendants Hogan, Sawyer, Adams, Bullivant, Stapholz and Nowicki, were not sufficiently involved in the conduct forming the basis for plaintiff's claims to be held accountable for the constitutional violations

---

[10]    By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983.  *See Hafer*, 502 U.S. at 30-31, 112 S.Ct. at 364-65.

alleged.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Certain of the defendants in this action appear to be named in plaintiff's complaint principally, if not exclusively, based upon their supervisory positions within the OMH and at the Center.  It seems clear that those supervising officials cannot be liable for damages under section 1983 solely by virtue of being a supervisor, since there is no *respondeat superior* liability under section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. The culpability of one or more of these individuals, as supervisory officials, for a civil rights violation could, however, be established in one of several ways, including when that the  individual under consideration 1) directly participated in the

14

challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom.*, *Ashcroft v. Iqbal*, ___ U.S. ___,129 S.Ct. 1937 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501. As can be seen, analysis of defendants' personal involvement argument requires a case by case review of each particular defendants' involvement.

### 1.    Dr. Michael Hogan

Defendant Hogan is and was at the relevant times the Commissioner of the OMH.  Amended Complaint (Dkt. No. 5) ¶ 5. Plaintiff's complaint does not allege that Dr. Hogan, as OMH Commissioner, was involved in the adoption or implementation of any of the offending policies or procedures at the Center.  Indeed, the record reveals that although as OMH Commissioner defendant Hogan has broad responsibility for the functioning of the agency as a whole, each facility operates autonomously under its own set of internal policies and

procedures formulated and implemented without involvement on the part of Commissioner Hogan.  Tauriello Decl. (Dkt. No. 46-12) ¶¶ 4-9.

Plaintiff's claims against Dr. Hogan appear to be based exclusively upon McChesney's filing of complaints with him, all of which are alleged to have gone unanswered, regarding the disputed policies.  *See, e.g.,* Amended Complaint (Dkt. No. 5) ¶¶ 18(d), 19, 20 and 21.  Allegations of this nature, standing alone, are insufficient to establish the requisite degree of personal involvement necessary to support a finding of liability. *Greenwaldt v. Coughlin*, No. 93 Civ. 6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing, *inter alia, Garrido v. Coughlin*, 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation)).  The record now before the court therefore fails to contain evidence from which a reasonable factfinder could conclude that defendant Hogan was personally involved in the constitutional violations alleged in plaintiff's complaint.

2.   Donald Sawyer, Ph.D.

16

Defendant Sawyer is the Executive Director at the Center.  While, like defendant Hogan, Dr. Sawyer is alleged to have ignored complaints by McChesney regarding the policies and practices at issue, plaintiff's claims against him go much further, alleging defendant Sawyer's direct participation in the adoption and implementation of the policies that are at the heart of plaintiff's complaint.  *See, e.g.,* Amended Complaint (Dkt. No. 5) ¶¶ 19(B), 20.  In a declaration given in support of this motion, Dr. Sawyer in fact acknowledges his role in preparation and adoption of those policies.  *See* Sawyer Decl. (Dkt. No. 46-10) ¶¶ 11-22.  In addition, plaintiff's amended complaint alleges that defendant Sawyer denied McChesney a clothing allowance and participation in a  treatment plan, further averring that defendant Sawyer has also harassed and abused plaintiff and searched his person and property.  Amended Complaint (Dkt. No. 5) ¶¶ 19-23.  These allegations suffice to establish defendant Sawyer's potential involvement in the conduct forming the basis for plaintiff's civil rights claims.

### 3.    Maureen Adams

Maureen Adams, who is now retired, was at the relevant times the Director of In-Patient Operations at the CNYPC.  In her declaration, defendant Adams admits that she was involved in the development of

operational policies for the SOTP at the Center.  Adams Decl. (Dkt. No. 46-2) ¶ 7.  This is consistent with the allegations set forth in plaintiff's complaint.  *See* Amended Complaint (Dkt. No. 5) ¶¶ 8, 19(c) and (d).  In fulfilling that role defendant was sufficiently involved in the constitutional deprivations alleged to potentially support a finding of liability on her part.

### 4.    Barbara Stapholz

Barbara Stapholz was formerly the Chief of Mental Health Treatment Services for the SOTP Program at the CNYPC.  In that capacity defendant Stapholz served as a member of the CNYPC Cabinet and, like defendant Adams, was actively involved in the development of certain of the operational policies put in place for the SOTP.  *See* Amended Complaint (Dkt. No. 5) ¶ 8, 9; Stapholz Decl. (Dkt. No. 46-11) ¶ 8.  This involvement suffices to establish a potential basis for finding liability on her part for the constitutional violations alleged.

### 5.    Jeffrey Nowicki

Defendant Nowicki is employed by the OMH as the Chief of Mental Health Treatment Services for the Center's SOTP.  Nowicki Decl. (Dkt. No. 46-8) ¶ 1; Amended Complaint (Dkt. No. 5) ¶ 10.  In his declaration defendant Nowicki acknowledges that, while he is not a member of the CNYPC Cabinet, he has assisted in the development of operational

policies for the SOTP.  Nowicki Decl. (Dkt. No. 46-8) ¶ 7.  As with Adams

and Stapholz, this allegation suffices to establish his potential involvement

in the constitutional violations alleged.

In sum, while plaintiff's allegations against defendant Hogan are

inadequate to establish his personal involvement in the civil rights

violations alleged, and plaintiff's claims against him are therefore subject

to dismissal on this basis, the record now before the court sufficiently

establishes participation on the part of defendants Sawyer, Adams,

Stapholtz, and Nowicki in the relevant events to avoid dismissal of his

claims against them for lack of personal involvement.

E.      Standing

In his complaint plaintiff cites the use of short chain and black box

restraints by officials at the CNYPC as one of the bases for his civil rights

claims.  *See, e.g.,* Amended Complaint (Dkt. No. 5) ¶ 18.  As those claims

are presented in plaintiff's amended complaint, however, they relate to

use of such restraints on a fellow patient, Andrew Pratt, and plaintiff's

complaint is devoid of allegations that he, too, was subject to the use of

such restraints.  Defendants argue that under circumstances the plaintiff

lacks of the requisite standing to raise claims associated with the use of

such restraints.

19

A fundamental predicate to the exercise of jurisdiction by a federal court is that a case or controversy meeting the definition set out in Article III of the Constitution be presented. *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 341-42, 126 S.Ct. 1854, 1861 (2006). The case or controversy limitation on federal court jurisdiction encompasses, among others, the requirement of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60, 112 S.Ct. 2130, 2136 (1992). Essentially, standing focuses on the question of "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Allen v. Wright*, 468 U.S. 737, 750-51, 104 S.Ct. 3315, 3324 (1984).

The "irreducible constitutional minimum" of standing requires that three elements be present. *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136. First, the plaintiff must have suffered an "injury in fact," which is both "concrete and particularized" and "actual or imminent." *Id.* at 560, 112. S.Ct. at 2136. Second, there must be a causal connection - the injury complained of must be fairly traceable to the defendant's conduct. *Id.* Third, plaintiff's injury must likely be redressable by a favorable decision in court. *Id.* at 561, 112 S.Ct. at 2136.

In addition to this tripartite constitutional element, the doctrine of standing also embraces several judicially self-imposed components, such

that even when a case meets the constitutional limitations, a plaintiff may still be denied standing on any of these grounds.  *Allen*, 468 U.S. at 751. 104 S.Ct. at 3324; *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608 (1979).  To fall within these prudential limitations, a plaintiff must not raise the legal rights of another person, must not allege a "generalized grievance," and plaintiff's complaint must "fall within the zone of interests protected by the law invoked." *Allen*, 468 U.S. at 751,104 S.Ct. at 3324.

To satisfy the first constitutional requirement, all plaintiffs "must demonstrate a 'personal stake in the outcome' in order to 'assure that concrete adverseness which sharpens the presentation of issues' necessary for the proper resolution of constitutional questions." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S.Ct. 1660, 1665 (1983) (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703 (1962)). "Abstract injury is not enough.  The plaintiff must show that he [or she] 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Lyons*, 461 U.S. at , 101-02,103 S.Ct. at 1665 (citations omitted).

As defendants point out, the allegations of plaintiff's complaint regarding the use of a black box device or short chain restraints when transporting sex offenders are made solely on behalf of a fellow CNYPC-SOTP resident, Andrew Pratt.  Plaintiff fails to allege that he himself experienced any injury or was otherwise affected by the defendants' use of such restraints, and therefore fails to meet the first requirement of constitutional standing, and frustrates the prudential prohibition against raising the rights of another person.  Accordingly, plaintiff's claim regarding the use of such restraints should be dismissed for failing to state a case or controversy justiciable by this court.

> F.    Plaintiff's Challenge to CNYPC Policies

The essence of plaintiff's complaint is that through the adoption and implementation of various policies and procedures at the CNYPC, the defendants have violated his constitutional rights.

> 1.    Eighth and Fourteenth Amendment Standards

Plaintiff's complaint references alleged violation of his rights under several constitutional provisions, including the Eighth Amendment.  When plaintiff was released by the DOCS into the CNYPC, he had served his term of imprisonment, subject to release on parole, and was no longer a prison inmate.  The Eighth Amendment, prohibiting cruel and unusual

22

punishment of those convicted of crimes, therefore is not applicable under the circumstances. *Youngberg v. Romeo*, 457 U.S. 307, 312, 102 S.Ct. 2452, 2456 (1982).

This does not mean that as a patient involuntarily committed for treatment plaintiff is without constitutional protections. Patients who are involuntarily committed are unquestionably entitled, for example, to certain rights under the Fourteenth Amendment; as the Supreme Court has noted, "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed . . . in unsafe conditions." *Youngberg*, 457 U.S. at 315-16, 102 S.Ct. at 2458. "The Supreme Court has explained that 'when the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume responsibility for [her] safety and general well-being.'" *Beck v. Wilson*, 377 F.3d 884, 889 (8th Cir. 2004) (quoting *DeShaney v. Winnebago Couty Dep't of Soc. Servs.*, 489 U.S. 189, 199-200, 109 S.Ct. 998 (1989)). Plaintiff's challenges to the various policies and practices referenced in his complaint must therefore be analyzed, at least in the first instance, within the framework of the Due Process Clause of the Fourteenth Amendment. *Sain v. Wood*, 512 F.3d 886, 893 (7th Cir. 2008); *Dove v. City of New*

*York*, No. 03-CV-5052 JFB LB, 2007 WL 805786 (E.D.N.Y. Mar. 15, 2007).

Because the due process clause requires that civilly committed patients be provided with protections at least as extensive as those to which convicted prisons are entitled, the Eighth Amendment provides a suitable starting point for analysis of plaintiff's claims. *Sain*, 512 F.3d at 893.   Under the Eighth Amendment, state officials are required to provide convicted inmates with housing under "humane conditions," and to afford them "adequate food, clothing, shelter, and medical care."  *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970 (1994); see also *Sain*, 512 F. 3d at 893.  The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle*).  While the Eighth Amendment does not mandate comfortable confinement conditions, neither does it tolerate inhumane treatment of those in confinement. *Farmer,* 511 U.S. at 832, 114 S.Ct. at 1976 (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101

S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement – the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference".[11]  *See Leach,* 103 F. Supp.2d at 546 (citing *Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson*, 501 U.S. 294, 111 S.Ct. 2321.  Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1978; *Leach*, 103 F. Supp. 2d at 546 (citing

---

[11]     Applying the reasoning embodied in the Supreme Court's decision in *Youngberg*, some courts have applied a more narrow subjective standard, particularly as against defendants who could fairly be characterized as professionals, under which liability would attach only to a decision that constituted a "substantial departure from accepted professional judgment, practice or standard" as distinct from the broader "deliberate indifference" standard. *Youngberg*, 457 U.S. at 323, 102 S.Ct. at 2462; *see Dove*, 2007 WL 805786, at *7-8; *Vallen v. Carrol,* 2005 WL 2296620, at *8-9 (S.D.N.Y. Sept. 20, 2005). Like the courts in *Dove* and *Vallen*, I find it unnecessary to determine which of these yardsticks should apply in the present setting, concluding that no reasonable factfinder could determine that the policies challenged violate the constitution under either standard, and further in view of my recommendation regarding the issue of qualified immunity.

*Farmer*); *Waldo*, 1998 WL 713809, at *2 (same).

Plaintiff's complaint challenges a host of policies and procedures to which patients at the Center are exposed, ranging from receipt of food packages, access to outside news sources, telephone usage, denial of electric shaver, failure to permit participation in programming treatment development, mail privileges, procedures associated with the MOD treatment program, the resident search policy, and the clothing allowance. *Youngberg* established that patients in mental institutions enjoy "constitutionally protected interests in reasonably nonrestrictive confinement conditions." *Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462. In evaluating whether state institutional policies comply with this constitutional mandate, the court must balance "'the individual's interest in liberty against the State's asserted reasons for restraining individual liberty.'" *Buthy v. Comm'r of the Office of Mental Health of New York*, 828 F.2d 1046, 1050 (2d Cir. 1987) (quoting *Youngberg*). The Supreme Court has recognized, however, that the Constitution is not concerned with *de minimis* restrictions on individual liberty. *Ingraham v. Wright*, 430 U.S. 651, 674, 97 S.Ct. 1401, 1414 (1977). Indeed, as the Second Circuit has acknowledged, some incidental restrictions relating to every day life are necessary in the context of the organized caretaking of institutional

26

residents.  *Buthy*, 818 F.2d at 1051 (citations omitted).  The record before

the court unequivocally establishes that the policies now challenged by

the plaintiff were designed and implemented by the defendants, in their

professional judgments, to further the substantial government interest in

preserving safety and security within the facility and in providing the state-

mandated SOTP.  *See generally* Sawyer Decl.  (Dkt. No. 46-10); Adams

Decl. (Dkt. No. 46-2); Maxymillian Decl. (Dkt. No. 46-6); Nowicki Decl.

(Dkt. No. 46-8); *see also* Defendants' Local Rule 7.1(a)(3) Statement (Dkt.

No. 46-1) ¶¶ 49-50.

2.     Food Package and Media Access Policies

Plaintiff complains that residents are prohibited from receiving food

packages until they reach Phase II of the SOTP program and that his

access to local new channels on television, hometown newspapers, and

periodicals is restricted.  The food package policy was enacted by the

CNYPC Cabinet as a means of both controlling the entry of contraband

into the facility and to monitor and control diet for patients, many of whom

are prone to weight issues given the nature of their illnesses and the side

effects of their psycho-tropic medications.  Amidon Decl. (Dkt. No. 46-3)

¶¶ 6-13; Maxymillian Decl. (Dkt. No. 46-6) ¶¶ 8-13.  The media access

policy was designed as a means of protecting staff members against

27

disclosure to patients, through media reports, of personal information concerning their families and residences.  Maxymillian Decl. (Dkt. No. 46-6) ¶¶ 53-57; Stapholz Decl. (Dkt. No. 46-11) ¶¶ 9-10; Bullivant Decl. (Dkt. No. 46-5) ¶ 7; Sawyer Decl. (Dkt. No. 46-10) ¶¶ 19-21.  Both policies are reasonably related to state interests and in any event represent only a *de minimis* interference with plaintiff's liberty.  *See Buthy*, 818 F.2d at 1051.

### 3.    Clothing Allowance Policy

One of plaintiff's complaints also concerns the failure to provide a clothing allowance to residents at the Center.  "It cannot be disputed that [CNYPC] residents have a constitutional right to adequate food, shelter, clothing and medical care."  *Soc'y for Good Will To Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1243 (2d Cir. 1984) (citing *Youngberg*, 457 U.S. at 316, 102 C.T. at 2458)   Neither the constitution nor state law, however, requires that CNYPC inmates be given a clothing allowance or be permitted to purchase clothing of their choice.  *See* N.Y. Mental Hyg. Law § 33.02(a)(3) (mandating that residents of mental health facilities be provided with "appropriate personal clothing for residents of hospital and developmental centers").  There is nothing in the record that suggests that the clothing provided to plaintiff was dirty, ill-fitting or otherwise affected his basic needs.  Instead, it is evident that plaintiff merely wishes to wear

clothing of his own choosing.  As defendants' submissions reflect, and indeed plaintiff's complaint confirms, *see* Amended Complaint (Dkt. No. 5) ¶ 22, residents at the facility are provided with appropriate clothing while confined for treatment, including pants, polo shirts, sweatshirts, sneakers, boots and coats.  Nowicki Decl (Dkt. No. 46-8) ¶ 39; Amended Complaint (Dkt. No. 5) ¶ 22.  This is all that the constitution requires.  *Cf.  Soc'y for Good Will To Retarded Children*, 737 F.2d at 1245 (noting that failure to provide adaptive clothing to involuntarily committed mentally challenged residents may deprive them of an opportunity to retain basic self-care skills such as dressing and toileting themselves, which would be a separate constitutional violation).

### 4.    Telephone Usage Policy

Residents undergoing SOTP treatment at the Center are subject to a telephone use policy, which was first implemented in August of 2007 and has been revised since that time.  Maxymillian Decl. (Dkt. No. 46-6) ¶ 14 and Exh. B.  Plaintiff also challenges this policy and its stringent restriction on telephone usage.  That policy was implemented in attempt to strike a balance between providing residents with the opportunity to freely communicate with others outside of the facility and the obligation to maintain the safety and security of the treatment Center and its residents.

*Id*. at ¶¶ 14-26; *see also* Nowicki Decl. (Dkt. No. 46-8) ¶¶ 18-19, 35-38.

Pursuant to the policy, patients are permitted to place and receive legal

calls in privacy, and the original restriction of the purchase of AT&T

telephone minutes to twenty dollars per month was modified to permit the

purchase of a unlimited monthly minutes at rates prescribed by that

carrier.  Nowicki Decl. (Dkt. No. 46-8) ¶¶ 18-19, 35-38.  The court finds no

constitutional shortcomings with regard to that policy, which appears to be

rationally related to legitimate OMH interests.

     5.   Search Policy

Plaintiff also challenges the CNYPC SOTP resident search policy,

which was first instituted on May 25, 2007 and was superceded by a

"Contraband Search Policy", which became effective on June 30, 2009.

*See* Maxymillian Decl. (Dkt. No. 46-6) ¶ 59.  As an involuntarily committed

patient, the plaintiff is entitled to some protection under the Fourth

Amendment; courts have recognized that although civilly committed

patients do not have an expectation of privacy equal to an individual in

society generally, they do not "check their constitutional rights at the

door".  *Aiken v. Nixon*, 236 F. Supp.2d 211, 233 (N.D.N.Y. 2002); *see also*

*Jennings v. New York State Office of Mental Health*, 786 F.Supp. 376,

382, 384 (S.D.N.Y. 1992), *aff'd*, 977 F.2d 731 (2d Cir. 1992).  The privacy

expectation of the involuntarily committed must be balanced against "the societal interest in protecting the health, safety, and welfare of the patients and staff of these units who would be detrimentally affected without sufficient precautionary measures."  *Aiken*, 236 F.Supp.2d at 232-33 (*citing Jennings*, 786 F.Supp. at  382-84).

The policy at issue in this case authorizes staff to conduct routine or random room searches; non-routine searches of rooms occupied by specific residents may only be conducted when there is an individualized suspicion that the resident is in possession of contraband or when the resident moves to another unit.  Maxymillian Decl. (Dkt. No. 46-6) ¶¶ 62-64.  The CNYPC-SOTP Contraband Search Policy was enacted in order to further the requirement of maintaining a safe and therapeutic environment for residents, staff and visitors, and to detect and remove contraband from the Center, recognizing that certain materials or items have the potential to cause harm and others may interference with treatment.  *See* Maxymillian Decl. (Dkt. No. 46-6)   ¶¶ 58-66; *see also* Nowicki Decl. (Dkt. No. 46-8) ¶¶ 22-25, 40-45.  The search policy is thus rationally related to legitimate state interests and does not violate either the Fourth or Fourteenth Amendments.

6.    MOD Policies and Procedures

Additionally, plaintiff challenges the MOD policies and practices at the facility.  Use of the MOD unit to treat residents is not regarded at the Center as a form of punishment, but instead as "a treatment modality designed to segregate and provide group therapy to individuals whose aggressive behavior make their continued participation in traditional SOTP treatment groups, with residents who are making progress and maintaining themselves in traditional SOTP treatment tracks, contra-therapeutic."  Sawyer Decl. (Dkt. 46-10) ¶ 24.  As residents in the MOD unit begin to demonstrate improved behavior they are gradually permitted to reenter the mainstream SOTP program.  Maxymillian Decl. (Dkt. No. 46-6) ¶¶ 44-52.  The court defers to the professional judgment of treatment providers at the Center, including to determine the appropriate treatment modality, and finds no constitutional infirmity in the use of the MOD unit for that purpose.  *Buthy*, 818 F.2d at 1050.

### 7.   Access To Court

The one allegation that gives room for pause concerns procedures which, whether directly or indirectly, have allegedly impacted upon plaintiff's right to court access.  Those claims include both alleged restriction on access to legal materials and restrictions on outside communications, including with attorneys.

32

"The First Amendment Guarantees the right to 'petition the Government for a redress of grievances.'" *McKithen v. Brown*, 565 F.Supp.2d 440, 458 (E.D.N.Y. 2008) (quoting U.S. Const. amend. I). Out of the Petition Clause of that amendment arises the right of access to courts, *City of New York v. Beretta U.S.A Corp.*, 524 F.3d 384, 397-98 (2d Cir. 2008), *cert. denied* 129 S.Ct. 1579 (2009). Undeniably the civilly committed patients at the Center, like convicted inmates, enjoy a First Amendment right of meaningful access to the courts. *Lane v. Carpinello*, No. 9:07-cv-751, 2009 WL 3074344, at * 24 (N.D.N.Y. Sept. 24, 2009) (Sharpe, D.J. and Peebles, M.J.). In its instructive decision in *Bounds*, the Supreme Court held that this right of access requires prison authorities "to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law[,]" *Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498. The Court later clarified that

> prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense.

*Lewis v. Casey*, 518 U.S. 343, 351, 116 S.Ct. 2174, 2180 (1996) (internal quotations and citations omitted).  Instead, a prison inmate "must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.*  From this it seems clear that to establish a violation of the right of access to the courts, a plaintiff must demonstrate that a defendants interference caused him or her actual injury – that is, that a "nonfrivolous legal claim had been frustrated or was being impeded" as a result of the defendant's conduct.  *Id.* at 353, 116 S.Ct. at 2181.

In this instance, plaintiff alleges that defendants have interfered with his right of access to the courts in wholly conclusory fashion.  Neither plaintiff's complaint, however, nor the record before the court reveals any prejudice resulting from defendants' actions.  In light of plaintiff's inability to establish this essential element of a court access claim, I find no basis to conclude that his First Amendment right of court access has been violated through implementation of the challenged policies at the Center.

In sum, when balanced against the significant state interests implicated, the relatively minimal restrictions on plaintiff's protected interests imposed by the policies now challenged did not arise to a level of

constitutional significance.  *See, e.g.*, *Buthy*, 818 F. 2d at 1050 n. 4 (*de minimis* restrictions relating to meals, exercise, sleeping hours, and other aspects of daily institutional life are mere incidental elements in the organized caretaking of those confined); *Merryfield v. Jordan*, No. 07-3289, 2008 U.S. Dist. 15074, at * (D. Kansas Feb. 26, 2008) (sex offender treatment patient's disgruntlement with loss of privileges for non-participation or in appropriate behavior insufficient to establish a constitutional claim); *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 n.7 (8th Cir. 2006) (denial of access to canteen, outside vendors and computer constitute *de minimis* restrictions "with which the Constitution is not concerned") (citations omitted); *William v. Nelson,* 398 F. Supp.2d 977, 987-981(W.D. Wis. 2005) (no constitutional violation occurred where in professional judgment, plaintiff was transferred to an alternative track treatment which resulted in suspension from participating in sex offender treatment).  I therefore recommend dismissal of those portions of plaintiff's claims.

G.    Equal Protection

Among plaintiff's claims is his contention that the treatment which he and other patients received at the CNYPC differs markedly from those experienced previously by him while a patient at the St. Lawrence

Psychiatric Center ("St. Lawrence"), another OMH facility located in Ogdensburg, New York.  This fact, he maintains, establishes a deprivation of equal protection.

The Equal Protection Clause directs state actors to treat similarly situated people alike.  *See City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985).  To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class.  *See Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia*, *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)).  The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests."  *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

When analyzing plaintiff's equal protection claim, it should be noted that plaintiff has been adjudicated as a "dangerous sex offender requiring commitment to a secured treatment facility" under a statutory provision

arising out of specific findings that "sex offenders in need of civil commitment are at different population from traditional mental health patients, who have different treatment needs in particular vulnerabilities." N.Y. Mental Hyg. Law § 10.01(g).  It should also be emphasized that the populations at the two OMH facilities differ markedly, in that St. Lawrence is used to house and treat persons with serious Axis I mental illnesses, whereas the CNYPC is utilized to treat persons with mental abnormalities diagnosed as Axis II personality disorders, and as such each operates under a separate set of policies and procedures.  *See* Nowicki Decl. (Dkt. No. 46-8) ¶¶ 13-14;  Defendants' Local Rule 7.1(a)(3) Statement ¶¶ 76-78.  Managing patients with the high degrees of psychopathy and anti-social personality disorders, such as those found at the Center, requires heightened vigilance in order to properly maintain security. Nowicki Decl. (Dkt. No. 46-8) ¶¶ 15-16.

The uncontroverted record in this case reveals that there are significant distinguishing characteristics between inmates at St. Lawrence and those like the plaintiff confined in the Center.  The record also reflects that any differential in treatment of inmates between the two facilities represents a rational means to a legitimate end - maintaining inmate population security - thereby negating plaintiff's Equal Protection Claim.

*Yeldon v. Hogan*, No. 9:08-CV-769, 2010 WL 983819, at *5-6 (N.D.N.Y. Mar. 15, 2010) (Mordue, C.J. and Treece, M.J.).

     H.    Qualified Immunity

     In their motion defendants assert that even if the policies, practices, and occurrences forming the basis for plaintiff's complaint resulted in constitutional deprivations, they are nonetheless entitled to qualified immunity.  Defendants base this claim principally upon the fact that the policies and issues were collaboratively developed, with input and review from various professionals, and were specifically analyzed by OMH counsel for compliance with state and federal laws.

     Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted).  "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed."  *Kelsey v. County of Schoharie*, 567 F.3d 54, 61 (2d Cir. 2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615,

119 S.Ct. 1692 (1999)).  The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. ___, 129 S.Ct. 808, 815 (2009) .

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims."  *Pearson*, 129 S.Ct. at 816.  The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[12] *Kelsey*, 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415, 430 n.9 (citing *Saucier*).[13]  Expressly recognizing that the purpose of the qualified

---

[12]    In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.

[13]    In *Okin*, the Second Circuit clarified that the "'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful."  *Okin*, 577 F.3d at 433, n.11 (citation omitted).

immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the . . . prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[14] *Pearson*, 129 S.Ct. at 818, 821.  In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so."  *Kelsey*, 567 F.3d at 61(citing *Pearson*, 129 S.Ct. at 821) (emphasis in original).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs . . . should be addressed in light of the circumstances in the particular case at hand.'" *Okin*, 577 F.3d 430

---

[14]   Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability. . .", *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson*, 129 S.Ct. at 815 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 524 (1991) (per curiam)).

n.9 (quoting *Pearson*).  "The [*Saucier* two-step] inquiry is said to be

appropriate in those cases where 'discussion of why the relevant facts do

not violate clearly established law may make it apparent that in fact the

relevant facts do not make out a constitutional violation at all.'" *Kelsey*,

567 F.3d at 61 (quoting *Pearson*, 129 S.Ct. at 818).

        In this instance, analysis of the second prong of the *Saucier* protocol

readily reveals a basis for finding qualified immunity.  The law regarding

application of the Fourteenth Amendment's Due Process clause to

conditions of confinement experienced by civilly committed sex offenders

under Article 10 of the MHL, which was only enacted in 2007, was

anything but clearly established at the relevant times; indeed, the statute

only became effective on April 13, 2007, and plaintiff was civilly committed

to CNYPC just eight months later.  *See Carney v. Hogan*, Nos. 9:08-CV-

1251, 9:08-CV-1280, 2010 WL 2519121, at * 5-6 (N.D.N.Y. Mar. 30, 2010)

(Baxter, M.J.); *Pratt v. Hogan*, 631 F. Supp.2d. 192, 198 (N.D.N.Y. 2009)

(Hurd, D.J.).  Moreover, the careful steps taken to study and enact the

disputed policies and precautions implemented to ensure their compliance

with state and federal mandates, in my judgment, entitles the defendants

who participated in the preparation and the implementing of those policies

to qualified immunity.  Under the circumstances presented, I have

concluded that defendants are immune from suit.

I.      State Law And Constitutional Violations

Interspersed within plaintiff's complaint, including the portion addressing his causes of action, are references to alleged violations of the state constitution and statutory provisions.  *See, e.g.,* Amended Complaint (Dkt. No. 5) ¶ 27.  Defendants maintain that any state law or constitutional claims are not actionable under section 1983, and that the court should not exercise supplemental jurisdiction to entertain them as pendent state law claims.

It is well-established that claimed violations of state constitutional and statutory provisions in and of themselves do not support a claim under 42 U.S.C. § 1983.  *Cusamano v. Sobek*, 604 F. Supp.2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases).  Such claims may, however, be  considered as pendent state law claims over which the court may, in its discretion, chose to exercise supplemental jurisdiction.  28 U.S.C. § 1367; *see also Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*, 464 F.2d 255, 263 (2d Cir. 2006).  In this instance, even if I were to conclude that these state law claims were not precluded, I would recommend that the court not exercise pendent jurisdiction over such claims, "pursuant to 28 U.S.C. § 1367, which authorizes a federal court to

42

decline supplemental jurisdiction over a state claim if all of the claims over which the court had original jurisdiction were dismissed." *Stephenson v. Albany County Policymakers*, Civ. No. 6:09-CV-326, 2009 WL 2922805, at *2 (N.D.N.Y. Aug. 14, 2009) (Kahn, J. & Treece, M.J.) (citing 28 U.S.C. § 1367(c)(3)).

    J.    <u>Dismissal of Claims Against Unserved Defendant</u>

One of the defendants in this action, Edwin Gwyther, has never appeared in the action, nor does it seem that he has been served.  Given the court's recommendation that summary judgment be entered dismissing plaintiff's claims against the other defendants, a question arises as to whether the action should remain open indefinitely in order to permit plaintiff to pursue his claims against this defendant, despite the fact that they appear destined to fail.

Although defendant's motion does not explicitly request this relief, the court *sua sponte* has determined to raise the question of whether plaintiff's claims should proceed against the unserved defendant.  This decision to raise the issue is bottomed upon the requirement, imposed by Rule 4(m) of the Federal Rules of Civil Procedure, that service be made within 120 days of issuance of the summons, absent a court order

extending that period.[15]  "[W]here good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp.*, 94 F.3d 338, 340 (7th Cir. 1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time."  *Id.* (citing Fed. R. Civ. P. 4(m)); *Zapata v. City of New York*, 502 F.3d 192, 196 (2d Cir. 2007) ("[D]istrict courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (2d Cir. 1986). When examining whether to extend the prescribed period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause.  *See Zapata*, 502 F.3d at 197.

---

[15]     That rule provides that

> [i]f a defendant is not served within 120 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time.  But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period. . . .

Fed. R. Civ. P. 4(m). This court's local rules shorten the time for service from the 120 day period under Rule 4(m) to sixty days.  *See* N.D.N.Y.L.R. 4.1(b).

44

A plaintiff's *pro se* status entitles him or her to a certain degree of leniency insofar as service of process is concerned; courts generally favor resolution of a case on its merits rather than on the basis of a procedural technicality. *Poulakis v. Amtrak*, 139 F.R.D. 107, 109 (N.D. Ill. 1991). When a plaintiff proceeds *in forma pauperis*, such as is the case here, the court is obligated to issue the plaintiff's process to the United States Marshal, who must in turn effect service upon the defendants, thereby relieving the plaintiff of the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint. *Byrd v. Stone*, 94 F.3d 217, 219 (6th Cir. 1996). This does not mean, however, that a *pro se* plaintiff may stand idly by upon being notified that efforts by the U.S. Marshals Service to serve a particular defendant have been unsuccessful. *VanDiver v. Martin*, 304 F. Supp. 2d 934, 938-43 (E.D. Mich. 2004). Rather, upon receiving notice that service has not been effectuated it is incumbent upon the plaintiff to develop, though pretrial discovery or otherwise, any additional information necessary to permit service by the United States Marshals Service. *See VanDiver*, 304 F. Supp. 2d at 942.

The court's records reflect that this action was commenced on February 11, 2008, and summonses were issued by the clerk to the

45

various defendants, including Edward Gwyther, on May 30, 2008.  See

Dkt. Nos. 1, 7.  While all other named defendants were successfully

served, the summons issued for defendant Gwyther was returned on or

about July 15, 2008 as unexecuted.  Dkt. No. 19.  After a brief exchange

of communications between the court and the New York State Department

of Correctional Services ("DOCS"), through which it was established that

defendant Gwyther was not a DOCS employee, *see* Dkt. Nos. 31, 32, a

summons was reissued for that defendant by the clerk on October 17,

2008 and forwarded for service upon him at the OMH.  Dkt. No. 36.  That

summons was again returned unexecuted, this time with an

accompanying letter from an OMH deputy counsel for litigation indicating

that "Mr. Gwyther no longer works at CNYPC, for OMH or for any other

OMH facility in the State." Dkt. No. 38.  Since that time plaintiff has made

no effort to obtain jurisdiction over defendant Gwyther.

I am mindful of the Second Circuit's recent decision cautioning that

care should be taken before dismissal of *pro se* claims against defendants

who cannot be located.  *Murray v. Pataki*, No. 09-1657, 2010 WL

2025613, at *2 (2d Cir. May 24, 2010) (summary order) (cited in

accordance with Fed.R.App.Pr. 32.1). In my view, however, given my

recommendation that the claims against the remaining defendants who

have appeared in the action be dismissed, no useful purpose would be

served keeping this case open, particularly since dismissal would

undoubtedly be warranted with regard to the claims against defendant

Gwyther on the same bases as is noted in my report.  Accordingly, I

recommend dismissal of plaintiff's claims against that defendant, though

without prejudice.

IV.     SUMMARY AND RECOMMENDATION

Plaintiff's complaint in this action challenges various policies and

practices implemented with respect to the SOTP administered at the

Center pursuant to statutory mandate.  Plaintiff's allegations, however, fail

to implicate personal involvement on the part of Dr. Hogan, the Director of

the OMH, who is entitled to dismissal of the claims against him on this

basis.  Additionally, addressing the merits, plaintiff's claims are deficient in

that they do not establish a violation of any constitutional provision, and no

reasonable factfinder could conclude otherwise.  Further, in the event of a

finding of a constitutional violation, I nonetheless conclude that

defendants should be afforded qualified immunity based upon the fact that

their actions were taken collaboratively, and in their professional

judgment, in order to meet the requirements of the New York State

Legislature in its 2007 enactment of the Mental Hygiene Law Article 10,

and did not violate any clearly established constitutional right of which a reasonable person should have known.

Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 46) be GRANTED, and that plaintiff's complaint in this action be dismissed in all respects;  and it is further

RECOMMENDED that plaintiff's claims against defendant Edwin Gwyther, who has neither been served nor appeared in the action, be DISMISSED *sua sponte*, without prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk revise court records in this case to reflect that the correct spelling of the last names for defendants Nowicki, Meyer, and Amidon and the first name for defendant Bill; and that it is further

ORDERED, that the clerk of the court serve a copy of this report and

recommendation upon the parties in accordance with this court's local

rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      August 17, 2010
            Syracuse, NY



Not Reported in F.Supp., 1989 WL 28416 (S.D.N.Y.)
(Cite as: 1989 WL 28416 (S.D.N.Y.))

**H** Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Thomas McLEOD, individually and on behalf of all
persons similarly situated Plaintiffs,
v.
Matthew T. CROSSON, in his official capacity as Chief
Court Administrator of The State of New York, Hon.
Adrienne Hoffman Scancarelli, in her official capacity
as Judge, Family Court of The State of New York, and
Supervising Judge, Ninth Judicial District, Family
Courts of The State of New York, and on behalf of all
Family Court Judges and acting Family Court Judges of
the State of New York, Defendants.
**No. 89 CIV. 1952.**

March 21, 1989.

*MEMORANDUM OPINION AND ORDER*

*HAIGHT, District Judge:*

**\*1** Plaintiff brings this action pro se against the above captioned defendants acting in their official capacities. Plaintiff applies for leave to proceed in forma pauperis. Consequently the Court has considered the complaint in accordance with 28 U.S.C. § 1915. Plaintiff's application was submitted to the undersigned sitting in Part I. I address the issues with the telephoned approval of Chief Judge Brieant, presently sitting in White Plains, to whom such petitions are normally referred. Plaintiff requested that the matter be expedited.

For the reasons which follow, plaintiff is permitted to proceed in forma pauperis, but the complaint must be dismissed.

Since August 1987, plaintiff has been engaged in litigation in the Family Court of the State of New York, County of Westchester. The adverse party in that litigation is Nancy Udell, from whom plaintiff was divorced in 1985. According to plaintiff's complaint, as the result of proceedings in the Commonwealth of Massachusetts the action in the Westchester Family Court was commenced by Ms. Udell to enjoin plaintiff from publishing materials relating to their Massachusetts divorce, as well as to enjoin plaintiff's subsequent efforts to enforce his parental visiting rights. Further, according to the complaint, prior to the August 1987 action there was also pending in the Westchester Family Court an action brought by Ms. Udell to enforce support and property distribution provisions from the Massachusetts divorce judgment.

Plaintiff allegedly enjoys the support of numerous individuals, many of whom he alleges are members of the Father's Rights Association of Greater New York, an organization advocating fairness in child support awards and increased participation in child upbringing by non-custodial parents.

Plaintiff's complaint alleges that defendant Scancarelli, the Family Court judge in charge of the litigation, improperly denied access to the courtroom to plaintiff's supporters and members of the public during hearings held in August and September, 1987. These allegedly "secret proceedings" are said to violate the United States Constitution. In addition, plaintiff complains of the procedures by which Judge Scancarelli held plaintiff in contempt and incarcerated him, within the context of orders to furnish child support.

The complaint seeks declaratory and injunctive relief, on the basis of plaintiff's assertions that various provisions of the New York Family Court Act violate the federal Constitution. Plaintiff prays for this relief on his behalf, and on behalf of a purported class of individuals who are or may become respondents in support proceedings under that statute. He also seeks to certify a defendant class of Family Court judges and administrators.

Even if plaintiff's complaint alleged a viable federal cause of action, it could not proceed as a class action. It is well

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1989 WL 28416 (S.D.N.Y.)
(Cite as: 1989 WL 28416 (S.D.N.Y.))

settled in this circuit that pro se plaintiffs cannot act as class representatives. They do not satisfy the requirements of Rule 23(a)(4), F.R.Civ.P. Plaintiff at bar proposes to meet that obstacle by expressing an intent to identify class members represented by counsel willing to undertake the case, or by petitioning the court for the appointment of counsel pro bono. These expressions are insufficient to take the case out of the customary rule.

**\*2** Turning to plaintiff's claim, we must recognize that the subject matter jurisdiction of the federal district courts is limited. *See generally Moore's Federal Practice* § 0.60[3] at pp. 620-21 (2d ed. 1984). A party seeking relief in the district court must at least plead facts which bring the suit within the court's jurisdiction. *See* Fed.R.Civ.P. 8(a). Failure to plead such facts warrants dismissal of the action. Fed.R.Civ.P. 12(h)(3); *Williams v. United States*, 405 F.2d 951, 954 (9th Cir.1969).

This pro se complaint is, of course, entitled to a close and sympathetic reading. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). Notwithstanding that entitlement, the complaint at bar does not state a viable federal claim. Insofar as it constitutes an effort to seek federal judicial relief in a child custody matter, it is well settled that federal courts will not accept jurisdiction in domestic relations cases, and this rule encompasses child custody cases. *See Bossom v. Bossom*, 551 F.2d 474 (2d Cir.1976); *Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel*, 490 F.2d 509 (2d Cir.1973).

Insofar as plaintiff seeks an order broadly affecting the ongoing state proceeding in his case, the complaint must be dismissed on a different ground: the doctrine of abstention. It is well settled that federal courts cannot intervene in ongoing state court proceedings except in the most extraordinary circumstances and upon a clear showing of both great and immediate harm. This is true in state criminal proceedings, *Younger v. Harris*, 401 U.S. 37 (1971); and the same principles apply in respect of state civil proceedings, as the Supreme Court recently held in *Pennzoil Co. v. Texaco, Inc.*, 107 S.Ct. 1519 (1987). In the instant complaint, plaintiff fails to allege any circumstances which might rebut the presumptive application of the *Younger* abstention doctrine (such as lack of opportunity to present the federal claims in the state proceeding). *Juidice v. Vail*, 430 U.S. 327, 337

(1977). *Pennzoil Co. v. Texaco, Inc., supra,* requires that the "federal courts abstain from subjecting pending state civil proceedings to federal constitutional scrutiny if the State's interest in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and the National Government." 107 S.Ct. at 1526. Obviously the State of New York has an vital interest in a broad-scale constitutional attack upon the validity of its Family Court Act. Plaintiff's remedy in the first instance is to appeal to the state appellate courts, who are fully competent to adjudicate federal constitutional questions. "[W]hen a litigant has not attempted to present his federal claims in related state court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary." *Pennzoil Co. v. Texaco, Co., supra,* at 1528.

**\*3** For the foregoing reasons, the complaint, filed informa pauperis under 28 U.S.C. § 1915(a), is dismissed, without prejudice. It is frivolous within the meaning of § 1915(d). We certify that any appeal from this order in forma pauperis would not be taken in good faith because such an appeal would be frivolous. 28 U.S.C. § 1915(a); *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

It is SO ORDERED.

S.D.N.Y.,1989.
McLeod v. Crosson
Not Reported in F.Supp., 1989 WL 28416 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)
(Cite as: 1998 WL 278264 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Anthony ROBINSON, Plaintiff,
v.
Jane DELGADO, Hearing Officer and Lieutenant; and
Donald Selsky, Director of Inmate Special Housing
Program, Defendants.
**No. 96-CV-169 (RSP/DNH).**

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for
Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, Ellen Lacy
Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

**\*1** Anthony Robinson, a former inmate incarcerated by the
New York State Department of Corrections ("DOCS"),
sued two DOCS employees, alleging that they violated his
right to due process in the course of a disciplinary
proceeding and subsequent appeal. On September 9, 1997,
defendants moved for summary judgment. Defendants
argued that plaintiff failed to demonstrate that the fifty
days of keeplock confinement that he received as a result
of the hearing deprived him of a liberty interest within the
meaning of the Due Process Clause. Plaintiff did not
oppose the summary judgment motion, and Magistrate
Judge David N. Hurd recommended that I grant it in a
report-recommendation filed April 16, 1998. Plaintiff did
not file objections.

Because plaintiff did not file objections, I "need only
satisfy [myself] that there is no clear error on the face of
the record in order to accept the recommendation."
Fed.R.Civ.P. 72(b) advisory committee's note. After
reviewing the record, I conclude that there is no clear error
on the face of the record. After being warned by
defendants' motion that he must offer proof in admissible
form that his disciplinary confinement imposed an
"atypical and significant hardship on the inmate in relation
to the ordinary incidents of prison life," Robinson failed
to offer any such proof. *Sandin v. Conner,* 515 U.S. 472,
115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995).
Consequently, he cannot maintain a due process challenge.
*Id.* Therefore, it is

ORDERED that the report-recommendation is approved;
and it is further

ORDERED that defendants' motion for summary
judgment is granted and the complaint dismissed; and it is
further

ORDERED that the Clerk of the Court serve a copy of this
order on the parties by ordinary mail.
HURD, Magistrate J.

REPORT-RECOMMENDATION

The above civil rights action has been referred to the
undersigned for Report and Recommendation by the
Honorable Rosemary S. Pooler, pursuant to the local rules
of the Northern District of New York. The plaintiff
commenced the above action pursuant to 42 U.S.C. § 1983
claiming that the defendants violated his Fifth, Eighth, and
Fourteenth Amendment rights under the United States
Constitution. The plaintiff seeks compensatory and
punitive damages.

Presently before the court is defendants' motion for
summary judgment pursuant to Fed R. Civ. P. 56.
However:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)
(Cite as: 1998 WL 278264 (N.D.N.Y.))

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

**\*2** The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d

15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1998.
Robinson v. Delgado
Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Marcus COTTO, Plaintiff,
v.
Daniel SENKOWSKI, Superintendent of Clinton Annex; T.J. Howard, Hearing Officer; J. Maggy, Sergeant; Byron Wind, Officer; Barry Rock, Officer; and Philip Coombe, Jr., Acting Commissioner, Defendants.
No. 95-CV-1733 (RSP/DNH).

Oct. 23, 1997.

Marcus Cotto, Plaintiff, pro se, Auburn Correctional Facility, Auburn, New York.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Attorney for Defendants, Albany, New York, Darren O'Connor, Esq., Asst. Attorney General, of Counsel.

MEMORANDUM DECISION AND ORDER

POOLER, D.J.

**\*1** This matter comes to me following a report-recommendation by Magistrate Judge David N. Hurd, duly filed on the 29th of August, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

In his *pro se* complaint, Cotto alleges that in August 1995, he and some other inmates were attacked while incarcerated at Clinton Correctional Facility. Compl., Dkt. No. 1, ¶ 2. Cotto alleges that as a result of this incident he

was charged with engaging in violent conduct and conduct which disturbed the order of the facility. *Id.* Although Cotto was found guilty of these charges and sentenced to a term of one year in the Special Housing Unit and loss of six months good time, his sentence was reversed on administrative appeal. *Id.* Cotto brought this action pursuant to 42 U.S.C. § 1983, alleging various violations of his rights under the Eighth and Fourteenth Amendments. *Id.*

By motion filed March 3, 1997, defendants sought summary judgment. Dkt. No. 17. Plaintiff filed no papers in opposition to the motion. In his report-recommendation, the magistrate judge recommended that I grant defendants' motion pursuant to Local Rule 7.1(b)(3), which provides that, absent a showing of good cause, failure to respond to a motion shall be deemed consent to the relief requested. Dkt. No. 19, at 2. Cotto has filed no objections to the report-recommendation.

After careful review of all of the papers herein, including the magistrate judge's report-recommendation, it is

ORDERED that the report-recommendation is hereby approved, and it is further

ORDERED that defendants' motion for summary judgement is GRANTED and the complaint against them dismissed in its entirety, and it is further

ORDERED that the Clerk of the Clerk serve a copy of this order on the parties by regular mail.

IT IS SO ORDERED.
DAVID N. HURD, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter was referred to the undersigned by the Honorable Rosemary S. Pooler, for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

Report-Recommendation pursuant to the Local Rules of the Northern District of New York.

Plaintiff commenced the above § 1983 action making various allegations regarding violations of his civil rights under the United States Constitution. Pursuant to Fed.R.Civ.P. 56, the defendants have moved for summary judgment alleging that there is no genuine issue as to any material fact and that as a matter of law they are entitled to judgment.

The defendants have filed a motion pursuant to Fed.R.Civ.P. 56 granting summary judgment in favor of the defendants on grounds including that there is no genuine issue as to any material fact, and that the defendant is entitled to judgment as a matter of law.

It is now more than ninety days beyond the date when the response papers were due, and the plaintiff has not filed any papers in opposition to the motion. "Failure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." Rules of U.S. Dist. Ct. for Northern Dist. of N.Y., L .R. 7.1(b)(3).

*2 NOW, upon careful consideration of the notice of motion, statement pursuant to Local Rule 7.1(F), with exhibits attached, and the memorandum of law submitted in support of the defendants' motion; and there being no opposition to the motion, it is

RECOMMENDED that the motion be granted and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(I), the parties have ten days within which to file written objections to the foregoing report. Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert denied, 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(I);

Fed.R.Civ.P. 72, 6(a), 6(e); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993); Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1997.
Cotto v. Senkowski
Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph
Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for
Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse
University ("University") pursuant to 20 U.S.C. § 1681 *et
seq.* ("Title IX") claiming hostile educational
environment, and retaliation for complaints of same.
Presently before the court is the University's motion for
summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are
affected by plaintiff's failure to file a Statement of Material
Facts which complies with the clear mandate of Local
Rule 7.1(a)(3) of the Northern District of New York. This

Rule requires a motion for summary judgment to contain
a Statement of Material Facts with specific citations to the
record where those facts are established. A similar
obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of
Material Facts. The non-movant's response shall mirror the
movant's Statement of Material Facts by admitting and/or
denying each of the movant's assertions in matching
numbered paragraphs. Each denial shall set forth a specific
citation to the record where the factual issue arises.... *Any
facts set forth in the [movant's] Statement of material
Facts shall be deemed admitted unless specifically
controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an
eleven page, twenty-nine paragraph Statement of Material
Facts, replete with citations to the record in every
paragraph. Plaintiff, in opposition, filed a two page, nine
paragraph statement appended to her memorandum of law
which failed to admit or deny the specific assertions set
forth by defendant, and which failed to contain a single
citation to the record. Plaintiff has thus failed to comply
with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules
are not suggestions, but impose procedural requirements
upon parties litigating in this District." *Osier v. Broome
County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a
consequence, courts in this district have not hesitated to
enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) FN1
by deeming the facts asserted in a movant's proper
Statement of Material Facts as admitted, when, as here, the
opposing party has failed to comply with the Rule. *See,
e.g., Phipps v. New York State Dep't of Labor,* 53
F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v.
Car-Freshner Corp.,* 49 F.Supp.2d 84, 86
(N.D.N.Y.1999); *Osier,* 47 F.Supp .2d at 317; *Nicholson
v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,
Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL
903629, at \*1 n. 1 (N.D .N.Y.1998); *Costello v.. Norton,*
1998 WL 743710, at \*1 n. 2 (N.D.N.Y.1998); *Squair v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1
n. 2 (N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's
Child and Family Studies ("CFS") department in the
Spring of 1995. Successful completion of the doctoral
program required a student to (1) complete 60 credit hours
of course work; (2) pass written comprehensive
examinations ("comp.exams") in the areas of research
methods, child development, family theory and a specialty
area; (3) after passing all four comp. exams, orally defend
the written answers to those exams; (4) then select a
dissertation topic and have the proposal for the topic
approved; and (5) finally write and orally defend the
dissertation. Plaintiff failed to progress beyond the first
step.

Each student is assigned an advisor, though it is not
uncommon for students to change advisors during the
course of their studies, for a myriad of reasons. The
advisor's role is to guide the student in regard to course
selection and academic progress. A tenured member of the
CFS department, Dr. Jaipaul Roopnarine, was assigned as
plaintiff's advisor.

As a student's comp. exams near, he or she selects an
examination committee, usually consisting of three faculty
members, including the student's advisor. This committee
writes the questions which comprise the student's comp.
exams, and provides the student with guidance and
assistance in preparing for the exams. Each member of the
committee writes one exam; one member writes two. Two
evaluators grade each exam; ordinarily the faculty member
who wrote the question, and one other faculty member
selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising

duties, was the coordinator of exams for the entire CFS
department. In this capacity, he was generally responsible
for selecting the evaluators who would grade each
student's comp. exam, distributing the student's answer to
the evaluators for grading, collecting the evaluations, and
compiling the evaluation results.

The evaluators graded an exam in one of three ways:
"pass," "marginal" or "fail." A student who received a
pass from each of the two graders passed that exam. A
student who received two fails from the graders failed the
exam. A pass and a marginal grade allowed the student to
pass. A marginal and a fail grade resulted in a failure. Two
marginal evaluations may result in a committee having to
decide whether the student would be given a passing
grade. In cases where a student was given both a pass and
a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions
independently of each other, and no indication of the
student's identity was provided on the answer. FN2 The
coordinator, Roopnarine, had no discretion in compiling
these grades-he simply applied the pass or fail formula
described above in announcing whether a student passed
or failed the comp. exams. Only after a student passed all
four written exam questions would he or she be permitted
to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of
the evaluators may have written the question, and
the question may have been specific to just that
one student, one of the two or three evaluators
may have known the student's identity regardless
of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took
the comp. exams in October of 1996. Plaintiff passed two
of the exams, family theory and specialty, but failed two,
child development and research methods. On each of the
exams she failed, she had one marginal grade, and one
failing grade. Roopnarine, as a member of her committee,
authored and graded two of her exams. She passed one of
them, specialty, and failed the other, research methods.
Roopnarine, incidently, gave her a pass on specialty, and
a marginal on research methods. Thus it was another
professor who gave her a failing grade on research

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's

College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

>    [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and

otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

*5 The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. *See Torres v. Pisano,* 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, *see Norton v. Sam's Club,* 145 F.3d 114, 117-20 (2d Cir.), *cert. denied,* 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer,* 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

## I. Hostile Environment

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action. *See Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing *Cannon v. University of Chicago,* 441 U.S. 677 (1979) and *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60 (1992)).

## A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. *See Davis,* 119 S.Ct. at 1675 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986), a Title VII case). *Accord Kracunas v. Iona College,* 119 F.3d 80, 87 (2d Cir.1997); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by *Gebser,* 118 S.Ct. at 1999.

FN5. In *Gebser,* 118 S.Ct. at 1999, and *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. *See, e.g., Distasio v. Perkin Elmer Corp.,* 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct, and only then consider whether this conduct is actionable. *See, e.g., Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *See id.*

*6 In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs ., 180 F.3d 426, 436* (alteration in original) (quoting *Harris, 510 U.S. at 21-22)*. From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *See id.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis, 119 S.Ct. at 1675*.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris, 510 U.S. at 21*. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998)*. Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 77 (1998)*. Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *See Harris, 510 U.S. at 23*. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what

psychological harm, if any, resulted from the conduct. *See id.; Richardson, 180 F.3d at 437*.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier, 47 F.Supp.2d at 323*, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn, 159 F.3d at 767* (quoting *Tomka v. Seiler Corp., 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)*). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id. Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir.1992)* ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See, e.g., Gutierrez v. Henoch, 998 F.Supp. 329, 335 (S.D.N.Y.1998)* (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc., 668 F.Supp. 294, 303 (S.D.N.Y.1987)* ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See, e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir.1999)*, this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier, 47 F.Supp.2d at 324*.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressured to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipsis in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to

which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *see supra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation.*" *Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

*9 By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

> FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

> FN7. As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third

exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v. Ohio State Univ.,* 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

> FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

> [FN9.] Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in [plaintiff's] case was inconsistent with these standards.").

CONCLUSION

**\*10** For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

GREENWALDT, Plaintiff,
v.
COUGHLIN, et al., Defendants.
**93 Civ. 6551 (LAP).**

April 19, 1995.

*MEMORANDUM AND ORDER*

PRESKA, District Judge:

**\*1** Plaintiff Paul P. Greenwaldt ("Greenwaldt") brings this prisoner pro se suit under 42 U.S.C. § 1983, claiming that the defendants, employees of the New York State Department of Correctional Services ("NYSDOCS"), violated his constitutional rights. Defendants Thomas A. Coughlin, III ("Coughlin"), Commissioner of NYSDOCS; Anthony J. Annucci ("Annucci"), Deputy Commissioner and Counsel; Susan E. Butler ("Butler"), Deputy Commissioner; Philip Coombe, Jr. ("Coombe"), First Deputy Commissioner; James Recore ("Recore"), Director of the Bureau of Temporary Release and Robert Hanslmaier ("Hanslmaier"), Acting Superintendent of Woodbourne Correctional Facility ("Woodbourne"), have moved to dismiss. Defendant T. J. Miller ("Miller"), Deputy Superintendent of Woodbourne, has not joined in the motion to dismiss. For the reasons given below, the motion is granted.

*BACKGROUND*

Greenwaldt makes numerous allegations against the defendants. On May 21, 1993, Greenwaldt was transferred to Woodbourne, a medium security facility under the jurisdiction of NYSDOCS. (Am. Compl. ¶¶ 1-2.)[FN1] Upon his arrival at Woodbourne, a sergeant allegedly informed Greenwaldt that at Woodbourne visits were permitted only on alternate Saturdays and Sundays, depending on the first letter of the inmate's last name.[FN2] Greenwaldt asked if there were any exceptions possible, and the sergeant told him to write the Deputy Superintendent to request an exception. (Am. Compl. ¶¶ 3-6.) Greenwaldt, an avid letter writer, proceeded to write to various state public officials concerning what he perceived to be discriminatory visitation rules. (Am. Com pl. ¶¶ 8-11.)

Greenwaldt also complains that on June 3, 1993, he was placed in keeplock without a good reason. (Am. Compl. ¶¶ 15-16.) Greenwaldt claims that, at about that time, he was fined five dollars, without explanation or notice. (Am. Compl. ¶ 20.) On June 5, 1993, Greenwaldt claims to have received notice that he had been found guilty of "refusing a direct order...; interfering with an officer; and, [sic] creating a disturbance." (Am. Compl. ¶ 22.) Greenwaldt then wrote to defendants Coughlin, Coombe, Annucci, and Hanslmaier complaining of perceived procedural violations in connection with his disciplinary proceeding. (Am. Compl. ¶¶ 23-25.) On June 8, 1993, Greenwaldt attended a Tier II disciplinary hearing and was found "not guilty of one charge, and guilty of the other charges." (Am. Compl. ¶¶ 26-28.) Greenwaldt appealed this finding. (Am. Compl. ¶ 30.) He also persisted in his complaints regarding the five dollar fine. (Am. Compl. ¶ 33.)

Greenwaldt also claims that a Sargeant Keesler ("Keesler") threatened him. Greenwaldt alleges Keesler told him, "if you continue to complain, I will personally have my officers write you up for every little thing and it will cost you much more than the five dollars ($5.00) we already got." (Am. Compl. ¶ 34.) Greenwaldt claims he immediately wrote to Coughlin, Coombe and Hanslmaier informing them of Keesler's threats. Hanslmaier responded to Greenwaldt in a letter which, according to Greenwaldt "totally disregarded the written complaint." (Am. Compl. ¶ 36.)

**\*2** Greenwaldt also claims that Recore denied his appeal

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

of the disciplinary hearing judgment. (Am. Compl. ¶¶ 37-41.) Displeased, Greenwaldt wrote to Recore, complaining that he did not receive a copy of the decision and alleging the decision was inaccurate. (Am. Compl. ¶ 42.) Greenwaldt also complained to Recore of alleged violations of New York correctional facility regulations and of allegedly improper administration of the temporary release program. (Am. Com pl. ¶ 44-48.) In fact, Greenwaldt claims Coughlin, Coombe, Butler, Annucci, Recore, and possibly even then-Governor Mario Cuomo, the Attorney General, and members of the New York State Senate and Assembly were together "engaged in an active conspiracy to circumvent and violate the very laws that they swore to uphold" with respect to the administration of the temporary release program. (Am. Compl. ¶ 49.) Greenwaldt also claims he requested Recore to:

take the necessary steps as the DIRECTOR of the TEMPORARY RELEASE PROGRAMS, to rectify the egregious violations of the law and, [sic] the total disregard of the mandates of 7 N.Y.C.C.R. Part 1900 et seq. by the Temporary Release Committees in the various correctional facilities.

(Compl. ¶ 49.)

Greenwaldt alleges that on September 10, 1993, Keesler conducted a search of Greenwaldt's cell and told him that he was "in real trouble because [he] wrote legal papers for other inmates." (Am. Compl. ¶ 52.) Keesler allegedly took legal papers and forms from Greenwaldt's cell. (Am. Compl. at ¶¶ 53-54.) Greenwaldt was served with a Notice of Charges, taken to a Tier III Disciplinary Hearing and "found guilty and sentenced." Though his legal papers were eventually returned to him, he was fined another five dollars. (Am. Compl. ¶¶ 59, 61.)

Greenwaldt alleges that he was subjected to new threats after this incident. According to Greenwaldt, Keesler and Miller "attempted to intimidate [[[Greenwaldt] by questioning [him] about the lawsuit presently pending." (Am. Compl. ¶ 62.) Greenwaldt claims that Keesler then said of Greenwaldt to Miller, in Greenwaldt's presence, "this one... you can lock up anytime, he deserves it." (Am. Compl. ¶ 62-63).

Turning to the procedural background of the instant action, Greenwaldt filed his original complaint on September 16, 1993. Defendants Coughlin, Annucci, Butler and Coombe moved to dismiss on November 18, 1993. On December 13, 1993, Greenwaldt filed his memorandum in opposition. Defendants, including Recore, filed an amended memorandum on January 31, 1994. Greenwaldt filed an amended complaint on March 2, 1994. Defendants filed a second amended memorandum on July 15, 1994, Hanslmaier by then having joined the motion as well.

Greenwaldt brings this suit under 42 U.S.C. § 1983, and alleges violations of his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. (Am. Compl. ¶¶ 70-74.) He asks that I enjoin the defendants "from further penalizing [Greenwaldt] for exercising his constitutional rights and from confining him to his cell," (Am. Compl. at 22, ¶ 1), and from implementing what Greenwaldt claims is a discriminatory policy on visiting times. (Am. Compl. at 22, ¶ 2). Greenwaldt also seeks declaratory relief declaring unconstitutional the administration of the temporary release program. Finally, he seeks compensatory damages, punitive damages, and costs. Defendants argue, *inter alia,* that there is no basis for holding defendants liable for the alleged violations, and that Greenwaldt has no protected interest, in either the temporary release program or the visitation policy, upon which to base his claims. Defendants' motion to dismiss is granted for the reasons stated below.

*DISCUSSION*

**\*3** Defendants have moved to dismiss the claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. A complaint should not be dismissed unless "it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim[s] which would entitle him to relief.'" *Elliott v. Bronson,* 872 F.2d 20, 22 (2d Cir. 1989) (quoting *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972)); *Massop v. Coughlin,* 770 F.2d 299, 301 (2d Cir. 1985). In addition, the courts "must construe pro se complaints liberally, applying less stringent standards than when a plaintiff is represented by counsel." *Elliott,* 872 F.2d at 21; *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir. 1987); *Williams v. Vincent,* 508 F.2d 541, 543 (2d Cir. 1974). Where a plaintiff acts pro se, a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

court must "read his supporting papers liberally, and... interpret them to raise the strongest arguments that they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (S.D.N.Y. 1995). However, I also note that the Court of Appeals has stated that:

As we have repeatedly held, complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.

*Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). *See, e.g., Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir. 1988); *Ruderman v. Police Dep't of New York,* 857 F. Supp. 326, 330 (S.D.N.Y. 1994); *Saunders v. Coughlin,* No. 92 Civ. 4289 (SCH), 1994 WL 88108 at *3 (S.D.N.Y. Mar. 15, 1994).

I. Plaintiff's Failure to Allege that the Defendants *Are Personally Responsible for any Violations*

Greenwaldt has failed to allege how the defendants are personally responsible for the injustices he perceives. It is well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087 (1978). A plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). The doctrine of *respondeat superior* is not applicable to § 1983 actions brought against corrections officers. *Monell v. Department of Social Serv. of New York,* 436 U.S. 658, 692 (1978); *Bass,* 790 F.2d at 263; *Candelaria v. Coughlin,* No. 93 Civ. 3212 (RWS), 1994 WL 119146 at *4 (S.D.N.Y. Apr. 4, 1994). Similarly, the fact that a defendant may have been in a "high position of authority" is an insufficient basis for the imposition of personal liability" under § 1983. *McKinnon,* 568 F.2d at 934; *see also Wright,* 21 F.3d at 501. There are a number of ways in which a defendant in a supervisory position may be found personally involved in, and therefore liable for, constitutional violations, including: (1) direct

participation, (2) failure to remedy a wrong after learning of it, (3) creation or tolerance of a policy under which unconstitutional practices occurred or were allowed to continue, or (4) gross negligence in managing subordinates who committed the violations. *Wright,* 21 F.3d at 501 (citations omitted).

**\*4** Greenwaldt's complaint and memorandum of law ("Pl.'s Mem." or "Memorandum in Opposition") are difficult to follow. He sets forth the facts at length, but mentions his various legal theories only briefly and without connecting those theories to his factual allegations. Thus, it is difficult to assess the merits of his case. However, construing the complaint liberally as I am constrained to do, I take it that Greenwaldt is displeased with various problems he claims to have faced at Woodbourne, including a misbehavior report, a disbursement and surcharge removed from Greenwaldt's account, and threats by a correctional officer to write up Greenwaldt. Greenwaldt also claims that the defendants failed to respond to his numerous letters. The defendants argue they cannot be said to have been personally involved in these alleged constitutional violations and, therefore, cannot be held liable.

In examining the complaint, it is apparent that the only connection between the defendants moving herein and the facts Greenwaldt recites are the numerous letters Greenwaldt claims to have sent the defendants. However, the defendants cannot be held liable on this basis. It is true that "supervisory liability may be imposed where an official demonstrates 'gross negligence' or 'deliberate indifference' to the constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place." *Wright,* 21 F.3d at 501. However, it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations. *E.g., id.; Murray v. Coughlin,* No. 91-CV-0476E(H), 1995 WL 128968 at *6 (W.D.N.Y. Mar. 15, 1995); *Cepeda v. Coughlin,* No. 91 Civ. 2469 (RWS), 1995 WL 23566 at *3 (S.D.N.Y. Jan. 19, 1995); *Clark v. Coughlin,* No. 92 Civ. 0920 (RWS), 1993 WL 205111 at *6 n.2 (S.D.N.Y. June 10, 1993), *aff'd,* 17 F.3d 391 (2d Cir. 1993); *Garrido v. Coughlin,* 716 F. Supp. 98, 100 (S.D.N.Y. 1989) (dismissing that portion of complaint against NYSDOCS Commissioner where his only alleged connection to the case was that "he ignored [plaintiff's]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

letter of protest and request for an investigation of the allegations made in [the] action"). To the extent that Greenwaldt relies upon his allegations that he sent letters to the defendants, his complaint must be dismissed.

In his Memorandum in Opposition, Greenwaldt contends that he does not rely solely on his letter-writing campaign to allege the personal involvement of the prison officials. Instead, he claims that he joined these defendants because (i) Coughlin directed an investigation by Keesler into Greenwaldt; (ii) the defendants implemented various policies that are not to Greenwaldt's liking; and (iii) Annucci failed to maintain the law library.[FN3] The second of these assertions is addressed *infra*. The first and third claims are too vague to withstand defendants' motion to dismiss. Greenwaldt has not made any "specific allegations of fact." *Barr v. Abrams,* 810 F.2d 358, 364 (2d Cir. 1987). In particular, I note that Greenwaldt has not explained how Annucci's alleged failure to maintain the law library has anything to do with the other defendants. Nonetheless, if Greenwaldt elects to do so, he may attempt to replead these allegations within thirty days of the date of this Memorandum and Order.[FN4]

II. *The Temporary Release Program*

A. *Conspiracy Claims*

**\*5** As stated *supra,* Greenwaldt claims that the defendants and numerous political figures, possibly including former Governor Cuomo, the Attorney General, and members of the New York State Senate and Assembly, were engaged in a conspiracy with respect to the temporary release program. (Am. Compl. ¶ 49.) In order to state a claim under § 1983 for conspiracy:

[T]he complaint must contain more than mere conclusory allegations. And while a plaintiff should not plead mere evidence, he should make an effort to provide some "details of time and place and the alleged effect of the conspiracy." Thus, complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; "[d]iffuse and expansive allegations are insufficient, unless amplified by

specific instances of misconduct."

*Dwares v. City of New York,* 985 F.2d 94, 99-100 (2d Cir. 1993) (citations omitted). *See also Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir. 1993); *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir. 1990) (dismissing plaintiff's claims that defendants conspired to deprive plaintiff of his constitutional rights where plaintiff made only "conclusory allegations" and "diffuse averments" without stating a factual basis for his claim or pleading overt acts indicating the existence of a conspiracy), *cert. denied,* 449 U.S. 937 (1991); *Zemsky v. City of New York,* 821 F.2d 148, 151 (2d Cir.), *cert. denied,* 484 U.S. 965 (1987). In the instant case, Greenwaldt's claim of conspiracy is insufficient to survive a motion to dismiss. It is entirely conclusory; Greenwaldt has failed to plead any factual basis indicating the existence of a conspiracy. Greenwaldt will not, however, be permitted to replead his conspiracy claim because, as explained *infra,* he has no protectible interest in the temporary release program.

B. *No Protected Interest*

Greenwaldt may not replead his conspiracy claim because he does not have a federally protected right to participate in New York's temporary release program. In order to state a claim under the due process clause, Greenwaldt must first allege that he was deprived of a property or liberty interest. Only if he claims such a protected interest is it necessary to go on to determine whether the deprivation of that interest occurred without the process that was due under the circumstances. *See generally Goss v. Lopez,* 419 U.S. 565 (1975); *Board of Regents v. Roth,* 408 U.S. 564 (1972); *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1061-62 (2d Cir.) (stating that "[i]n order to succeed on a claim of deprivation of procedural due process, a plaintiff must establish that state action deprived him of a protected property or liberty interest"), *cert. denied,* 114 S. Ct. 185 (1993). In the instant case, Greenwaldt's claim fails because there is no protected right to participate in New York's temporary release program.

**\*6** It is well-settled that the Constitution itself does not confer a right for an inmate to be conditionally released before serving his full sentence. *Connecticut Bd. of*

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

*Pardons v. Dumschat,* 452 U.S. 458, 464 (1981); *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7 (1979) (stating that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence"). The question thus becomes whether New York conferred an enforceable liberty interest in its temporary release program.

In general, a state may create a protected liberty interest through the use of mandatory language and placement of substantive limits on the authority and discretion of state officials. *See Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 461-63 (1989); *Olim v. Wakinekona,* 461 U.S. 238, 249-51 (1983); *Klos v. Haskell,* No. 684, 93-2666, 1995 WL 64776 at *6 (2d Cir. Feb. 10, 1995). In order for the state to confer such a liberty interest:

(1) the state must have articulated specified "substantive predicates" which limit the discretion of state officials; and (2) it must have employed "explicitly mandatory language," requiring state officials to follow those substantive predicates.

*Klos,* 1995 WL 64776 at *6.

Turning to New York's temporary release program, it is clear that prisoners do not have a protected interest in being admitted to this program. Neither the governing statute, *Correction Law § 851 et seq.,* nor the regulations, 7 N.Y.C.R.R. § 1900 *et seq.,* contain any assurance of admission into the program. In fact, it is stated explicitly that there are no guarantees of admission:

Participation in the temporary release program shall be a privilege. Nothing contained in this article may be construed to confer upon any inmate the right to participate, or to continue to participate, in a temporary release program.

*Correction Law § 855(9).* Nothing in the regulations concerning the temporary release program confers a protected entitlement. *See* 7 N.Y.C.R.R. § 1900 *et seq.* In addition, courts that have considered whether inmates in

New York have a protected interest in the temporary release program have consistently held that they do not. *See, e.g., Dugar v. Coughlin,* 613 F. Supp. 849, 854-57 (S.D.N.Y. 1985); *Martino v. Gard,* 526 F. Supp. 958, 960 (E.D.N.Y. 1981); *McCormack v. Posillico,* No. 71654, 1995 WL 122170 at *1 (3d Dep't Mar. 23, 1995); *Grant v. Temporary Release Committee,* 619 N.Y.S.2d 106, 106 (2d Dep't 1994); *Szucs v. Recore,* 618 N.Y.S.2d 473, 473 (3d Dep't 1994); *Walker v. Le Fevre,* 598 N.Y.S.2d 345, 345 (3d Dep't 1993). Consequently, Greenwaldt's claim that he was denied due process in connection with the temporary release program is dismissed without leave to replead.

III. *Visitation Policy*

Greenwaldt is disgruntled with the NYSDOCS visitation policy. (Am. Compl. ¶ ¶ 4-6, 8-10.) It appears that Greenwaldt is most displeased about the fact that visits are permitted daily at maximum security facilities but only on weekends and holidays at medium and minimum security facilities. The Supreme Court unambiguously has rejected the argument that "an inmate's interest in unfettered visitation is guaranteed directly by the Due Process Clause." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460 (1989). The question thus becomes whether New York has created a protected interest in visitation. *Klos v. Haskell,* No. 684, 93-2666, 1995 WL 64776 at *6 (2d Cir. Feb. 10, 1995). It appears that New York has done so. *See Kozlowksi v. Coughlin,* 871 F.2d 241, 242 (2d Cir. 1989) (explaining that the District Court had ruled that a "state-created liberty interest in prison visitation rights existed, and that proper process was due prior to curtailment of these rights"); *Ricco v. Coughlin,* No. 92-CV-0632E(H), 1995 WL 128959 at *1 (W.D.N.Y. Mar. 15, 1995); *Daniels v. Walker,* No. 93-CV-570, 1995 WL 88186 at *5 (N.D.N.Y. Mar. 1, 1995).

*7 However, to recognize that inmates have a protected interest in visitation is not to say that the NYSDOCS policy infringe upon that interest. The District Court has considered and rejected a virtually identical claim to Greenwaldt's in an earlier decision, *Windley v. Cuomo,* No. 91 Civ. 3774 (TPG), 1992 WL 123172 at *2 (S.D.N.Y. May 27, 1992). In that case, a prisoner at a New York state facility complained that the facility's elimination of weekday visitation violated his rights under

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

the First Amendment, the Eighth Amendment, and the Due Process Clause of the Fourteenth Amendment. *Id.* at *1. Visitation was, however, permitted on weekends and state holidays. *Id.* The District Court dismissed plaintiff's due process claim, explaining that:

Plaintiff's Fourteenth Amendment claim is also without substance. It is true that "[t]he State of New York, by judicial decision, administrative regulation and departmental directive, has granted its prisoners a protected liberty interest in receiving visits from persons of their choice." *Kozlowski v. Coughlin,* 539 F. Supp. 852, 856-57 (S.D.N.Y. 1982). Neither the *Kozlowski* decision nor any provision of state or federal law, however, forbids reasonable regulation of visiting hours by prison officials. There is no showing that the regulation here exceeds the bounds of reasonableness.

*Id.* This reasoning is equally applicable to the instant case, where the policy is the same, *i.e.,* visitation is permitted on the weekends and holidays. Thus, Greenwaldt's claims regarding visitation policy are dismissed with prejudice.

IV. *Equal Protection Claims*

Greenwaldt argues in his Memorandum in Opposition that his complaint should not be dismissed because, he claims, the defendants have violated the Equal Protection Clause of the Fourteenth Amendment with respect to visitation policy and the temporary release program. (Pl.'s Mem. at 7). Greenwaldt claims in his Memorandum in Opposition that:

Plaintiff can *decisively* demonstrate, if permitted to proceed with discovery, that discrimination exists under the rules, regulations, practices and policies of the defendants in relation to visits, temporary release, disciplinary programs, etc.

(Pl.'s Mem. at 7-8 (emphasis in original).)

Greenwaldt's claims that he will be able to establish discrimination by the defendants if he is permitted to engage in discovery does not preclude dismissal of his equal protection claims at this time. Greenwaldt's equal protection claims are properly dismissed at this time because they are vague and inconclusive. *See Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). If Greenwaldt seeks to do so, he may replead his equal protection claims within thirty days.

*CONCLUSION*

With respect to the defendants moving herein, *i.e.,* Coughlin, Annucci, Butler, Coombe, Recore, and Hanslmaier, Greenwaldt's complaint is dismissed with prejudice in its entirety, with the limited exception of those particular claims that Greenwaldt has been granted leave to replead within thirty days. That is, within thirty days of the date of this Memorandum and Order, Greenwaldt may replead his allegations that Coughlin directed an investigation by Keesler into Greenwaldt, that Annucci failed to maintain the law library, and that the defendants violated his right to equal protection with respect to visitation policy and the temporary release program.

FN1. Reference is made to the Amended Complaint dated February 25, 1994.

FN2. Inmates whose names begin with letters A-L would have visitations on Saturday, and those whose names begin with letters M-Z on Sunday. On the following weekend, the order would be reversed. (Am. Compl. ¶4.)

FN3. As Greenwaldt puts it in his memorandum:

In the present case, COMMISSIONER COUGHLIN not only learned of the deprivations through letters from the plaintiff; but went so far as to direct an investigation by the defendant KEESLER. Exactly what more plaintiff must do to show that the Commissioner has direct knowledge and is condoning his subordinates [sic] actions or lack of actions, as the case may be, is beyond

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

the comprehension of the plaintiff.... Plaintiff does not join the Commissioner of Correctional Services and three Deputy Commissioners by virtue of their failure to respond to plaintiff's complaints in letters addressed to them respectively. He (plaintiff) joins the Commissioner and the three Deputy Commissioners by virtue of the investigation ordered by COMMISSIONER COUGHLIN and the implementation of various policy Directives signed and ordered by the Deputy Commissioners and condoned by the Commissioner.... Counsel either fails to understand the responsibilities of either the Commissioner or the three Deputy Commissioners or, while understanding their respective responsibilities would rather distort the factual position of the plaintiff. The perfect example of the above is Deputy Commissioner Annucci's total disregard of his responsibility to maintain the law libraries with the proper materials.

(Pl.'s Mem. at 3-4.) I note that Greenwaldt's allegations regarding the investigation and the law library are glaringly absent from the complaint.

FN4. I note that it may be that, if pleaded properly, Greenwaldt's claim that Annucci failed to maintain the law library might state a claim. For example, it has been held that:

Prisoners have a constitutional right of access of the courts. Thus prison authorities must assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law. The right of access to the courts must ensure that prisoners have a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. Courts have held that prisoners do not have a right to access law books per se, but must be provided with any of several methods designed to provide meaningful access to the courts

including the use of trained legal assistants.

*Bellamy v. McMickens,* 692 F. Supp. 205, 214 (S.D.N.Y. 1988). *See Morello v. James,* 810 F.2d 344, 347 (2d Cir. 1987) (stating that "[w]here a prisoner chooses to proceed pro se with his appeal, the state is required to provide affirmative assistance in the form of adequate law libraries or trained legal assistance"). However, Greenwaldt's allegations are, again, too conclusory to assess, and must be dismissed.

S.D.N.Y. 1995
Greenwaldt v. Coughlin
Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Horace DOVE, Plaintiff,
v.
CITY OF NEW YORK, Venessa Williams, Staff on
Ward 53 at Kings County Hospital, The Patients on
Ward 53, Jewish Board Family & Children Services,
Owners of Maple Street Residence, Jeffrey Clarke,
Arlene Bishop, Esther, The Staff at Maple Street, Lionel
Young, and Abbot Laboratory of Illinois, Defendants.
**No. 03-CV-5052 JFB LB.**

March 15, 2007.

Plaintiff appears pro se.

John P. Hewson and Lisa Fleming Grumet, Esqs.,
Corporation Counsel of the City of New York, Marc A.
Konowitz, Esq., New York State Attorney General's
Office, New York, NY, for Defendants.

MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge.

*1 *Pro se* plaintiff Horace Dove ("Dove") brings this
action against the City of New York (the "City"), Vanessa
Williams ("Williams"), the staff on Ward 53 at Kings
County Hospital, and the patients on Ward 53
(collectively, "defendants"), alleging violations of
plaintiff's constitutional rights pursuant to 42 U.S.C. §
1983 and various state law claims.[FN1] Specifically, plaintiff
alleges that, during his time as a patient at Kings County
Hospital (the "Hospital"), (1) the Hospital's policy or
custom of permitting patients to smoke in the Hospital
violated plaintiff's rights, (2) the Hospital's staff and

several patients conspired to assault plaintiff, and (3) the
Hospital's staff failed to protect plaintiff from assaults by
other patients on four separate occasions between June 9,
2002 and July 10, 2002.

> FN1. Defendants Jewish Board of Family &
> Children Services, the owners of the Maple
> Street Residence, Jeffrey Clark, Arlene Bishop,
> Esther, the Staff at Maple Street, Lionel Young,
> and Abbot Laboratory of Illinois are no longer
> parties to this action.

Defendants now move for summary judgment pursuant to
Rule 56 of the Federal Rules of Civil Procedure.[FN2] For the
reasons that follow, defendants' motion is granted.

> FN2. Plaintiff failed to serve the unidentified
> staff and patients named in the complaint. Thus,
> those defendants have not appeared in the instant
> action.

I. BACKGROUND

A. Facts

Upon consideration of a motion for summary judgment,
the Court construes the facts in the light most favorable to
plaintiff, the non-moving party.[FN3] *See Capobianco v. City
of New York,* 422 F .3d 47, 50 (2d Cir.2005).

> FN3. Defendants submitted a statement, pursuant
> to Local Civil Rule 56. 1, which asserts material
> facts that they claim are undisputed in this case.
> Defendants also complied with Local Civil Rule
> 56.2 by providing notice to plaintiff that he is not
> entitled simply to rely on allegations in his
> complaint, but is required to submit evidence,
> including sworn affidavits, witness statements
> and documents to respond to the motion for
> summary judgment, pursuant to Fed.R.Civ.P.
> 56(e). (*See* Dkt. Entry # 84.) This action

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

provided actual notice to plaintiff of the consequences of noncompliance with the requirements of Fed.R.Civ.P. 56. *See, e. g., Irby v. N.Y. Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("[W]e remind the district courts of this circuit, as well as summary judgment movants, of the necessity that *pro se* litigants have actual notice, provided in an accessible manner, of the consequences of the *pro se* litigant's failure to comply with the requirements of Rule 56.... [E]ither the district court or the moving party is to supply the *pro se* litigant with notice of the requirements of Rule 56.... In the absence of such notice or a clear understanding by the *pro se* litigant of the consequences of failing to comply with Rule 56, vacatur of the summary judgment is virtually automatic."). Although plaintiff did not respond to defendants' Rule 56.1 Statement in the precise form specified by the local rule, the Court overlooks this technical defect and reads plaintiff's responses liberally as he is *pro se,* and considers factual assertions made by plaintiff in his submissions to the Court as contesting defendants' statement of material undisputed facts, where his statements or evidence conflict. *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 63, 73 (2d Cir.2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.") (citations omitted); *see, e.g., Gilani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. April 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). Therefore, where the Court cites to defendants' Rule 56.1 Statement, plaintiff has not contested that fact in any of his papers. *See, e.g., Pierre-Antoine v. City of New York,* No. 04 Civ. 6987(GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006) (deeming facts in defendants' Rule 56.1 statement as admitted by *pro se* plaintiff, where plaintiff was provided notice of his failure to properly respond to the summary judgment motion under Local Civil Rule 56.2 and the court's review of the record did not reveal that there was a genuine issue of material fact); *Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund,* No. 03 Civ. 7421(KMK), 2005 WL 1026330, at *1 n. 2 (S.D.N.Y. May 3, 2005)

(deeming defendants' factual assertions admitted where *pro se* plaintiff was provided with notice under Local Civil Rule 56.2 and where plaintiff did not submit evidence controverting those factual assertions).

The Hospital is operated by defendant City and offers treatment to patients involuntarily committed for treatment of mental health issues. (Dfts.' 56.1 ¶¶ 7-14.) Defendant Williams is a Coordinating Manager in the Behavioral Health Division of the Hospital. According to the New York City Health and Hospitals Corporation's "Position Description" for a Coordinating Manager, Williams' duties include aiding in the maintenance of a safe and hygienic environment at the Hospital, procuring supplies to facilitate the comfort, safety and therapeutic aspects of the Hospital wards, and supervising the staff that maintains the Hospital's wards. (Dfts.' 56.1 ¶ 27; Hewson Decl., Ex. K.) Moreover, according to the City, Williams' duties do not include the supervision over, or responsibility for, any aspect of patient care. (*Id.*)

On June 9, 2002, New York City police officers brought plaintiff to the Hospital. (Dfts.' 56.1 ¶ 5.) After plaintiff's arrival, a treating physician and a social worker diagnosed plaintiff with schizophrenia of the chronic paranoid type. (*Id.* ¶ 7.) They also found that plaintiff was abusive and threatening to others, was a threat to himself and others, and that he suffered from persecutory delusions. (*Id.* ¶¶ 7, 9, 12.) On June 10, 2002, plaintiff was admitted to the Hospital pursuant to New York Mental Hygiene Law Section 9.39, and sent to Ward 53. (*Id.* ¶ 12; Compl. ¶ 29.) Plaintiff's claims arise out a string of incidents that allegedly occurred while plaintiff was a patient at the Hospital.

1. Smoking in the Hospital

According to plaintiff, during his first night at the Hospital, plaintiff's roommates and other patients smoked marijuana and cigarettes in plaintiff's room. (Compl. ¶ 30.) The patients continued to smoke, plaintiff alleges, even though plaintiff told the patients that he had asthma, that he was allergic to marijuana and cigarette smoke, and that the smoke was harmful to him. (*Id.*) Plaintiff also alleges that he complained to the staff about other patients'

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

smoking, but that the staff did nothing to stop the patients from smoking. (*Id.* ¶ 31.) According to plaintiff, the other patients told him that the Hospital staff allowed patients to smoke in their rooms. (*Id.* ¶ 33.)

### 2. The June 15, 2002 Incident

**\*2** On or about June 15, 2002, plaintiff and four other patients at the Hospital were involved in a physical altercation. (Hewson Decl., Ex. E.; Compl. ¶ 35.) According to plaintiff, six patients, including one of his roommates, surrounded plaintiff and "viciously assaulted" him. (Compl.¶ 35.) Plaintiff alleges that "some of the staff in Ward 53" were warned of the attack in advance and "gave their approval." (*Id.* ¶ 38.) According to plaintiff's deposition testimony, the attackers hit him in the face with an iron rod, kicked him in the face, poured chemicals on his left hand, caused him to bleed from his nose and mouth and rendered him unconscious for two to three hours. (Hewson Decl., Ex. G.)

However, according to the Hospital's records, a physician examined plaintiff following the June 15, 2002 altercation and noted that plaintiff had "no visible injury," and did not indicate that plaintiff had any facial injuries, chemical burns on his hands, blood on his skin or clothes, or had suffered a loss of consciousness. (Hewson Decl., Ex. E.) However, the physician noted that plaintiff's eyeglasses were broken during the altercation. (*Id.*) The Hospital's records also indicate that members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on June 15, 2002, and there was no evidence that plaintiff had suffered any injuries during that time. (*Id.,* Ex. H.) According to the Hospital's records, the patients involved in the altercation were separated and counseled as to their behavior. (Hewson Decl., Ex. E.)

### 3. The Chair-Throwing Incident

According to plaintiff, on June 22, 2002, another patient threw "iron chairs at [plaintiff's] head." (Compl.¶ 43.) Plaintiff alleges that, during the incident, the other patient said that plaintiff had complained too much to the staff. (*Id.* ¶ 44.) According to plaintiff, the assault rendered him unconscious for hours. (Hewson Decl., Ex. G.) Moreover,

plaintiff alleges that, following the incident, he ran to the staff office and asked the staff to stop the other patient from assaulting him, but the staff did not tell the other patient to stop. (*Id.* ¶ 43.)

The Hospital's records show that plaintiff was involved in a "chair throwing" incident with another patient on July 2, 2002 rather than, as plaintiff alleges, on June 22, 2002. (Hewson Decl., Ex. F.) According to the Hospital's records, plaintiff was hit in the chest by one of his peers during the incident. (*Id.*) Plaintiff was examined by a physician following the incident on July 2, 2002; the physician found no injuries to plaintiff. (*Id.,* Ex. F.) Moreover, according to the Hospital's records, members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on July 2, 2002, and there was no evidence that plaintiff had been lying on the floor unconscious or that plaintiff had suffered any injuries during that time. [FN4] (Hewson Decl., Ex. H.) Also, according to the Hospital's records, a psychiatrist evaluated plaintiff on July 2, 2002 and found that he continued to be delusional. (*Id.*)

> [FN4.](#) The Hospital's records also indicate that, on June 22, 2002-the alleged date of the chair-throwing incident according to plaintiff-members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day and there was no evidence that such an altercation had occurred or that plaintiff had suffered any injuries during that time. (Hewson Decl., Ex. H.)

### 4. The June 27, 2002 Incident

**\*3** According to plaintiff, on June 27, 2002, he told Williams that he suffered from asthma and that the smoking by other patients was very harmful to him. (Compl.¶ 46.) In response, according to plaintiff, Williams told him that patients are permitted to smoke in all of the Hospital's wards and that plaintiff should not complain to the Hospital's staff about other patients smoking in the Hospital. (*Id.* ¶¶ 47, 54.) Moreover, plaintiff alleges that three other patients joined the conversation and that Williams told those three patients that they could "smoke all they want in Ward 53." (*Id.* ¶ 54.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

Plaintiff alleges that, following plaintiff's conversation with Williams, plaintiff saw Williams speak separately with the same three patients. (Compl.¶ 51.) Plaintiff concedes in the complaint that he could not hear what Williams and the three patients were saying during this separate conversation. (Compl.¶¶ 51-52.) Moreover, during his deposition, plaintiff confirmed that he had no direct knowledge of the content of the conversation between Williams and the three patients. (Hewson Decl., Ex. G.)

According to plaintiff, on the night of June 27, 2002, five patients, including the three patients with whom Williams had allegedly spoken to, "viciously assaulted" plaintiff in his room. (Compl.¶ 54.) Plaintiff alleges that Williams had conspired with the alleged attackers to harm plaintiff, and that, during the assault, the attackers allegedly told plaintiff that Williams "did not like" plaintiff. (Compl.¶¶ 56, 58.)

According to the Hospital's records, members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on June 27, 2002, and there was no evidence that an incident occurred or that plaintiff had suffered any injuries during that time. (Hewson Decl., Exs. F, H.)

5. The July 9, 2002 Incident

Plaintiff alleges that five patients "viciously assaulted [plaintiff] again" on July 9, 2002. (Compl.¶ 78.) According to plaintiff, the other patients once again assaulted plaintiff with an iron rod and rendered him unconscious. (Hewson Decl., Ex. G.) Plaintiff alleges that, during the alleged assault, he called out to the staff for help but no one came to help him. (Compl.¶ 79.)

The Hospital's records do not reflect that an incident occurred on July 9, 2002. According to the Hospital's records, members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on July 9, 2002, and there was no evidence that an incident had occurred or that plaintiff was injured on that day.

(Hewson Decl., Exs. F, H.) In particular, according to the Hospital's records, plaintiff was examined by hospital personnel sometime after 1:00 p.m. and was found to be "cooperative and friendly," although still suffering from "persecutory delusions." (*Id.,* Ex. F.) Plaintiff was again observed at 10:00 p.m. and "no complaints [were] voiced" by him to the Hospital's staff. (*Id.*)

**\*4** On July 10, 2002, plaintiff was transferred from the Hospital to Kingsboro Psychiatric Center, a New York State facility. (Compl.¶ 84.) Upon arriving at Kingsboro, plaintiff was given a full physical exam by a doctor. (Hewson Decl., Ex. I.) Records of that examination indicate that plaintiff did not have any physical problems except for a rash on his left hand, and that he was in good physical health, had no injury or abnormalities to his head, and denied having any physical ailments. (*Id.*)

B. Procedural History

Plaintiff commenced the instant action against the City on October 6, 2003. On October 8, 2003, plaintiff filed an amended complaint naming several additional defendants. By Memorandum and Order dated September 28, 2005, the Honorable Nina Gershon dismissed plaintiff's claims against several defendants. On February 10, 2006, the case was reassigned to this Court. On July 17, 2006, defendants moved for summary judgment pursuant to Rule 56.

II. DISCUSSION

A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir.2006). Moreover, where the plaintiff is proceeding *pro se,* the Court must "construe the complaint broadly, and interpret it to raise the strongest arguments that it suggests." *Weixel v. Bd. of*

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

*Educ. of the City of N.Y.,* 287 F.3d 138, 145-46 (2d Cir.2002) (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)).

The moving party bears the initial burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). However, once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (internal quotations omitted); *Tufariello v. Long Island R.R.,* 364 F.Supp.2d 252, 256 (E.D.N.Y.2005).

As such, a *pro se* party's "bald assertion," completely unsupported by evidence, is not sufficient to defeat a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Instead, to overcome a motion for summary judgment, the non-moving party must provide this Court "with some basis to believe that his 'version of relevant events is not fanciful.' " *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting *Christian Dior-New York, Inc. v. Koret, Inc.,* 792 F.2d 34, 37-39 (2d Cir.1986)); *accord Perez v. N.Y. Presbyterian Hosp.,* No. 05 Civ. 5740(LBS), 2006 WL 585691, at *3 n. 1 (S.D.N.Y. March 20, 2006).

B. Plaintiff's Allegations

**\*5** The standard rule is that, at the summary judgment stage, the court "is ... to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). However, in *Jeffreys v. City of New York,* 426 F.3d 549 (2d Cir.2005), the Second Circuit recognized that there is a narrow exception to this well-established rule in the "rare circumstances" where the sole basis for the disputed issues of fact is the plaintiff's

"own testimony" which is so lacking in credibility that no reasonable juror could find for the plaintiff. In affirming the dismissal of the plaintiff's suit at the summary judgment stage, the Second Circuit explained:

> [W]e hold that the District Court did not err in granting defendants' motion for summary judgment on the basis that Jeffreys's testimony-which was largely unsubstantiated by any other direct evidence-was "so replete with inconsistencies and improbabilities" that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint.

*Id.* at 505 (citing *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 475 (S.D.N.Y.2003) (dismissing excessive force claims brought under 42 U.S.C. § 1983)); *see also Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991) (holding that the post-trial sworn statements of the president of plaintiff corporation did not create a factual issue because "a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony"); *Radobenko v. Automated Equip. Corp.,* 520 F.2d 540, 544 (9th Cir.1975) (holding that plaintiff had failed to create an issue of fact where plaintiff's affidavits conflicted with plaintiff's earlier deposition); *Schmidt v. Tremmel,* No. 93 Civ. 8588(JSM), 1995 U.S. Dist. LEXIS 97, at *10-* 11 (S.D.N.Y. Jan. 6, 1995) (finding no genuine issues of material fact where "[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in [plaintiff] complaint or in her subsequent missives to the court"); *Ward v. Coughlin,* No. 93 Civ. 1250(FJS)(RWS), 1995 U.S. Dist. LEXIS 21297, at *11 (S.D.N.Y.1995) (finding plaintiff's self-serving affidavit incredible as a matter of law); *Price v. Worldvision Enters., Inc.,* 455 F.Supp. 252, 266 n. 25 (S.D.N.Y.1978) (addressing affidavit of party).

Here, the Court believes that there is a clear basis to find that the instant action presents one such "rare circumstance[ ]" where the plaintiff's testimony is "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Jeffreys,* 275 F.Supp.2d at 475 (internal

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

quotations and citation omitted). Plaintiff's allegations in his complaint and his deposition testimony provide the sole basis for the alleged disputed issues of fact in this case. However, the credibility of plaintiff's submissions is critically undermined by both the evidence presented by defendants, as well as the gross inconsistencies found in plaintiff's own submissions. See _Law Offices of Curtis V. Trinko, LLP v. Verizon Comm'ns. Inc.,_ No. 00 Civ.1910(SHS), 2006 WL 2792690, at *9 (S.D.N.Y. Sep. 27, 2006).

**\*6** First, as set forth in the facts section, the Hospital's records contradict plaintiff's testimony as to the occurrence of several of the alleged assaults and as to the occurrence or the severity of all of plaintiff's alleged injuries.[FN5] Second, as discussed more fully below, plaintiff has undermined his own allegations regarding Williams' involvement in the alleged June 27, 2002 assault by conceding that he has no personal knowledge, or any other evidence, that Williams conspired to assault him.

FN5. There is no credible evidence demonstrating that any of the incidents alleged by plaintiff even occurred, save for the June 15, 2002 incident and the chair-throwing incident. As discussed _supra,_ the Hospital's records confirm that plaintiff was involved in a physical altercation with four other patients on June 15, 2002, as well as some type of "chair-throwing" incident with another patient on July 2, 2002. However, as to the June 15, 2002 incident, the Hospital's documentation indicates that plaintiff did not suffer any injury as a result of the altercation, much less the severe injuries alleged by plaintiff, which include facial cuts, bleeding, chemical burns, and brain damage. Moreover, plaintiff's own submissions drastically diverge as to the severity of the injuries he allegedly suffered during the June 15, 2002 altercation. Similarly, as to the chair-throwing incident, the Hospital's documentation indicates that plaintiff did not suffer any injury as a result of the incident, much less the severe injuries alleged by plaintiff. Moreover, plaintiff's own allegations regarding the chair-throwing incident are grossly inconsistent.

Finally, plaintiff's own submissions are replete with contradictory descriptions of the injuries he allegedly suffered as a result of the alleged assaults. As to the alleged June 15, 2002 assault, plaintiff variously asserts that he suffered just "headaches" (Compl.¶ 39), or "severe brain damage" (Dep. Tr., at 88), as a result of the assault. As to the chair-throwing incident, plaintiff contends both that he was assaulted by five patients (Dep. Tr. at 91), and that he was assaulted by just one patient (Compl.¶ 43). Also as to the chair-throwing incident, plaintiff fails to allege in the complaint that he suffered any injuries during the incident. However, plaintiff asserts in his deposition testimony that he was rendered unconscious as a result of the incident and remained so for "hours." (Pl.'s Dep. at 91-92.) As to the alleged July 9, 2002 assault, plaintiff asserts in his complaint that he "became unconscious" as a result of the assault, and fails to allege what, if any, weapons were used during the assault. However, in his deposition testimony, plaintiff contends that the assailants used an "iron rod" and left a "scar" on his forehead. (Pl.'s Dep. at 108.)

Therefore, the Court finds that, given the complete lack of evidence to support plaintiff's claims regarding these assaults and the alleged severe injuries resulting therefrom, the Hospital documentation fully contradicting such claims, and the drastic inconsistencies in plaintiff's own statements regarding these incidents, dismissal is warranted under _Jeffreys_ because no reasonable juror could credit plaintiff's unsubstantiated testimony under these circumstances. However, even if the Court fully credited plaintiff's allegations regarding these incidents, summary judgment is still appropriate because he has produced no competent evidence demonstrating that these defendants are liable for the alleged actions of the other patients. As set forth more fully below, even assuming _arguendo_ that the smoking by other patients and all of the assaults referred to in plaintiff's testimony actually occurred, plaintiff has failed to establish a genuine issue as to defendants' liability for the alleged deprivations of plaintiff's rights.

C. Claims Against the Unnamed Defendants

At this stage of the case, discovery has been completed and plaintiff has failed to identify or to serve with process any of the unnamed defendants allegedly responsible for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

the deprivation of plaintiff's rights. Moreover, plaintiff does not assert that additional discovery will help to ascertain the identities of such individuals. Accordingly, because a "tort victim who cannot identify the tortfeasor cannot bring suit," the Court grants summary judgment as to plaintiff's claims against the unnamed defendants. *Valentin v. Dinkins,* 121 F.3d 72, 75 (2d Cir.1996); *see, e.g., Peterson v. Tomaselli,* --- F.Supp.2d ----, 2007 WL 102073, at *18 (S.D.N.Y.2007); *Alicea v. City of New York,* No. 04 Civ. 1243(RMB), 2005 WL 3071274, at *1 n. 1 (S.D.N.Y. Nov. 15, 2005).

### D. Due Process Claims

**\*7** Plaintiff asserts, *inter alia,* a violation of his rights under the Eighth and Fourteenth Amendments. However, because plaintiff was not a convicted prisoner at the time of the alleged deprivation of his federal rights, any claim arising from his confinement must be asserted under the Due Process Clause of the Fourteenth Amendment, rather than the provisions of the Eighth Amendment. *See, e.g., Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir .1996); *Vallen v. Carrol,* No. 02 Civ. 5666(PKC), 2005 WL 2296620, at *9 (S.D.N.Y. Sept. 20, 2005); *see also Fair v. Weiburg,* No. 02 Civ. 9218(KMK), 2006 WL 2801999, at *4 (S.D.N.Y. Sept. 28, 2006).

"An involuntary civil commitment is a massive curtailment of liberty, ... and it therefore cannot permissibly be accomplished without due process of law." *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir.1995) (citation and quotation omitted); *see Graves v. MidHudson,* No. 04 Civ. 3957(FB), 2006 WL 3103293, at *3 (E.D.N.Y. Nov. 2, 2006). However, in this case, the complaint, even as liberally construed, fails to allege that plaintiff's rights were violated during the civil commitment process.[FN6]

> **FN6.** The Court notes that plaintiff's brief in response to the instant motion consists principally of quotations from Supreme Court opinions regarding the process due to individuals prior to their involuntary commitment to a mental hospital. However, the entirety of plaintiff's remaining submissions to the Court-that is, other than his response brief-fail to

allege or to address a claim that plaintiff's pre-commitment procedural rights were violated by defendants; nor has plaintiff requested leave to amend his complaint to allege such a claim. Moreover, at his deposition, plaintiff was asked to clarify whether he was, in fact, alleging a violation of his pre-commitment procedural rights. Plaintiff declined to do so. (Hewson Decl., Ex. G.) Accordingly, the Court declines to address any such claim at this time.

However, " '[t]he mere fact that an individual has been committed under proper procedures ... does not deprive him of all substantive liberty interests under the Fourteenth Amendment.' " *MidHudson,* 2006 WL 3103292, at *3 (citing *Youngberg v. Romeo,* 457 U.S. 307, 315 (1982)). Such individuals retain a right to " 'conditions of reasonable care and safety' " during their confinement. *Kulak v. City of New York,* 88 F.3d 63, 77 (2d Cir.1996) (quoting *Youngberg,* 457 U.S. at 324); *Lombardo v. Stone,* No. 99 Civ. 4603(SAS), 2001 WL 940559, at *8 (S.D.N.Y. Aug. 20, 2001) (citing *Youngberg,* 457 U.S. at 315-16 ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed-who may not be punished at all-in unsafe conditions.")); *see also DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199 (1989) ("[T]he substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others."); *Beck v. Wilson,* 377 F.3d 884, 889-90 (8th Cir.2004) ("Because [plaintiff] was an involuntarily committed patient ... the Fourteenth Amendment imposed upon the defendants, as state actors, an affirmative duty to undertake some responsibility for providing [her] with a reasonably safe environment.").

In *Youngberg,* the Supreme Court set forth the standard for adjudicating Section 1983 claims brought by involuntarily committed mental patients against "professional" officials charged with the patients' care. *Youngberg,* 457 U.S. at 322-24; *see Vallen,* 2005 WL 2296620, at *9; *Warheit v. City of New York,* No. 02 Civ. 7345(PAC), 2006 WL 2381871, at *11 (S.D.N.Y. Aug. 15, 2006); *Lombardo,* 2001 WL 940559; *Marczeski v. Handy,* No. 01 Civ. 01437(AHN)(HBF), 2004 WL

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

2476440, at *8 (D.Conn. Sept. 9, 2004) (Fitzsimmons, Magistrate J.). In reviewing such claims, the critical question is whether the charged official's decision alleged to have caused a deprivation was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg,* 457 U.S. at 323; *see Kulak v. City of New York,* 88 F.3d 63, 75 (2d Cir.1996) ("This standard requires more than simple negligence on the part of the doctor but less than deliberate indifference.").

**8** Notably, however, the Court in *Youngberg* specifically limited the substantial departure standard to claims against "professionals," or "person[s] competent, whether by education, training or experience, to make the particular decision at issue," and contrasted such persons with non-professionals, or "employees without formal training but who are subject to the supervision of qualified persons." *Youngberg,* 457 U.S. at 323 n. 30; *see Kulak,* 88 F.3d at 75. As such, some courts have declined to apply the *Youngberg* standard to officials deemed to be "low-level staff members," and, instead, apply a "deliberate indifference" standard to Section 1983 claims against such officials, asking whether "the [challenged] officials displayed a mental state of deliberate indifference with respect to [plaintiff's] rights." *Marczeski,* 2004 WL 2476440, at *8;* see *Shaw by Strain v. Strackhouse,* 920 F.2d 1135, 1147 (3rd Cir.1990) ("Nonprofessional employees who provide care for involuntarily institutionalized mentally retarded individuals are subject even after *Youngberg,* only to a deliberate indifference standard."); *Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004) (applying deliberate indifference standard to Section 1983 claims against staff at a group home for the mentally retarded); *see also Vallen,* 2005 WL 2296620, at *9 ("I am inclined to agree ... that the standard of 'deliberate indifference' is the correct one for Section 1983 claims brought by involuntarily committed mental patients and based on alleged failures to protect them that violated their substantive due process rights.").

However, in this case, the Court need not reach the issue of whether defendants' actions should be evaluated under the "substantial departure" or "deliberate indifference" standard because, under either standard, the result is the same: no reasonable factfinder could conclude based upon the evidence, drawing all inferences in plaintiff's favor,

that defendants' conduct substantially departed from accepted professional judgment, practices, or standards, or was deliberately indifferent to plaintiff's constitutional rights. *See Vallen,* 2005 WL 2296620, at *9.

As the Second Circuit has observed:

Rule 56(e) of the Federal Rules of Civil Procedure states unequivocally that in order to defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Such an issue is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the litigants.

*U.S. v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) (quotations and citations omitted); *see Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (requiring that the party opposing summary judgment "bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful"). Here, the Court finds that plaintiff has failed to set forth any evidence, beyond mere "surmise or conjecture," in support of his allegations that defendants were personally involved in the alleged deprivations of plaintiff's constitutional rights or that a municipal policy or custom caused the alleged deprivations.

(i) Due Process Claims Against Williams

**9** In order to be held liable under § 1983, each defendant must have been personally involved in the alleged constitutional violation. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("It is well settled in [the Second Circuit] that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (internal citation omitted); *see also Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987). "[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). As such, the Second Circuit has held that the personal involvement of supervisory officials may be established by evidence that: (1) the defendant participated directly in the alleged constitutional

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited gross negligence or deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

In this case, plaintiff alleges that Williams was involved in the deprivation of his right to reasonable care and safety in two ways. First, plaintiff alleges that, on June 27, 2002, Williams told other patients that they could smoke in the Hospital. (Compl.¶ 54 .) Second, plaintiff alleges that Williams had foreknowledge of the alleged assault against Williams that occurred on June 27, 2002, and "conspired" with the alleged attackers to harm plaintiff. (Compl. ¶¶ 53, 56.) For the reasons set forth below, the Court finds that plaintiff fails to present facts from which a reasonable factfinder could conclude that Williams was personally involved in the deprivation of any rights guaranteed to plaintiff by the Fourteenth Amendment.

First, plaintiff alleges that Williams violated plaintiff's rights by telling other patients that they could smoke in the hospital, thus causing harm to plaintiff. In particular, plaintiff asserts that he informed Williams about the serious health risks posed to plaintiff by other patients' smoking habits and that he witnessed Williams tell other patients that they could smoke in the Hospital.

However, assuming *arguendo* that the alleged conduct, if true, would constitute a violation of plaintiff's right to reasonable care and safety, plaintiff has failed to produce any affirmative evidence in support of his allegations that Williams was personally involved in causing other patients to smoke. Specifically, in support of his allegations, plaintiff points to a single conversation with Williams on June 27, 2002, wherein Williams allegedly told plaintiff and three other patients that patients were permitted to smoke in the Hospital. (Compl.¶¶ 46-49, 51-53.) However, plaintiff has failed to present any facts demonstrating that this conversation actually caused any patients to smoke in the Hospital or even that, following

the alleged conversation, other patients actually did smoke in the Hospital. Plaintiff points to specific instances of patients smoking in his room at times *preceding* the alleged conversation with Williams, but he fails to allege or to offer any evidence from which this Court could reasonably infer that Williams *caused* patients to smoke in the Hospital.

**\*10** Thus, the Court finds that plaintiff has failed to present any evidence, beyond conjecture, from which the Court could reasonably infer that Williams' conduct caused plaintiff to suffer "actual or imminent harm." *See Benjamin,* 343 F.3d at 51 n. 17 ("To establish the deprivation of a basic human need such as reasonable safety, an inmate must show 'actual or imminent harm.' ") (quoting *Lewis v. Casey,* 518 U.S. 343, 350 (1996)). Accordingly, plaintiff's claims against Williams arising from alleged smoking in the Hospital are dismissed.

Second, plaintiff has failed to set forth concrete evidence showing that Williams was personally involved in the alleged June 27, 2002 assault of plaintiff by other patients. Plaintiff offers nothing more than bald assertions that Williams condoned the assault and conspired with the alleged attackers to harm plaintiff. In support of these allegations, plaintiff points to a second conversation involving Williams and three other patients that allegedly also took place on June 27, 2002, wherein Williams and the patients allegedly "conspired and or agreed" that the patients would assault plaintiff that night. (*See* Compl. ¶ 62.)

However, even assuming *arguendo* that plaintiff observed a conversation between Williams and three other patients on June 27, 2002 and that plaintiff was actually assaulted that night, plaintiff has failed to raise a triable issue as to whether Williams conspired or agreed to assault plaintiff. In the complaint, plaintiff concedes that he has no direct knowledge of the contents of the alleged conversation; he claims that Williams pulled the three patients "aside so that she could talk to them without me hearing what they were talking about." (Compl.¶ 52.) Moreover, at his deposition, plaintiff confirmed that he had no direct knowledge of the conversation or of Williams' approval of the alleged assault. (Hewson Decl., Ex. G.) Although plaintiff also asserted at his deposition that he knew of other patients that had overheard staff members approve

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

the alleged assault, plaintiff has failed to identify those witnesses. (*Id.*)

Accordingly, because plaintiff has failed to produce *any* affirmative evidence, beyond conjecture, demonstrating that Williams participated in, directed, or had knowledge of the alleged June 27, 2002 assault, the Court grants defendants' motion as to plaintiff's claims against Williams arising from that assault.

(ii) Due Process Claims against the City

It is well-settled that municipalities may not be liable under § 1983 for constitutional torts committed by its employees under a *respondeat superior* theory; rather, to prevail against a municipality, a plaintiff must demonstrate that his injury "was caused by a policy or custom of the municipality or by a municipal official 'responsible for establishing final policy.' " *Skehan v. Village of Mamaroneck,* 465 F.3d 96, 108-9 (2d Cir.2006) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986)); *accord Coon v. Town of Springfield, Vt.,* 404 F.3d 683, 686 (2d Cir.2005). "In essence, 'municipalities such as the City of New York may only be held liable when the city itself deprives an individual of a constitutional right.' " *Warheit,* 2006 WL 2381871, at *12 (quoting *Davis v. City of New York,* 228 F.Supp.2d 327, 336 (S.D.N.Y.2002)).

*11 Moreover, courts must apply "rigorous standards of culpability and causation" to *Monell* claims in order to ensure that "the municipality is not held liable solely for the actions of its employee." *Bd. of Cty Com'rs of Bryan Cty, Okl. v. Brown,* 520 U .S. 397, 405 (1997). "Thus, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the state." *Davis,* 228 F.Supp.2d at 336 (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 831 (1985) (Brennan, J., concurring in part and concurring in the judgment)). Instead, to constitute a "policy," the municipality must have either enacted an official policy measure or an employee with "policy making authority" must have undertaken an unconstitutional act. *See Pembaur,* 475 U.S. at 480-81. A "custom," although it need not receive formal approval by the municipality, must be "so persistent or widespread as to constitute a custom or usage with the force of law" and "must be so

manifest as to imply the constructive acquiescence of senior policy-making officials." *Green v. City of New York,* 465 F.3d 65, 80 (2d Cir.2006) (quotation marks and citations omitted). "To succeed on this theory, plaintiff must prove the existence of a practice that is permanent." *Davis,* 228 F.Supp.2d at 337. For the reasons that follow, the Court finds that no reasonable factfinder could conclude that the alleged deprivation of plaintiff's rights was caused by a municipal policy or custom.

1. Smoking in the Hospital

Plaintiff alleges that it was the "policy or custom" of the City to permit patients to smoke in the Hospital, thus depriving plaintiff of his right to reasonable care and safety during his confinement. However, defendants have demonstrated that the City's official policy is to prohibit smoking in health care facilities, except in designated areas. *See* N.Y.C. Admin. Code § 17-503 ("Smoking is prohibited in ... [h]ealth care facilities including ... hospitals ... [and] psychiatric facilities ..., provided however, that this paragraph shall not prohibit smoking by patients in separate enclosed rooms of residential health care facilities or facilities where day treatment programs are provided, which are designated as smoking rooms for patients."). Plaintiff has failed to present any facts that create a triable issue as to whether City policymakers altered this policy at the Hospital or that it was the custom or practice of the City to deviate from this policy.[FN7] In addition, plaintiff has failed to identify any members of the Hospital's staff that allegedly permitted other patients to smoke or the other patients that allegedly told plaintiff they had received permission to smoke from members of the Hospital's staff.

FN7. Even assuming *arguendo* that Williams told patients and staff members on June 27, 2002 that patients were permitted to smoke in the hospital, a "single instance" of improper conduct by Williams, who lacks final policymaking authority to suspend the smoking prohibition set forth in New York City Administrative Code § 17-503, would not create a triable issue of fact as to the existence of an unconstitutional policy or a custom or practice so widespread as to have the force of law. *See Sewell v. N.Y.C. Transit Auth.,* 809 F.Supp. 208, 217 (E.D.N.Y.1992) ("[W]hen

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

an official's discretionary decisions are constrained by policies not of that official's making, those [municipal] policies, rather than the subordinate's departures from them, are the act of the municipality.") (quoting *St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988)).

Accordingly, because plaintiff "points to no evidence, other than his own speculation, that such a custom or policy exists," *Warheit,* 2006 WL 2381871, at *13, the Court finds that plaintiff has failed to raise a genuine issue as to whether the City is liable under Section 1983 for permitting patients to smoke in the Hospital. *See Opals on Ice Lingerie v. Body Lines Inc.,* 320 F.3d 362, 370 n. 3 (2d Cir.2003) ("An 'opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions.' ") (quoting *Contemporary Mission v. U.S. Postal Serv.,* 648 F.2d 97, 107 n. 14 (2d Cir.1981)).

### 2. Assaults on Plaintiff

**\*12** Plaintiff alleges that Hospital staff had foreknowledge of each of the alleged assaults against plaintiff by other patients and that it was the "policy and custom" of the City to allow such assaults to occur. (Compl.¶ 67.) As to the alleged "policy" that harmed plaintiff, plaintiff fails to identify any municipal official with policy making authority who was involved in an assault against plaintiff or to provide any documents, affidavits, or other evidence from which a reasonable jury could find that such a policy actually exists. *See Warheit,* 2006 WL 2381871, at *12 n. 4 (finding no unconstitutional policy where plaintiff "provides no evidence, other than his own bare allegations, that such a policy exists").

As to the alleged "custom" of Hospital staff to permit other patients to assault plaintiff, the Court finds that no reasonable factfinder could conclude that the alleged assaults were caused by an unofficial practice of the Hospital "so persistent or widespread as to constitute a custom or usage with the force of law." *Green,* 465 F.3d at 80.

Plaintiff has failed to specifically identify any defendants, other than Williams, who failed to protect plaintiff from attacks by other patients. Moreover, even as to the unnamed staff members who allegedly permitted assaults on plaintiff, plaintiff has failed to present evidence showing that a trial is needed on the issue of whether a practice existed among Hospital staff to allow assaults against plaintiff. Specifically, plaintiff has failed to present any facts, beyond mere conjecture, demonstrating that the Hospital staff had foreknowledge of the alleged assaults or that they failed to act or to intervene to protect plaintiff from such assaults. *See Vallen,* 2005 WL 2296620, at *11 (granting summary judgment were there was "nothing in the record that shows whether [hospital staff] observed the attack and failed to act or intervene").

First, as to the June 15, 2002 incident, plaintiff fails to offer any facts demonstrating that members of the Hospital's staff knew of or condoned the alleged assault, other than his unsupported speculation that "some of the staff" knew of the assault and gave their approval. (*See* Compl. ¶¶ 35, 38.)

Second, as to the alleged chair-throwing incident, plaintiff fails to present any facts from which a reasonable factfinder could infer that Hospital staff knew of or failed to stop the alleged assault. Plaintiff merely alleges that, *following* the assault, he "told the staff to tell [the other patient] to stop but they did not tell him to stop it." (Compl.¶ 43.)

Third, as to the June 27, 2002 incident, the Court found *supra* that plaintiff has failed to present any facts that create a triable issue as to the alleged deprivation of plaintiff's rights based on the conduct of Williams. Plaintiff does not allege that any other defendants were involved in that alleged assault.

Finally, as to the alleged assault that occurred on July 9, 2002, plaintiff asserts that he called out to Hospital staff for help but no staff members came to help him. However, there is nothing in the record from which a reasonable juror could find that members of the Hospital's staff observed the alleged assault, or heard plaintiff's call for help and failed to act or to intervene in the assault.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

**\*13** Accordingly, because plaintiff has failed to identify a municipal policy or custom that caused injury to plaintiff, the Court finds that no reasonable factfinder could conclude that the City was liable for the alleged deprivation of plaintiff's rights.

### E. Other Federal Claims

Plaintiff also alleges various other claims arising from the alleged deprivation of his federal rights. For the reasons that follow, the Court grants summary judgment as to all of defendants' remaining federal claims.

First, because the Court found *supra* that plaintiff has failed to offer any evidence of an agreement between Williams and plaintiff's alleged attackers and because plaintiff has failed to specifically identify any other government officials that entered into such an agreement, plaintiff's Section 1983 and Section 1985 conspiracy claims are dismissed. *See, e.g., Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir.1999); Thomas v. Roach, 165 F.3d 137, 147 (2d Cir.1999).* Moreover, because no actionable conspiracy exists, plaintiffs' Section 1986 claims must also fail. *See Dwares v. New York, 985 F.2d 94, 101 (2d Cir.1993)* ("Liability under § 1986 ... is dependent on the validity of a claim under § 1985.") (citing *Dacey v. Dorsey, 568 F.2d 275, 277 (2d Cir.1978)*).

Second, plaintiff's Section 1981 claim is dismissed because plaintiff has failed to allege, or provide any proof, that any individuals intended to discriminate against plaintiff on the basis of race. *See Gyadu v. Hartford Ins. Co., 197 F.3d 590, 591 (2d Cir.1999).*

Finally, plaintiff's Section 1988 claim for attorney's fees is dismissed because plaintiff is not the "prevailing party" in this case. 42 U.S.C. § 1988; *see Ass'n for Retarded Citizens of Conn., Inc. v. Thorne, 68 F.3d 547, 551 (2d Cir.1995).*

### F. State Law Claims

Plaintiff also asserts claims under the New York State Constitution. (Compl.¶1.) Defendants argue that plaintiff's pendent state law claims must be dismissed for failure to file a Notice of Claim pursuant to New York General Municipal Law Sections 50-e and 50-i. *See Hardy v. N.Y.C. Health & Hosps. Corp., 164 F.3d 789, 793 (2d Cir.1999)* (holding that in federal court, state notice-of-claim statutes apply to state law claims). Plaintiff does not dispute defendants' assertion that a Notice of Claim was not filed for any of his state law claims.

Sections 50-e and 50-i require a party asserting a state law tort claim against a municipal entity or its employees acting in the scope of their employment to file a notice of claim within ninety days of the incident giving rise to the claim and requires the plaintiff to commence the action within a year and ninety days from the date on which the cause of action accrues. *See N.Y. Gen. Mun. Law §§ 50-e, 50-I.* "Under New York law, notice of claim is a statutory precondition to filing suit against the City or its employees." *Harris v. Bowden,* No. 03 Civ. 1617(LAP), 2006 U.S. Dist. LEXIS 12450, at \*22 (S.D.N.Y. March 23, 2006). "A plaintiff's failure to file a notice of claim requires dismissal of pendent state tort claims against the City or its employees in a federal civil rights action." *Robinson v. Matos,* No. 97 Civ. 7144(TPG), 1999 U.S. Dist. LEXIS 5447, at \*3 (S.D.N.Y. April 19, 1999) (citing *Felder v. Casey, 487 U.S. 131, 151 (1988)*).

**\*14** Furthermore, the Court does not have jurisdiction to allow plaintiff to file a late notice of claim. *Corcoran v. N.Y. Power Auth.,* No. 95 Civ. 5357(DLC), 1997 U.S. Dist. LEXIS 14819, at \*19 (S.D.N.Y. Sept. 26, 1997); *see also* N.Y. Gen. Mun. Law § 50(e)(7) ("All applications under this section shall be made to the supreme court or to the county court."). Accordingly, defendants' motion to dismiss plaintiff's state law claims is granted.[FN8] *See Gonzalez v. City of New York,* No. 94 Civ. 7377(SHS), 1996 U .S. Dist. LEXIS 5942, at \*5-\*6 (S.D.N.Y. May 3, 1996) ("Despite the statute's seemingly plain language, it applies not only to suits against municipal corporations but also to suits against 'officer[s], agent[s] or employee[s]' whose conduct has caused injury.").

FN8. Plaintiff also seeks relief under "[a]pplicable ... State Statutes," but fails to identify, and the Court is unable to discern,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

which, if any, state statutes apply to this case. (*See* Compl. ¶ 1.) Nevertheless, even assuming *arguendo* that plaintiff had properly alleged state statutory claims, such claims must also be dismissed due to plaintiff's failure to file a Notice of Claim. *See, e.g., Flynn v. New York City Bd. of Educ.,* No. 00 Civ. 3775(LAP), 2002 WL 31175229, at *9-*10 (S.D.N.Y. Sept. 30, 2002) (dismissing New York state statutory claims due to plaintiff's failure to file a notice of claim).

Moreover, even assuming *arguendo* that plaintiff had filed a notice of claim, the Court would, in its discretion, "decline to exercise supplemental jurisdiction over [plaintiff's] state law claims [because] it has dismissed all claims over which it has original jurisdiction." *Kolari v. New York Presbyterian Hospital,* 455 F.3d 118, 121-22 (2d Cir.2006) (quoting 28 U.S.C. § 1367(c)(3)) (internal quotation marks omitted) ("If the federal law claims are dismissed before trial ... the state claims should be dismissed as well."); *Karmel v. Liz Claiborne, Inc.,* No. 99 Civ. 3608(WK), 2002 U.S. Dist. LEXIS 12842, *11 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

## III. CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is GRANTED and plaintiff's claims are dismissed in their entirety. The Clerk of the Court shall enter judgment in favor of defendants and close this case.

SO ORDERED.

E.D.N.Y.,2007.
Dove v. City of New York
Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

*1 This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory
Committee Notes. Accordingly, the Court adopts the

Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff
and failed to provide adequate medical treatment for his
injuries and drug problem. Plaintiff seeks declaratory
relief and monetary damages. Presently pending is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

> FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

### II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46,

78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

#### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

#### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl., ¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

*Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above,

plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

▷

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Barry Lee VALLEN Plaintiff,
v.
S.H.T.A. CARROL; S.H.T.A. Gantz; S.H.T.A.
Gonzales; S.H.T.A. Malfatone; S.H.T.A. Nelson;
S.H.T.A. Leper; Dr. Beneb Ting; Senior S .H.T.A. John
Doe; S.H.T.A. March; S.H.T.A. Adams; S.H.T.A.
Brown; S.H .T.A. Jones; and Various S.H.T.A. John
Does, Defendants.
No. 02 Civ. 5666(PKC).

Sept. 20, 2005.

*MEMORANDUM AND ORDER*

CASTEL, J.

**\*1** Plaintiff Barry Lee Vallen brings this action, pursuant
to 42 U.S .C. § 1983, alleging that he was the victim of
multiple patient-to-patient assaults and deprivations of
property during the time that he resided at the
Mid-Hudson Forensic Psychiatric Center ("Mid-Hudson"),
a facility operated by an agency of the state of New York.
In a Memorandum and Order dated September 2, 2004, I
dismissed defendants New York State Office of Mental
Health and Mid-Hudson on the basis of the state's
constitutionally-based immunity from suit. *Vallen v.
Mid-Hudson Forensic Office of Mental Health,* 2004 WL
1948756 (S.D.N.Y. Sept. 2, 2004). I concluded that the
Complaint set forth allegations sufficient to state claims
against the individual defendants for deliberate
indifference to confinement conditions that were seriously
and dangerously unsafe. *Id.* at *3. I held that plaintiff's
claim did not arise under the Eighth Amendment because
he was not serving a term of imprisonment pursuant to a
conviction, but, generously construed, his *pro se*
Complaint could be read as alleging that persons acting

under color of state law had deprived him, as an
involuntarily detained person, of rights protected by the
Fourteenth Amendment. *Id.*

Discovery in this action is now closed. The defendants
have moved for summary judgment dismissing the
plaintiff's claims. For the reasons explained below, the
defendants' motion is granted.

*Background*

The following facts are taken from plaintiff's pleadings,
his sworn deposition summary testimony or are otherwise not
disputed. Where multiple inferences can be drawn from
the facts, I have considered only the one most favorable to
Mr. Vallen, the non-movant.

In 1984, the plaintiff was charged with two counts of
second-degree murder in connection with the death of his
parents. (Vallen Dep. at 169) Plaintiff pleaded not guilty
by reason of mental illness or defect and was diagnosed as
a paranoid-schizophrenic. (Vallen Dep. at 169-71) A
Justice of the New York Supreme Court, Orange County,
found that, at that point in time, the plaintiff suffered from
a dangerous mental illness and ordered that he be
committed to a psychiatric facility. (Vallen Dep. at 170)
Subsequently, plaintiff was discharged to outpatient care
on two occasions, but in each instance he was later
recommitted. (Vallen Dep. at 172-84) From April 18,
1997 through June 14, 2000, plaintiff was an inpatient at
Mid-Hudson. (Dickson Aff. ¶ 5)

In an order dated July 22, 2002, Chief Judge Michael B.
Mukasey dismissed plaintiff's deprivation of property
claim and ruled that the State of New York provided
adequate post-deprivation remedies for the recovery of
lost property. (July 22, 2002 Order at 3) He also ruled that
the Complaint inadequately detailed the assault claims,
and dismissed those claims without prejudice. (July 22,
2002 Order at 2, 4-5) Plaintiff filed an Amended
Complaint ("AC") dated January 24, 2003.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

The AC alleges that, during his three years of treatment at Mid-Hudson Forensic Psychiatric Facility, the plaintiff was subjected to violence and threats of violence, and that the individual defendants promoted or failed to prevent these incidents. The individual defendants were employed as security hospital treatment assistants ("SHTAs") who were responsible for assisting psychiatric patients in their day-to-day needs and activities. (DeLusso Aff. ¶¶ 2-3)

**\*2** Each of the incidents set forth in the AC are discussed below. Generally described, the plaintiff alleges that the defendants either encouraged or failed to intervene in violent attacks that other patients inflicted upon the plaintiff. According to the AC, the defendants were aware that various Mid-Hudson patients had violent histories, and placed these patients in close proximity to the plaintiff. On other occasions, the AC alleges that the defendants displayed pleasure at the attacks on plaintiff that allegedly took place. Plaintiff notes, by way of contrast, that since the year 2000 he has resided at a facility in Rochester, New York, and has never been threatened or assaulted.

Helpfully, as part of their motion papers, the defendants have organized the allegations set forth in the Complaint into sixteen distinct incidents or clusters of incidents. Solely for the purposes of facilitating evaluation and discussion of the incidents, I will refer to the sixteen incidents by the number and descriptive title employed in the defendants' motion papers. (Appendix to this Memorandum and Order) I do not in any way treat the defendants' submission as having any evidentiary quality to it.

*Summary Judgment Standard*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome

of the suit under the governing law ..." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e). In raising a triable issue of fact, the nonmovant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.' " *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 84 (2d Cir.2004) (quoting *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. Caution is particularly warranted when considering a summary judgment motion in a discrimination action, since direct evidence of discriminatory intent is rare, and often must be inferred. *Forsyth v. Fed'n Empl. & Guidance Serv.,* 409 F.3d 565, 569 (2d Cir.2005). The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (quotations and citations omitted); *accord Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. *See* Fed.R.Civ.P. 56(c). In the absence of any disputed material fact, summary judgment is appropriate. *Id.*

**\*3** The defendants have served the *pro se* plaintiff with the notice explaining the manner in which a party may oppose summary judgment, as required by Local Rule 56.2. I am mindful of the latitude afforded to a *pro se* party opposing

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

a summary judgment motion. *See Forsyth,* 409 F.3d at 570 ("special solicitude" owed to *pro se* litigants opposing summary judgment); *Shabtai v. U.S. Dep't of Educ.,* 2003 WL 21983025, at *5 (S.D.N.Y. Aug. 20, 2003) (obligation to construe leniently *pro se* opposition papers on a summary judgment motion). However, a party's *pro se* status does not alter the obligation placed upon the party opposing summary judgment to come forward with evidence demonstrating that there is a genuine dispute regarding material fact. *Miller v. New York City Health & Hosp. Corp.,* 2004 WL 1907310, at *9 (S.D.N.Y. Aug. 25, 2004).

*Discussion*

1. *Statute of Limitations Defense*

The applicable limitations period for Section 1983 actions is found in the state statute of limitations for personal injury actions. *Owens v. Okure,* 488 U.S. 235, 249-50 (1989). "Accordingly ... New York's three-year statute of limitations for unspecified personal injury actions, New York Civil Practice Law and Rules § 214(5), governs section 1983 actions in New York." *Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997). The statute of limitations begins to accrue " 'when the plaintiff knows or has reason to know of the injury which is the basis of his action.' " *Id.* (quoting *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980)).

This action was filed in the *pro se* office on December 10, 2001, although the Complaint was not formally accepted for filing until July 22, 2002. The timeliness of the Complaint for statute of limitations purposes is measured from the delivery to the *pro se* office on December 10, 2001. *See Ortiz v. Cornetta,* 867 F.2d 146 (2d Cir.1999); *Toliver v. Sullivan County,* 841 F.2d 41 (2d Cir.1988). It is undisputed that some of the events alleged in the AC occurred more than three years prior to such delivery, *i.e.* prior to December 10, 1998.

Here, plaintiff argues that he is entitled to tolling under New York law by reasons of insanity. Once the defendant demonstrates that the claim facially falls within the limitations period, the plaintiff, not the defendant, bears

the burden of proof on tolling. *See Doe v. Holy See (State of Vatican City),* 17 A.D.3d 793, 794 (3d Dep't 2005); *Assad v. City of New York,* 238 A.D.2d 456, 457 (2d Dep't 1997).

CPLR 208 provides for tolling when "a person entitled to commence an action [was] under a disability because of infancy or insanity at the time the cause of action accrues...." While the words of the statute, taken at face value, might appear to be broad enough to apply to any person suffering from a debilitating mental illness, the New York Court of Appeals has interpreted the statute more narrowly. *McCarthy v. Volkswagen of Am.,* 55 N.Y.2d 543 (1982). The *McCarthy* Court reviewed the legislative history of the provision and concluded that the legislature intended that CPLR 208 be "narrowly interpreted." *Id.* at 548. In the words of the Court: "we believe that the Legislature meant to extend the toll for insanity to only those individuals who are unable to protect their legal rights because of an over-all inability to function in society." *Id.* at 548-549. New York courts have consistently applied the *McCarthy* standard to claims of tolling by reason of insanity. *See, e.g., Eberhard v. Elmira City School Dist.,* 6 A.D.3d 971, 973 (3d Dep't 2004) (*McCarthy* standard not satisfied by claim of post-traumatic stress syndrome); *Burgos v. City of New York,* 294 A.D.2d 177, 178 (1st Dep't 2002) ("The doctor's affirmation ... was vague and conclusory in asserting that plaintiff's 'dementia and psychotic disorder [are] due to multiple medical conditions [that] have existed for many years and are permanent,' and thus insufficient to raise an issue of fact" on CPLR 208 tolling under the *McCarthy* standard).

**\*4** The standard articulated in *McCarthy* has two components. First, the party must be "unable to protect [his] legal rights" and, second, the reason he is unable to protect his legal rights is "because of an over-all inability to function in society." I assume for the purposes of this motion that, during the period for which plaintiff seeks tolling, he had "an over-all inability to function in society." In this regard, plaintiff has several "retention hearings" that have resulted in findings that Vallen should remain in an institutional setting. (Vallen Decl. ¶ 1) However, I still must consider whether plaintiff has raised a triable issue of fact as to his ability to protect his legal rights during the period for which he seeks tolling.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

As part of their summary judgment burden, the defendants have come forward with evidence of Vallen's direct, personal and vigorous pursuit of his legal rights in judicial proceedings instituted during the period for which he claims tolling. In November 1998, plaintiff commenced an action in the Court of Claims of the State of New York alleging that the state had been negligent in permitting seven inmate assaults on him over the course of one and one-half years. (Peeples Aff., Ex. C) He was then familiar with the necessity of timely filing a claim, as evidenced by his handwritten complaint dated November 16, 1998, which recites as follows: "This claim is filed within 3 years after the claim accrued, as required by law." (Peeples Aff., Ex. C) [FN1] *Vallen v. State of New York,* Claim No. 100141 (N.Y.Ct.Cl. Sept. 1, 1999). He filed a second Court of Claims action in or around July 1999 alleging that the state had been negligent by permitting a patient identified as C.J. to initiate a physical attack. [FN2] (Peeples Aff. Ex. D) *Vallen v. State of New York,* Claim No. 100803 (N.Y.Ct.Cl. Apr. 17, 2001). Plaintiff filed a third Court of Claims action in July 1999, alleging that the state was negligent in permitting the theft of his personal property; in that action, he set forth a detailed list of each item of lost property and its value, including a "suit for court" ($279) and a pair of ostrich leather western boots ($350) (Peeples Aff. Ex. E) *Vallen v. State of New York,* Claim No. 100804 (N.Y.Ct.Cl. Apr. 17, 2001). Also in July 1999, he filed a Section 1983 action in this District alleging that his constitutional rights had been violated. (Peeples Aff. Ex. I) *Vallen v. Connelly,* 99 Civ. 9947(SAS). [FN3] In March 2000, plaintiff filed a fourth suit in the Court of Claims alleging that falsified claims had been levied against him. (Peeples Aff. Ex. F) *Vallen v. State of New York,* Claim No. 102160 (N.Y.Ct.Cl. Sept. 1, 2000). In toto, between November 1998 and March 2000, Vallen, proceeding *pro se,* filed five separate lawsuits in two different fora in an effort to enforce and protect his legal rights. In two of the pleadings, he affirmatively expressed an understanding of the applicable statute of limitations. The 1999 federal court action evinces an awareness of a federal remedy and the procedural means to invoke it. *Cf. Cerami v. City of Rochester Sch. Dist.,* 82 N.Y.2d 809, 813 (1993) (considering, inter alia, the numerous lawsuits filed by the party claiming toll in rejecting such a claim).

FN1. The same allegation is set forth in Vallen's 2000 state Court of Claims complaint. (Peeples Aff., Ex. F)

FN2. To protect their privacy, all Mid-Hudson patients other than the plaintiff will be identified via their initials.

FN3. *See also Vallen v. Connelly,* 36 Fed. Appx. 29 (2d Cir. June 11, 2002), *on remand,* 2004 WL 555698 (S.D.N.Y. Mar 19, 2004).

*5 In response to the defendants' evidence submitted on their summary judgment motion, plaintiff has been unable to raise a triable issue of fact as to his ability to protect his legal rights during the period for which he claims tolling. The plaintiff has had a full opportunity to conduct discovery. In his papers in opposition to summary judgment, he has exhibited an understanding of the requirements of Rule 56, which were explained to him in the Local Rule 56.2 Notice. Yet, nowhere does he address his ability or inability to protect his rights during the time he has been in a mental health facility. Indeed, rather than rebut the defendants' evidence, plaintiff notes that, during the period for which he seeks tolling, he "pressed charges and the patient C.J. was convicted and sent to Orange County jail." (Pro Se Affidavit in support to deny [sic] summary judgment) The closest he comes to responding to the defendant's argument is the assertion that he lost some or all of his lawsuits on the basis of "simple technicalities", thereby demonstrating that he was unable to protect his rights. (Pro Se Mot. to Den. Summ. J. at 1) But it does not follow that because other claims he asserted were dismissed on various grounds that, therefore, he was unable to assert the claims that he belatedly asserted in this action. He also asserts that the express reference to the statute of limitations in two of his filings "was only a mere statement I read in a book...." (Pro Se Mot. to Den. Summ. J. at 1) The source of his awareness of his rights is not relevant to this motion.

To the state employees who are named as individual defendants in plaintiff's Section 1983 claim, it is no small matter to allow a stale claim to stand when there is no basis in the record for tolling. These individuals would be required to defend themselves against allegations concerning events that occurred long ago brought by a plaintiff who has amply demonstrated his ability to file a lawsuit in a timely manner in other instances where he has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

felt aggrieved.

I conclude that the plaintiff has failed to raise a triable
issue of fact on his claim that he was "unable to protect
[his] legal rights" for the period commencing from
November 18, 1998, the date of his first Court of Claims
Complaint. On the issue of tolling, the plaintiff bore the
burden of proof and, in response to defendant's motion, he
failed to come forward with evidence sufficient to require
a trial on this issue. *Holy See (State of Vatican City),* 17
A.D.3d at 794; *Assad,* 238 A.D.2d at 457. However, there
remains the question of which incidents occurred more
than three years prior to the commencement of this action,
*i.e.* prior to December 10, 1998.

Plaintiff has stated that in the "first few months" after his
May 18, 1997 assignment to Mid-Hudson, defendant
Gonzales predicted that violence would be "coming [his]
way." (Vallen Dep. at 216) This is Incident No. 1 in the
Appendix. According to the AC, during his first months at
Mid-Hudson, defendant SHTA Carrol predicted that the
plaintiff would have some accidents, defendant SHTA
Malfatone was aware that patient John Doe No. 1 had
violent tendencies, and defendant SHTA Gonzales failed
to intervene during an assault that John Doe No. 1 made
against the plaintiff. (AC at 3, 5, 8; Vallen Tr. at 216,
219-20) Additionally, on November 8, 1998, a patient
identified in the AC as "Reshawn" physically attacked the
plaintiff in front of defendant Gantz, who allegedly failed
to intervene. (Complaint at 17) This is Incident No. 9 in
the Appendix. One to two weeks later, defendant SHTA
Gantz allegedly threatened and punched the plaintiff.
(Vallen Dep. Tr. at 56-59) This is Incident No. 10 in the
Appendix. Sometime between the Reshawn incident and
the Gantz incident, Malfatone instructed the plaintiff to
stop drinking from a water fountain, and knocked him to
the ground. (Vallen Dep. Tr. at 230) This is Incident No.
13 in the Appendix.

**\*6** The plaintiff does not dispute that these incidents all
occurred between May 18, 1997 and late November 1998.
The three-year statute of limitations for these incidents
accrued, and plaintiff's claims were thus time-barred, prior
to the commencement of this action on December 10,
2001.[FN4] The defendants' summary judgment motion is
granted as to Incident Nos. 1, 9, 10 and 13 set forth in the
Appendix, and this portion of the plaintiff's action is

dismissed. Though claims based upon these occurrences
are barred by the statute of limitations, I will consider the
underlying facts to the extent they are relevant to plaintiff's
opposition to the other prongs of defendants' motion. *See
Jute v. Hamilton Sanstrand Corp.,* Docket No. 04-3927
(2d Cir. August 23, 2005) (considering such facts in the
context of Title VII).

> FN4. Assuming that the earliest of his claims
> accrued in May 1997 and was tolled under CPLR
> 208 from May 1997 to November 18, 1998,
> plaintiff had three years from November 18,
> 1998, *i.e.* until November 18, 2001 to assert the
> claims. He did not assert the claims prior to that
> date.

2. *Lack of Showing of a Defendant's Personal
Involvement*

The defendants, each of whom is individually accused of
having deprived plaintiff of constitutionally-protected
rights, argue that certain of the plaintiff's claims should be
dismissed because there is no evidence of personal
involvement in the events giving rise to the asserted
claims. "It is well settled in this Circuit that 'personal
involvement of defendants in alleged constitutional
deprivations is a prerequisite to an award of damages
under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d
Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d
880, 885 (2d Cir.1991)).

There are five ways in which a plaintiff may show the
personal involvement of a defendant in a constitutional
deprivation: (1) the defendant directly participated in the
alleged constitutional violation, (2) the defendant, having
been informed of a violation through a report or appeal,
failed to remedy the wrong, (3) the defendant created a
policy or custom under which constitutional violations
occurred, or allowed the continuation of such a policy or
custom, (4) the defendant was grossly negligent in
supervising subordinates who committed wrongful acts, or
(5) the defendant displayed deliberate indifference to the
inmates' rights by failing to act on information that
unconstitutional acts were occurring. *See Colon v.
Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Liability may
not be anchored in a theory of *respondeat superior.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

*Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992). "The bare fact that [a defendant] occupies a high position in the [institutional] hierarchy is insufficient to sustain [a] claim." *Colon*, 58 F.3d at 874.

The defendants identify six separate incidents for which they claim that the plaintiff can set forth no facts that indicate personal involvement on the part of the various defendants. The plaintiff alleges that a Mid-Hudson patient, C.J., stabbed him with a pen near his eye while SHTA Nelson and John Doe defendants Nos. 2 and 3 were supposed to be supervising. (AC at 11-12) This is Incident No. 4 in the Appendix. SHTA Nelson was never served and is not a party to this action, and the plaintiff has been unable to identify John Does Nos. 2 and 3.[FN5] (Vallen Dep. Tr. at 106-07) As such, his claims arising from this incident (No. 4) are dismissed.

> FN5. According to Donna DeLusso, director of Human Resources at Mid-Hudson, SHTA Nelson has not been employed by Mid-Hudson since his retirement on October 30, 1999. (DeLusso Aff. ¶ 4)

*7 The plaintiff alleges that in a separate incident, patient C.J. approached him, stabbed him near the eye, and attempted to gouge out his eye with his fingers. (AC at 14) This is Incident No. 5 in the Appendix. Plaintiff asserts that John Doe defendants Nos. 1, 2 and 3 observed this incident and failed to intervene. (AC at 14) However, the plaintiff is unable to identify John Does Nos. 1, 2, and 3. (Vallen Dep. Tr. at 120-21) Because there is no evidence of personal involvement on the part of any defendant remaining in this action, plaintiff's claim arising from this incident (No. 5) is dismissed.

In a third incident involving patient C.J., plaintiff alleges that two Mid-Hudson employees permitted C.J. to assault him in a facility dining room. (AC at 10-11) This is Incident No. 6 in the Appendix. Plaintiff alleges that afterward, defendant Carrol laughed about the incident and expressed regret that he had not been present to observe the assault. (AC at 11) However, the plaintiff does not identify any employee who observed the assault, and the alleged after-the-fact laughter and comments of defendant Carrol, while callous and distasteful, do not rise

to the level of a constitutional violation. *Cf. Moncrieffe v. Witbeck*, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (allegation that corrections officer laughed at plaintiff does not state an Eighth Amendment claim). Plaintiff's claims arising out of this incident (No. 6) are dismissed.

Next, the plaintiff asserts that another Mid-Hudson patient, A.A., had a long history of attacking people, and that Mid-Hudson staff intentionally placed A.A. in the plaintiff's proximity. (AC at 15-16) This is Incident No. 7 in the Appendix. Plaintiff alleges that SHTA Nelson positioned A.A. close to the plaintiff, and that A.A. attacked him. (AC at 15-16) However, Nelson was not served in this action, and the plaintiff has identified no other Mid-Hudson employees who were involved in the incident. Because there are no facts in the record before me indicating that any defendant to this action was personally involved in or supervised A.A.'s attack, plaintiff's claim arising out of this incident (No. 7) is dismissed.

The plaintiff claims that SHTA March shouted at him and pushed him in a bathroom. (AC at 23) This is Incident No. 11 in the Appendix. However, March was not served in this action, and none of the defendants who are parties to this action were implicated in these events. Because there are no facts in the record before me indicating that any defendant to this action was personally involved in the attack, plaintiff's claim arising out of this incident (No. 11) is dismissed.

Lastly, defendants move for summary judgment seeking the dismissal of plaintiff's claims arising from three incidents loosely raised in the AC. Plaintiff alleged that another patient, N., kicked and punched him, and that staff members laughed because N. was an older man. (AC at 24-25) This is Incident No. 14 in the Appendix. In another incident, the plaintiff alleges that an unidentified staff member gave another patient a key to plaintiff's locker, leading that patient to steal $35. (AC at 25) This is Incident No. 15 in the Appendix. In the third incident, the plaintiff alleges that patient B. punched him in a bathroom. (AC at 25) This is Incident No. 16 in the Appendix. However, the plaintiff has not identified by name any members of the Mid-Hudson staff who were involved in these incidents. As a result, all claims arising

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

from these three incidents (Nos.14-16) are dismissed as to all defendants.

3. *Defendants' summary judgment Motion as to plaintiff's remaining claims*

**\*8** Defendants move for summary judgment dismissing plaintiff's remaining claims and assert that, in response to their motion, plaintiff has come forward with no facts from which a reasonable fact-finder could conclude that that he was deprived of any rights under the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 315-16 (1982), the Court concluded that an involuntarily committed person has substantive rights under the Due Process Clause of the Fourteenth Amendment to be free from unsafe conditions of confinement. The Court reasoned that "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Id. See also DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199 (1989) ("[T]he substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others.").

Although *Youngberg* established that involuntarily committed mental patients have substantive due process rights, the standard articulated in the opinion for adjudicating claims based on those rights does not control here. Like Mr. Vallen, the plaintiff in *Youngberg* had been involuntarily committed to a state institution-albeit one for mentally retarded individuals-and had experienced violent attacks from other residents while staying there. *See Youngberg,* 457 U.S. at 310. The plaintiff alleged that the institution's director and two supervisors had known, or should have known, that the plaintiff was suffering injuries and that they failed to institute appropriate preventive measures. *Id.* The Court held that only an official's decision that was a "substantial departure from accepted professional judgment, practice or standards" would support a substantive due process claim brought by an involuntarily committed mental patient. *Id.* at 323. This standard reflected the Court's conclusion that a decision in this setting, "if made by a professional, is presumptively

valid." *Id.* In defining its use of the term "professional", the Court appeared to include nonprofessionals acting under the direction of professional supervisors. *Id.* at 323 n. 30. Unlike the defendants in *Youngberg,* the defendants here are low-level staff members. The nature of such an employee immediately addressing patient-on-patient assault or theft differs significantly from higher-level decisions like patient placement and the adequacy of supervision. For the latter decisions, it is readily possible to apply a test based on professional judgment, practice or standards. In this case, professionals made none of the challenged decisions, and thus the "substantial departure" test has no applicability.

In addition, the general approach to substantive due process claims appears inappropriate in this case. Usually, in order to establish a substantive due process violation for purposes of Section 1983, a plaintiff must show that the defendant's actions taken under color of state law involved "conduct intended to injure [plaintiff] in some way unjustifiable by any government interest [and] ... most likely to rise to the conscience-shocking level." *County of Sacramento v. Lewis,* 523 U.S. 833, 849 (1998). However, for pretrial detainees protected by the Fourteenth Amendment, but not the Eighth Amendment, the Court has applied the lower standard of "deliberate indifference" to Section 1983 claims arising from state officials' inattention to their medical needs.[FN6] In *Lewis,* the Court reasoned:

FN6. In the Eighth Amendment context, a "prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates" the inmate's constitutional protection. *Farmer v. Brennan,* 511 U.S. 825, 828 (1994). Officials must take " 'reasonable measures to guarantee the safety of the inmates," ' including protection of inmates from other inmates' acts of violence. *Id.* at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)). A failure-to-protect claim requires the plaintiff to satisfy both an objective test and a subjective test. The objective test requires that a deprivation must be "sufficiently serious," with a defendant's act or omission resulting in the denial of "the minimal civilized measure of life's necessities." *Id.* at 834 (citation omitted). To succeed on a deliberate indifference failure-to-protect claim,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

the plaintiff must also prove that a plaintiff was "incarcerated under conditions posing a substantial risk of serious harm." *Id.* By contrast, the subjective considerations look to whether a defendant had a "sufficiently culpable state of mind," one that reflects deliberate indifference to an inmate's health or safety. *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 297 (1991)).

**\*9** "Since it may suffice for Eighth Amendment liability that prison officials were deliberately indifferent to the medical needs of their prisoners, it follows that such deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial."

*Id.* at 850 (citations omitted). As in the case of pretrial detainees, the involuntary commitment of mentally ill individuals does not constitute punishment for purposes of the Eighth Amendment. *See DeShaney,* 489 U.S. at 199 ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.") (citations omitted). However, the Fourteenth Amendment still protects these individuals, including the plaintiff in this case. *See, e.g., Lombardo v. Stone,* 2001 WL 940559, *7 n. 7 (S.D.N.Y. Aug. 20, 2001)* (rejecting the Eighth Amendment as a basis for claims of a patient at a psychiatric facility who had not been convicted of a crime and analyzing them instead under the Fourteenth Amendment). Moreover, the state's central role in supervising and caring for the involuntarily committed-like the pretrial detainees considered in *Lewis*-suggests that the conscience-shocking standard demands too much of such plaintiffs' substantive due process claims.

I am inclined to agree with the Eighth Circuit that the standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients and based on alleged failures to protect them that violated their substantive due process rights. *See Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004). However, I do not need to reach the issue because whether the defendants' actions are measured under the "conscience-shocking", the "substantial departure" or the "deliberate indifference" standard, the result is the same:

no reasonable fact-finder could conclude based upon the evidence, drawing all inferences in plaintiff's favor, that the defendants' conduct either shocked the conscience, was deliberately indifferent or substantially departed from accepted professional judgment, practices or standards.

Defendants argue that four incidents (Nos.2, 3, 8, 12) set forth in the AC should be dismissed because there are no triable issues of fact that support plaintiff's claim. I address them each in turn.

First, the plaintiff asserts that defendant Jones and that SHTA John Does Nos. 1 and 2 permitted patient C.J. to circle the plaintiff, and that C.J. then punched the plaintiff in the face several times. (Vallen Dep. Tr. at 89-96; AC at 9-10) This was the first alleged assault that C.J. inflicted upon the plaintiff, and is designated as Incident No. 2 in the Appendix. The defendants assert that summary judgment is warranted because the plaintiff cannot point to any facts supporting a conclusion that defendant Jones had any advance knowledge of C.J.'s assault upon plaintiff or was deliberately indifferent to the assault once he observed it. The defendants point to Vallen's deposition testimony that Jones "flew out from behind the desk and threw [C.J.] to the ground or something" when he saw that C.J. was attacking the plaintiff. (Vallen Dep. Tr. at 96) There is no dispute that once an attack was underway, Jones actively intervened to stop a physical attack against the plaintiff. After intervening in the attack, Jones told the plaintiff that he saw C.J. "circling you, I knew he was going to do something, and then he did it." (Vallen Dep. Tr. at 95) While such a statement may be open to multiple inferences, this remark standing alone is insufficient to raise a triable issue of fact. Based on the plaintiff's own account, as soon as C.J. began the assault upon plaintiff, defendant Jones immediately intervened and restrained C.J. Defendant Jones's conduct was not indifferent to Vallen's fate but rather proactive and protective of him. Plaintiff's claim does not survive under any of the arguably applicable standards-conscience-shocking conduct, deliberate indifference or substantial departure from accepted judgment standards or practices. Defendants' motion for summary judgment as to this incident (No. 2) is therefore granted.

**\*10** Next, the defendants assert that summary judgment is appropriate for an incident in which defendant SHTA

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

Leper told Mid-Hudson patient C.J. to enter a bathroom that the plaintiff was using because it would not bother the plaintiff. (AC at 16) This is Incident No. 8 in the Appendix. Defendants assert that summary judgment is appropriate because Leper did not infringe the plaintiff's constitutional rights when he suggested that C.J. enter the bathroom. (Def.'s Mem. 20-21) In opposition, the plaintiff asserts that C.J. posed a risk of violence to him at that time, but he does not indicate that he endured any physical injury from C.J.'s presence. (Opp'n Decl. ¶ 8) However embarrassing this incident may have been to the plaintiff, it does not rise to the level of a Constitutional violation. *See, e.g., Rodriguez v. Ames,* 287 F.Supp.2d 213, 219-20 (W.D.N.Y.2003) (doctor was not deliberately indifferent to inmate's privacy rights when he conducted examination of inmate's bowel condition in prison cell because of lower privacy baseline in prison facilities); *Robinson v. Middaugh,* 1997 WL 567961, at *4 (N.D.N.Y. Sept. 11, 1997) ("plaintiff's claims that he was made to shower, dry off with a pillow case, and his private parts exposed due to the wearing of a 'paper suit,' and sleeping on an unsanitized mattress do not rise to the level of deliberate indifference or the wanton infliction of pain."). The deprivation implicated is not sufficiently serious and does not deprive him of the minimal civilized measure of life's necessities. *Cf. Farmer v. Brennan,* 511 U.S. 825, 834 (1994). The defendant's motion is granted as to this incident (No. 8), and it is dismissed from this case.

Defendants move for summary judgment as to the plaintiff's claims concerning defendant SHTA Brown and Mid-Hudson patient F. This is Incident No. 12 in the Appendix. According to the plaintiff, F. commenced an attack on the plaintiff and began to kick him from behind. (AC at 24) At that point, according to the AC, "S.H.T.A. Brown jumped in to protect the patient who kicked me." (AC at 24) The AC does not assert that S.H.T.A. Brown was responsible for the attack, encouraged the attack, or had foreknowledge of the attack. To the contrary, the record and the allegations indicate only that once an attack was underway, defendant Brown attempted to restrain patient F. from attacking the plaintiff. In his deposition, the plaintiff volunteered that defendant Brown intervened when the plaintiff himself "started to go at [patient F.]." (Vallen Dep. Tr. at 229) Because the record does not support an inference that defendant Brown's conduct shocked the conscience, resulted from deliberate indifference or departed substantially from professional standards or practices, the defendants' motion for summary judgment is granted as to the incident (No. 12), and it is dismissed.

Finally, the defendants' motion for summary judgment is granted as to claims arising from an incident with Mid-Hudson patient S.W. This is Incident No. 3 in the Appendix. Defendants argue that the plaintiff can point to no admissible evidence from which a reasonable fact-finder could find in plaintiff's favor. "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *see also Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223-24 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The plaintiff alleges that he was walking up the staircase when S.W. punched him in the face. (AC at 9-10; Vallen Dep. Tr. at 97-98) He asserts that defendant SHTA Malfatone was present. (Vallen Dep. Tr. at 98) However, there is nothing in the record that shows whether SHTA Malfatone observed the attack and failed to act or intervene, or whether Malfatone was indifferent to the plaintiff's health or safety. As a result, the defendants' summary judgment motion seeking the dismissal of plaintiff's claim based upon this incident (No. 3) is granted because plaintiff has failed to raise a triable issue of fact under any of the applicable standards.

4. *Qualified Immunity and Law of the Case*

**11** Because claims arising from these incidents are dismissed on other grounds, I do not consider the defendants' contention that defendants Carrol, Jones and Leper are entitled to qualified immunity. Similarly, I need not consider the defendants' contention that the law of the case bars plaintiff from continuing to pursue his lost property claim for the $35 stolen from his locker.

*CONCLUSION*

The defendants' summary judgment motion is GRANTED.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

The Clerk is directed to enter judgment in favor of the defendants, and to dismiss this case.

SO ORDERED.

*APPENDIX TO MEMORANDUM AND ORDER IN VALLEN V. CARROL, 02 CIV. 5666(PKC)*

1. *Allegations Based on Events that Occurred During Plaintiff's First Few Months at Mid-Hudson Forensic*

SHTA Carrol told plaintiff that he was going to have some accidents. (AC at 3, 5) SHTA Gonzales told Plaintiff that violence was coming his way. (AC at 5) SHTA Gonzales heard patient John Doe # 1 threaten plaintiff, and stood by as patient John Doe # 1 hit plaintiff in the head. (AC at 5) SHTA Malfatone "and other S.H.T.A. staff" were aware that this same patient, John Doe # 1, was violent, but laughed and did nothing when patient John Doe # 1 followed plaintiff to his room and punched him. (AC at 8) The next morning, patient John Doe # 1 came up behind plaintiff at a sink and put a hair pick to his eyes and said that he wanted no more trouble out of plaintiff. (AC at 8) SHTA Gonzales told plaintiff to stop causing trouble. (AC at 8) These events (the "Initial Incidents") allegedly occurred within the first few months of plaintiff's arrival at Mid-Hudson Forensic-within a few months of April 8, 1997. (Vallen Dep. Tr. 216, 219-20)

2. *The First Patient C.J. Allegation*

SHTA Jones and SHTAs John Doe # 1 and # 2 "let" patient C.J. "circle around" plaintiff until he got behind plaintiff. (AC at 9) Patient C.J. then punched plaintiff in the face and "tried to take [plaintiff's eye out." (AC at 9) Plaintiff does not know who John Doe # 1 and # 2 are. (Vallen Dep. Tr. 96) This was the first time patient C.J. had assaulted plaintiff. (Vallen dep. Tr. 89-91, 95-96; AC at 9-10)

3. *The Patient S.W. Allegation*

Patient S.W. punched plaintiff on a staircase, and SHTAs Malfatone and Nelson were there (the "S.W. Incident"). (AC at 9-10)

4. *The Second Patient C.J. Allegation*

Patient C.J. was on assault precautions in the high observation area in the dayroom. SHTA Nelson and SHTAs John Doe # 2 and # 3 were watching the ward. Patient C.J. walked to where plaintiff was watching television, and stabbed plaintiff near his eye with a pen. (AC at 11-13) Plaintiff cannot identify SHTAs John Doe # 2 and # 3. (Vallen Dep. Tr. 106-07)

5. *The Third Patient C.J. Allegation*

Patient C.J. took a pen and left the precaution area while SHTAs John Doe # 1, # 2 and # 3 were observing, walked to where plaintiff was seated watching television, stabbed plaintiff near the eye, and tried to gouge plaintiff's eye with his fingers. (AC at 14) Plaintiff cannot identify John Does # 1, # 2 or # 3. (Vallen Dep. Tr. 120-21)

6. *The Fourth Patient C.J. Allegation*

**\*12** SHTAs John Doe # 1 and # 2 allowed patient C.J., who was on assault precautions, to leave his line in the dining room, and patient C.J. then assaulted plaintiff while plaintiff was carrying his tray. (AC at 10-11, Vallen Dep. Tr. at 101) Plaintiff cannot identify SHTAs John Doe # 1 or # 2. (Vallen Dep. Tr. at 101) An hour later, SHTA Carrol laughed and said he wished he had been present to watch the assault. (AC at 11)

7. *The Patient A.A. Allegation*

Unidentified staff "indicated" that plaintiff was "a good target." (AC at 15) Patient A.A. was attacking people, and after SHTA Nelson placed patient A.A. in a chair a few feet from plaintiff, patient A.A. jumped from his chair and attacked plaintiff. (AC at 15-16)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

8. *The Allegation Against SHTA Leper*

Plaintiff was in the bathroom, and SHTA Leper told patient C.J. to go into the bathroom because it would not bother plaintiff if patient C.J. went in (the "Leper Bathroom Incident"). (AC at 16-17)

9. *The "Reshawn" Allegation*

After SHTA Gantz had given plaintiff permission to do laundry, a patient whom plaintiff identifies as "Reshawn" pushed plaintiff in front of Gantz. (AC at 17) Reshawn then punched plaintiff in the mouth. (AC at 17-21) The blow split plaintiff's lip and broke one tooth and loosened another. (Vallen Dep. Tr. at 37-38) Plaintiff received fourteen stitches to his lip. (Vallen Dep. Tr. at 222-23) The Reshawn Incident occurred on November 8, 1998. (Vallen Dep. Tr. at 24; Peeples Aff., Exh. C, at 1)

10. *The Gantz Bathroom Allegation*

SHTA Gantz threatened plaintiff and punched him in the chest in a bathroom (AC at 21-22; Vallen Dep. Tr. at 56-59) The Gantz Bathroom Incident occurred a week or two after the Reshawn Incident, which occurred on November 8, 1998. Vallen Dep. Tr. at 24, 56-57; Peeples Aff., Exh. C, at 1)

11. *The SHTA March Bathroom Allegation*

SHTA March came into the bathroom at the Canteen, screamed at plaintiff, and pushed plaintiff across a room. (AC at 23)

12. *The SHTA Brown Allegation*

Patient F. kicked plaintiff from behind, and SHTA Brown jumped in to protect patient F. because plaintiff "started to go at" patient F. (AC at 24; Vallen Dep. Tr. at 229)

13. *The SHTA Malfatone Water Allegation*

SHTA Malfatone told plaintiff to stop drinking water from a water fountain in the yard, and came over and knocked plaintiff to the ground. (AC at 24) The Malfatone Water Incident occurred before the Reshawn Incident. (Vallen Dep. Tr. at 231-32)

14. *The Patient N. Allegation*

Patient N. kicked and punched plaintiff, and unidentified staff laughed because patient N. was an old man. (AC at 24-25) Plaintiff cannot identify the staff members. (AC at 24-25; Vallen Dep. Tr. at 233-35)

15. *The $35.00 Allegation*

An unidentified staff member gave the key to plaintiff's locker to another patient, who then took $35.00 in quarters from plaintiff's locker (the "$35.00 Incident"). (AC at 25) Plaintiff cannot identify the staff members. (AC at 25; Vallen Dep. Tr. at 235-39)

16. *The Patient B. Bathroom Allegation*

**\*13** Patient B. punched plaintiff in the bathroom, and plaintiff chased patient B. out of the bathroom. (AC at 25) Unidentified staff saw plaintiff chasing patient B, but did not see patient B. assault plaintiff in the bathroom. (AC at 25; Vallen Dep. Tr. at 238-39)

S.D.N.Y.,2005.
Vallen v. Carrol
Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

▷ Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Warren LANE, Plaintiff,
v.
Sharon E. CARPINELLO, Commissioner, New York
State Office of Mental Health; Donald Sawyer, Director;
Sharon Barboza, M.D.; Jeffrey Nowicki, Social Worker;
Anthony Lucenti, Social Worker; J. Crociata, Nurse;
Michael Babula, Treatment Assistant; Frank Menz,
Treatment Assistant; Stephen Coppola, Treatment
Assistant Central New York Psychiatric Center; and
Barbara Bebe, Facility Review Specialist, New York
State Commission for Quality of Care, Defendants.
**Civil Action No. 9:07-cv-751 (GLS/DEP).**

Sept. 24, 2009.

West KeySummary
**Civil Rights 78** 🔑 **1021**

<u>78</u> Civil Rights
    <u>78I</u> Rights Protected and Discrimination Prohibited in General
        <u>78k1016</u> Handicap, Disability, or Illness
            <u>78k1021</u> k. Physical Access and Mobility; Carriers. <u>Most Cited Cases</u>
A visually impaired sex offender failed to state a discrimination claim under the Americans with Disabilities Act against employees who worked in his sex offender treatment program. The sex offender alleged that the employees failed to provide him with a reasonable accommodation after taking his cane. The cane was confiscated because sex offenders were not permitted to have such items in the treatment facility and the confiscation of the cane did not exclude the sex offender from participating in the program or of the benefits of the services, programs, or activities of the sex offender treatment program. Americans with Disabilities Act of 1990, § 2 et seq., <u>42 U.S.C.A. § 12101 et seq.</u>

Warren Lane, Bronx, NY, pro se.

Hon. <u>Andrew M. Cuomo</u>, Attorney General of the State of New York, Dean J. Higgins, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

***ORDER***

<u>GARY L. SHARPE</u>, District Judge.

**\*1** The above-captioned matter comes to this court following a Report-Recommendation by Magistrate Judge David E. Peebles, duly filed August 31, 2009. Following ten days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Magistrate Judge's Report-Recommendation for clear error, it is hereby

ORDERED, that the Report-Recommendation of Magistrate Judge David E. Peebles filed August 31, 2009 is ACCEPTED in its entirety for the reasons state therein, and it is further

ORDERED, that the plaintiff's motion for partial summary judgment (Dkt. No. 57) is DENIED, defendants' cross-motion for summary judgment (Dkt. No. 79) is GRANTED, and the plaintiff's complaint is DISMISSED in its entirety, and it is further

ORDERED, that the Clerk of the court serve a copy of this order upon the parties in accordance with this court's local rules.

IT IS SO ORDERED.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Warren Lane, a former New York State prison inmate who alleges that he is "legally blind", has commenced this civil rights action pursuant to 42 U.S.C. §§ 1983, 1984, 1985 and 12,101 against ten defendants, eight of whom are employed at the Central New York Psychiatric Center ("CNYPC"), alleging various constitutional and statutory violations committed by the defendants during the period of his confinement in CNYPC. In his complaint, plaintiff asserts claims relating to his involuntary confinement at CNYPC in 2006, commencing upon his conditional release date from prison. Plaintiff maintains that he was transferred into CNYPC in violation of his constitutional right to due process, and that while there he was subjected to further violations, including discrimination based upon his disability, excessive force, failure to intervene to protect him from harm, indifference to his medical needs, and retaliation. Plaintiff requests redress in the form of compensatory and punitive damages as well as declaratory relief.

Currently pending before the court in connection with this action are two motions. Plaintiff initiated the motion process by seeking partial summary judgment with respect to his claim that he was denied due process with regard to his commitment to CNYPC and for violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12,101 *et seq.,* while he was held there. Defendants responded in opposition and cross-moved for summary judgment requesting dismissal of plaintiffs complaint in its entirety. Having carefully reviewed the extensive record now before the court, I recommend that plaintiff's motion for partial summary judgment be denied, defendants' motion for summary judgment be granted, and plaintiff's complaint be dismissed in its entirety.

I. *BACKGROUND* [FN1]

FN1. In light of the procedural posture of the

case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *See Burtnieks v. City of New York,* 716 F.3d 982, 985-86 (2d Cir.1983) (citations omitted). It should be noted, however, that many of plaintiff's allegations regarding his case and treatment while at CNYPC are vigorously contested by defendants.

Plaintiff, who is visually impaired, was incarcerated by the New York State Department of Correctional Services ("DOCS") for approximately twenty-five years following his conviction for multiple sex offenses.[FN2] Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57-4) p. 1. Prior to his DOCS conditional custody release date, plaintiff was evaluated by two physicians from the New York State Office of Mental Health ("OMH"); based upon their evaluations, on September 12, 2006, on application of the superintendent of the Sullivan Correctional Facility made pursuant to section 9.27 of the New York Mental Hygiene Law ("MHL"), plaintiff was admitted involuntarily into CNYPC under close observation for participation in the sex offender treatment program ("SOTP").[FN3] Lane Aff. (Dkt. No. 57-2) ¶¶ 1-5. Although his stay at the CNYPC lasted for less than two months, plaintiff's many complaints regarding his commitment and treatment at that facility give rise to this suit.

FN2. Plaintiff was given a vision impairment assessment on July 22, 2005 while incarcerated at Sullivan Correctional Facility, and was diagnosed as having a prosthesis of the left eye and glaucoma and increasing myopia in the right eye. Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57-4), Exh. B. Defendants acknowledge the existence of one artificial eye, but state their belief that plaintiff is able to use his other eye to read, write, and operate a calculator. *See* Affidavit of Jeffrey Nowicki, LCSW-R ("Nowicki Aff.") (Dkt. No. 79-5) ¶¶ 10-11; Defendants' Response to Plaintiff's Request for Admissions (Dkt. No. 62-3) ¶ 3.

FN3. The CNYPC is a secure adult psychiatric center established within the New York State Office of Mental Health. Defendants' Statement

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

Pursuant to Local Rule 7.1(a)(3) (Dkt. No. 79-2) ¶ 3.

**\*2** Admission records reflect that upon being admitted to CNYPC, plaintiff was "very agitated due to his admission to the SOTP and was making statements that he would due [sic] whatever it took to violate and get sent back to prison." Higgins Decl. (Dkt. No. 79-4) Exh. D, p. 92.[FN4] When admitted to CNYPC, plaintiff's mobility cane, which he claims to require when he is outdoors or in an unfamiliar environment, was confiscated by defendant Steven Coppola, a treatment assistant at the facility. Complaint (Dkt. No. 1) p. 6. According to defendants, plaintiff's cane was taken pursuant to a CNYPC safety and security policy that precludes any resident of the center from possessing such an item. Nowicki Aff. (Dkt. No. 79-5) ¶ 7. Plaintiff alleges that thereafter he was denied reasonable accommodations for his blindness despite his numerous requests. Complaint (Dkt. No. 1) p. 6. Defendant Jeffrey Nowicki, who was at all times relevant to plaintiff's complaint the Team Leader of the SOTP at CNYPC and is currently the Chief of Mental Health Treatment Services of the SOTP, explains that while plaintiff's cane was confiscated, he was offered a wheelchair or walker, both of which plaintiff refused. Nowicki Aff. (Dkt. No. 79-5) ¶¶ 1, 7-8. Nowicki states further that staff at CNYPC were aware of plaintiff's left eye prosthesis and that plaintiff was given medical support for this condition. *Id.* ¶ 10. Plaintiff's in-patient nursing assessment conducted on September 12, 2006, upon his admission to CNYPC, reflects plaintiff's mobility status as fully independent without any notations that a cane or walker was needed. Higgins Decl. (Dkt. No. 79-4) Exh. D, p. 38.

FN4. To protect plaintiff's privacy, and with the permission of the court, defendants filed plaintiff's records from CNYPC as well as those records from the Commission on Quality of Care and Advocacy traditionally under seal as Exhibits D and E, respectively, to the Declaration of Dean J. Higgins, Esq. ("Higgins Decl."), Dkt. No. 79-4.

On October 13, 2006, one month after his transfer into CNYPC, plaintiff wrote a letter to defendant Donald Sawyer, director of the facility, demanding compliance with the ADA and that he be provided with reasonable accommodations for his disability, including a laptop computer with zoom text, a scanner and inkjet color printer, a 7x magnifier, books on tape, a high intensity lamp and 20/20 pens. Complaint (Dkt. No. 1) p. 9; Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57-4) Exh. C; *see also* Defendants' Response to Plaintiff's Statement Pursuant to Local Rule 7.1(a)(3) (Dkt. No. 78) ¶ 5. Plaintiff claims that, in response, defendant Nowicki told him that accommodations were unnecessary because plaintiff "would not remain at CNYPC for much longer." Complaint (Dkt. No. 1) p. 9. Feeling threatened by Nowicki's statement, Lane sent a letter to defendant Sharon Carpinello, Commissioner of the OMH, requesting that she place him into protective custody and transfer him from CNYPC. *Id.* Plaintiff did not receive a response to that letter. *Id.*

Plaintiff claims to have been subjected to three separate attacks during his stay at CNYPC. On September 18, 2006, while in the recreation yard, plaintiff was struck by a football and subsequently attacked by a fellow patient, suffering injury to his face, nose and jaw.[FN5] Complaint (Dkt. No. 1) p. 7; Plaintiffs Deposition Transcript ("Tr.") pp. 27-33.[FN6] Plaintiff claims that upon requesting medical attention he was told by defendant J. Crociata, a nurse at CNYPC, "[t]here's nothing wrong with you," and denied treatment. Complaint (Dkt. No. 1) p. 7. Plaintiff's CNYPC records contradict his version of the events, instead reflecting that defendant Crociata witnessed plaintiff arguing with another patient near the recreation yard door entrance and tried to intervene. Higgins Decl. (Dkt. No. 79-4) Exh. D, p. 114. When Crociata approached Lane and inquired if he was injured, Lane stated that he was not touched and became angry when Crociata asked what had happened, accusing Crociata of being a racist. *Id.* Plaintiff was visited by a doctor later that evening during rounds; although the doctor offered to see him, plaintiff again said he was "okay" and declined any treatment. *Id.*

FN5. The record is unclear as to whether the incident occurred on September 17 or 18, 2009. The parties agree, however, that plaintiff was involved in an altercation in the recreation yard during that period, as a result of which he later sought to pursue criminal charges.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

FN6. Plaintiff's deposition transcript, which was filed as Exhibit F to Defendants' Motion for Summary Judgment (Dkt. No. 79-7), will be referenced herein as "Tr."

**\*3** Following the September 18, 2009 incident, plaintiff demanded that he be permitted to file criminal charges against the patient who assaulted him, but was allegedly denied the opportunity to contact law enforcement authorities by Nowicki and defendants Michael Babula and Frank Menz, both of whom are treatment assistants at CNYPC. Complaint (Dkt. No. 1) p. 7. Nowicki informed plaintiff that mediation was available to handle such disputes, making it unnecessary to contact the State Police.FN7 *Id.* Plaintiff claims defendant Nowicki then threatened that if he insisted on filing criminal charges, Nowicki would have his parole violated. *Id.* As a result of the September 18 attack plaintiff no longer felt safe, particularly in light of his blindness, and was fearful of losing his remaining ability to see in another altercation. *Id .* Plaintiff requested that Nowicki either transfer him to another facility or place him in protective custody.FN8 *Id.* After both requests were denied, plaintiff subsequently sent a written request to defendants Sawyer and Sharon Barboza, Director of the SOTP at CNYPC, again asking for protective custody and transfer. *Id.* Plaintiff received no response from either Sawyer or Barboza. *Id .*

FN7. Plaintiff ultimately agreed to settle the matter through that channel. *See* Higgins Decl. (Dkt. No. 79-4) Exh. D, pp. 134-35.

FN8. Defendant Nowicki asserts that the CNYPC staff was not aware that plaintiff needed protection and that it was actually the other residents who needed protection from the plaintiff. Nowicki Aff. (Dkt. No. 79-5) ¶ 17.

Plaintiff's CNYPC records show that a call was placed to the New York State Police when plaintiff indicated that he wanted to pursue criminal charges, and that plaintiff became belligerent and threatening after the incident, touting his lengthy disciplinary record in prison and warning not only that he would "kick the shit" out of the other patient with whom he had the problem, but also that he would soon be running the ward.FN9 Higgins Decl. (Dkt.

No. 79-4) Exh. D, pp. 116-19. Plaintiff did contact his parole officer regarding the incident and also filed a complaint with Nowicki. *Id.*

FN9. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in a Special Housing Unit ("SHU"). Tier III hearings concern the most serious violations, and could result in unlimited keeplock or SHU confinement, with significant restrictions on access to exercise, showers, and other programs and privileges available in general prison population, and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998). Inmates in SHU are not completely restricted. *Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998); *see also* 7 N.Y.C.R.R. pt. 304. Although Lane appears to dispute their accuracy, parole records indicate that while in prison he was accused of sixty-one Tier III infractions and forty-one Tier II violations, including harassing, threatening, lewd, unhygienic and violent conduct, resulting in a total of approximately five years in keeplock, eight years of disciplinary SHU confinement and seven months of involuntary protective custody. Higgins Decl. (Dkt. No. 79-4) Exh. E, pp. 153-80.

The next relevant incident occurred on September 22, 2006 when, plaintiff claims, defendant Nowicki called him to a hallway and ordered defendants Menz and Coppola to "take him down" after Lane refused to speak with Nowicki. Complaint (Dkt. No. 1) p. 8. As a result, plaintiff was thrown to the floor and kicked and punched, put in restraints, and placed on a gurney, even though he claims he did not resist.FN10 *Id.* Plaintiff alleges that he was denied medical treatment for the shoulder, lower back, and face injuries that he sustained and was instead held captive in a room for two to three days, forced to sleep on the floor, and provided only one meal during that time period. Complaint (Dkt. No. 1) p. 8; Tr. p. 55.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

FN10. Plaintiff stated during his deposition that approximately twenty staff members were present during the assault; as a result, he is unsure which defendants actually kicked and punched him. Tr. pp. 49-50.

Once again, defendants' version of what occurred on that occasion is markedly different. Defendant Nowicki states that on September 22, 2006 plaintiff became hostile toward both staff and the residents, and threatened to instigate a riot. Nowicki Aff. (Dkt. No. 79-5) ¶¶ 21-30; *see also* Higgins Decl. (Dkt. No. 79-4) Exh. D, pp. 139-50. Nowicki attempted to counsel Lane in the "side room"; plaintiff rebuffed those efforts and instead attempted to re-enter the day room. Nowacki Aff. (Dkt. No. 79-5) ¶¶ 23-24. As a result, plaintiff was placed in four point restraints, pursuant to a doctor's orders, for a period of seven minutes and physically removed to the side room. *Id.* ¶ 25. When plaintiff's threats continued, he was left in the side room under supervision, consistent with hospital policy, from September 22, 2006 at 1:00 p.m. until September 25 at 9:30 a.m., during which time he was provided food, a mattress and a chair. *Id.* ¶¶ 26-30. When plaintiff was visited by a psychiatrist, he stated that he was upset because he felt that he was being treated differently than other patients with respect to unit policies, and denied any intention to hurt anyone, despite his threats. Higgins Decl. (Dkt. No. 79-4) Exh. D, p. 150. Detailed CNYPC progress notes recording plaintiff's status at fifteen minute intervals show that Lane was provided and ate all of his meals during the time he was confined to the side room. *Id.* pp. 153-81. Plaintiff's parole officer was called to CNYPC, but found that there was insufficient evidence to bring parole violation charges against plaintiff. *Id.* p. 186; *see also* Nowicki Aff. (Dkt. No. 79-5) ¶ 27 (reflecting that the parole officer was summoned at plaintiff's request).

*4 Following the events of September 18 and 22, 2006, plaintiff and his wife made several written complaints and placed telephone calls to various New York and federal agencies and officials. Complaint (Dkt. No. 1) p. 8. Plaintiff complains that neither he nor his wife were ever contacted by New York State Mental Hygiene Legal Services, that Prisoners Legal Services declined to represent him because he was no longer incarcerated, and that defendant Beebe, the person with the New York State

Commission for Quality Care of Persons with Disabilities, assigned to investigate plaintiff's complaint, never visited CNYPC while Lane was there, and failed to interview plaintiff or his wife. *Id.* Defendants, by contrast, contend that defendant Beebe had either personal telephone conversations or exchanged voice mail messages with plaintiff's wife, Denise Lane, on October 1, October 23, November 1, November 3, and November 7, 2006. Defendants' Response to Plaintiff's Request for Admissions (Dkt. No. 62-3) ¶ 8. Defendant Beebe also visited CNYPC on November 21, 2006 to investigate plaintiff's complaints. Higgins Aff. (Dkt. No. 79-4) Exh. E, pp. 32-33.

Plaintiff asserts that in early October of 2006, he was again "attacked" by another patient whom, he maintains, has a history of assaultive behavior. Complaint (Dkt. No. 1) p. 9; Tr. p. 39. While plaintiff admits that there was no physical contact between the two, he states that out of fear he immediately requested placement in protective custody, a request that was once again denied. *Id.* After the incident, plaintiff was brought to the side room and is reported to have said that the fellow patient kept threatening him, and that he would take matters into his own hands if required. Higgins Decl. (Dkt. No. 79-4) Exh. D, p. 214. It was noted that CNYPC staff members were becoming increasingly concerned regarding plaintiff's menacing behavior and his apparent attempts to control and rally other patients, and that Lane stated that he felt like killing the other patient. *Id.,* pp. 214, 220.

The final incident of which plaintiff complains occurred on October 31, 2006, when Lane, upset after seeing another patient attacked, requested and was given permission to return to his room instead of remaining queued with the other patients proceeding to the dining room. Complaint (Dkt. No. 1) p. 9. After returning to his room plaintiff was approached by defendant Lucenti regarding the incident; responding to Lucenti, Lane said, "[w]hat are you people waiting for someone to get stabbed?" Complaint (Dkt. No. 1) p. 9. When plaintiff left his room later that day he was confronted by defendants Nowicki, Lucenti, Menz, Coppola and Babula, at which time Nowicki allegedly stated, "[w]e got you now." Complaint (Dkt. No. 1) p. 10. Plaintiff appears to have interpreted this statement to mean that defendants falsified documents to make it seem that plaintiff had threatened defendant Lucenti. *Id.; Tr.* pp. 43-44. As a result of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

incident plaintiff's parole status was revoked, and he was removed that day from CNYPC and transferred into the Oneida County Jail. Nowicki Aff (Dkt. No. 78-2) ¶¶ 6, 19; Tr. p. 18.

**\*5** According to defendants the events of October 31, 2006 were precipitated by plaintiff's refusal to stay in line and his subsequent threat, when approached regarding the incident, to put a knife to the neck of one of the CNYPC staff members. Higgins Decl. (Dkt. No. 79-4) Exh. D, pp. 296-301. According to defendant Lucenti, when he went to speak with the plaintiff about getting out of line,

> Mr. Lane then got in my face, he said he was going to put a knife in a TA's [treatment assistant's] neck, a knife or something in a TA's neck. He said I am serious, I will put a knife in one of their necks, I will lay them out cold. You better call parole. I'm tired of all this, I am going to the side room.

Parole Hearing Tr. (Dkt. No. 84-5) p. 32; Higgins Decl. (Dkt. No. 79-4) Exh. D, p. 296. Lucenti considered this to be a serious threat. Parole Hearing Tr. (Dkt. No. 84-5) p. 32. Plaintiff demanded that he be moved to the side room and returned to prison, and was informed that arrangements were being made to return him to the custody of the DOCS as soon as possible; plaintiff went to the side room, his parole officer was called, a violation was issued, and Lane was returned to prison. *Id.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on July 19, 2007, and was thereafter granted leave to proceed *in forma pauperis* on August 1, 2007. Dkt. Nos. 1,4. In his complaint plaintiff names ten defendants, including Sharon E. Carpinello, the Commissioner of the OMH; Barbara Beebe,[FN11] a facility review specialist from the State of New York Commission on Quality of Care for Persons with Disabilities; Donald Sawyer, the Director of the CNYPC; Sharon E. Barboza, M.D., the Director of the SOTP at CNYPC; Jeffrey Nowicki, a team leader of the SOTP at CNYPC; and Anthony Lucenti, Michael Babula, Frank Menz, Steven Coppola, and J. Crociata, all staff members at the facility. Alleging violations of the ADA as well as the First,

Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution, plaintiff's complaint asserts ten enumerated causes of action, including denial of due process, failure to provide reasonable accommodations for his disability, excessive use of force, deliberate indifference to his medical needs, failure to intervene and/or protect, retaliation, conspiracy and failure to investigate his complaints. *Id.*

> **FN11.** Defendant Beebe's name is incorrectly spelled as "Bebe" in the caption and throughout plaintiff's complaint. The court will respectfully direct the clerk to amend the caption to reflect the correct spelling of that defendant's name.

On October 2, 2008, following joinder of issue and the close of discovery, plaintiff moved for partial summary judgment on his due process claim as it relates to his commitment to CNYPC as well as his claims under the ADA. Dkt. No. 57. In support of his motion, relying on the doctrines of *res judicata* and collateral estoppel, plaintiff asserts that the procedures under which he was involuntarily committed to CNYPC were determined to be unconstitutional by the New York State Court of Appeals in *Harkavy v. Consilvio,* 7 N.Y.3d 610, 825 N.Y.S.2d 702 (2006), that he was unlawfully denied a mobility guide for his blindness, and that his parole violation was "fruit of a poisonous tree" and would not have occurred had he not been unlawfully detained at CNYPC in violation of the Fourth Amendment. Dkt. No. 57.

**\*6** Defendants opposed plaintiff's motion and cross-moved for summary judgment, advancing several grounds for rejection of all of plaintiff's claims, including that 1) plaintiff's section 1983 claims against defendants, acting in their official capacities, are barred by the Eleventh Amendment; 2) plaintiff has failed to establish a valid cause of action under the ADA, and defendants cannot be held individually liable for damages under that Act; 3) plaintiff has not established claims of failure to protect, deliberate indifference to his medical needs, denial of access to courts, retaliation, excessive use of force, or conspiracy; 4) plaintiff has failed to demonstrate the requisite personal involvement by defendants Carpinello and Sawyer to support a finding of liability against them; 5) plaintiff has no cognizable constitutional interest in filing a criminal complaint, or in the pursuit of an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

investigation regarding his complaints made while housed at CNYPC; 6) defendants are not bound by the Court of Appeals decision in *Harkavy*, which was decided after plaintiff was released from CNYPC, and that decision does not create a constitutional right that is redressable in this court; and 7) in any event, defendants are shielded from suit by the doctrine of qualified immunity. Dkt. No. 79-3. Plaintiff has since responded in opposition to defendants' motion. Dkt. No. 84.

Both of the pending summary judgment motions, which are now ripe for determination, have been referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509-10). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A moving party seeking summary judgment bears the initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any

essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, to successfully resist summary judgment they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*7** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict"). In a case such as this, where parties have interposed cross-motions for summary judgment, each motion must be independently assessed, using this standard as a backdrop. *See Light Sources, Inc. v. Cosmedico Light, Inc.,* 360 F.Supp.2d 432, 434 (D.Conn.2005).

B. *Fourteenth Amendment Procedural Due Process Claim*

Plaintiff challenges his involuntary commitment to CNYPC as violative of his right to due process and moves for summary judgment on this claim, arguing that the New

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

York State Court of Appeals decision in *Harkavy,* should be given res judicata or collateral estoppel effect in this action. In *Harkavy,* the Court of Appeals held that the DOCS' resort to Article 9 of the MHL to institute commitment procedures for sex offenders in its custody was improper, observing that

> in the absence of a clear legislative directive in regard to inmates nearing their release from incarceration, we believe that [New York] Correction Law § 402 is the appropriate method for evaluating an inmate for postrelease involuntary commitment to a mental facility.

*Harkavy,* 7 N.Y.3d at 614, 825 N.Y.S.2d 702, 859 N.E.2d 508.[FN12] Having been committed to CNYPC under MHL § 9.27, plaintiff now argues that *Harkavy* renders his commitment unconstitutional, and that defendants are bound by that decision. Defendants counter that since plaintiff was already removed from CNYPC and returned to prison by the time *Harkavy* was decided, the case has no bearing on his circumstances.

FN12. The Correction Law requires that the prison superintendent first apply to the court for appointment of two examining physicians and then petition the court again for a commitment order, providing a copy of the petition to the inmate, the inmate's friend or relative, and to the Mental Hygiene Legal Service. *Harkavy,* 7 N.Y.3d at 612, 825 N.Y.S.2d 702, 859 N.E.2d 508. The Correction Law also provides the inmate with an opportunity to request a hearing before a judge after receiving a copy of the petition but before being committed to the psychiatric hospital. *Harkavy,* 7 N.Y.3d at 612, 825 N.Y.S.2d 702, 859 N.E.2d 508. In contrast, the requirements of MHL Article 9 do not necessitate that the examining physicians be appointed by the court, nor do they require either notice to the inmate or the opportunity for a hearing. *Harkavy,* 7 N.Y.3d at 612, 825 N.Y.S.2d 702, 859 N.E.2d 508. In the wake of *Harkavy,* on March 14, 2007, then-New York Governor Eliot Spitzer signed the Sex Offender Management and Treatment Act, which became effective on April 13, 2007, in part as Article 10 of the MHL, creating a new legal regime for

committing sex offenders to mental health facilities for treatment in the SOTP.

### 1. Res Judicata

Under the doctrine of *res judicata,* known also as "claim preclusion," a final judgment on the merits of an action precludes the parties, or those in privity with the parties, from relitigating issues that were or could have been raised in that action. *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980); *Jacobson v. Fireman's Fund Insurance Co.,* 111 F.3d 261, 265 (2d Cir.1997); *Burgos v. Hopkins,* 14 F.3d 787, 789 (2d Cir.1994). "It is a cardinal principle of *res judicata* that 'the first suit and the subsequent case must involve the same cause of action[,]' otherwise, *res judicata* will not bar the second action." *Thompson v. County Franklin,* No. 92-CV-1258, 1996 WL 341988, at *3 (June 18, 1996) (McCurn, S.J.) (quoting *Bloomquist v. Brady,* 894 F.Supp. 108, 114 (W.D.N.Y.1995)). In the Second Circuit, there are three separate but related factors which together inform the analysis of the preclusive effect to be given a prior judgment, including "[w]hether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." [FN13] *Woods v. Dunlop Tire Corp.,* 972 F.2d 36, 38 (2d Cir.1992) (quoting *NLRB v. United Technologies,* 706 F.2d 1254, 1260 (2d Cir.1983) (internal quotations omitted)).

FN13. Both the Full Faith and Credit Clause of the United States Constitution, *see* U.S. Const. art. IV, § 1, and the corresponding Full Faith and Credit statute, 28 U.S.C. § 1738, require that a federal court accord a state court judgment the same preclusive effect that it would merit under the law of the state from which it originated. *See Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *Kremer v. Chem. Constr. Corp.,* 456 U.S. 461, 466, 102 S.Ct. 1883, 1889-90, 72 L.Ed.2d 262 (1982); *Burgos v. Hopkins,* 14 F.3d at 790. This principle applies fully to claims brought pursuant to 42 U.S.C. § 1983. *Migra,* 465 U.S. at 84-85, 104 S.Ct. at 897-98; *Allen v. McCurry,* 449 U.S. at 103-04, 101 S.Ct. at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

419-20. *Giakoumelos v. Coughlin,* 88 F.3d 56, 59 (2d Cir.1996). Since the state court determination upon which Lane rests his res judicata and collateral estoppel argument originated in New York, the law of that state controls in determining the extent of the preclusive effect of which *Harkavy* is deserving. *Giakoumelos,* 88 F.3d at 59; *see also Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir.2002); *LaFleur v. Whitman,* 300 F.3d 256, 271-72 (2d Cir.2002). It should be noted, however, that while the law of New York, rather than federal principles, applies to determine the preclusive effect to be given to the decision in *Harkavy,* this is a distinction without a difference since, as the Second Circuit has noted, "there is no discernable difference between federal and New York law concerning *res judicata* and collateral estoppel." *Marvel Characters, Inc.,* 310 F.3d at 286 (citing *Pike v. Freeman,* 266 F.3d 78, 90 n. 14 (2d Cir.2001)).

**\*8** Neither Lane nor the defendants were parties to *Harkavy.* That lawsuit was a habeas corpus proceeding filed against the DOCS by the New York Mental Hygiene Legal Services seeking the immediate release of certain individuals whose prison terms had expired and were being held at the Manhattan Psychiatric Center. While it is arguable that defendants in this action are in privity with the DOCS, *see Browdy v. Lantz,* 3:03CV1981, 2006 WL 2711753, at \*5 (D.Conn. Sept.21, 2006), plaintiff, who had been released from CNYPC at the time *Harkavy* had been decided, was not a party to that action, does not allege any privity with the petitioners in *Harkavy,* and was never held in the Manhattan Psychiatric Center. Accordingly, the two actions do not arise from the same core of operative facts, nor would they involve the same evidence. In addition, although both *Harkavy* and this action involve MHL § 9.27, *Harkavy* did not determine the constitutionality of the DOCS' use of MHL § 9.27 to commit sex offenders leaving their custody. Rather, the issue presented and addressed by the New York Court of Appeals in that case was whether the DOCS' use of the MHL procedure, as distinct from that set forth in Correction Law § 402, was proper, and the court held only that it was not. *Harkavy,* 7 N.Y.3d at 610, 825 N.Y.S.2d 702, 859 N.E.2d 508. For these reasons, the *Harkavy* decision does implicate the doctrine of *res judicata* in this action.

*2. Collateral Estoppel*

The doctrine of collateral estoppel, or claim preclusion, is equally inapplicable in this case. Once a court has decided an issue of fact or law necessary to its judgment, a party to the first action, or one in privity with the party, cannot relitigate that specific issue in a subsequent lawsuit. *Allen,* 449 U.S. at 94; *Burgos,* 14 F.3d at 792; *Ryan v. N.Y. Telephone Co.,* 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 467 N.E.2d 487, 490 (1984). Under New York law, collateral estoppel applies only if 1) the issue in question was necessarily decided in the prior proceeding and is decisive of the present proceeding; and 2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding. *Burgos,* 14 F.3d at 792; *Khandhar v. Elfenbein,* 943 F.2d 244, 247 (2d Cir.1991). The party asserting collateral estoppel has the burden of showing that the identical issue was previously decided, while the party opposing estoppel must show the absence of a full and fair opportunity to litigate in the prior proceeding. *Burgos,* 14 F.3d at 792. Because the issue decided in *Harkavy* was not identical to the issue raised in this lawsuit, collateral estoppel does not preclude litigation of the constitutionality of defendants' actions in this case.

*3. Due Process*

Turning to the merits of plaintiff's due process claim, I begin by noting that to successfully state a claim under 42 U.S.C. § 1983 for denial of procedural due process, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996). It is undeniable that "[i]nvoluntary confinement, including civil commitment, constitutes a significant deprivation of liberty, requiring due process." *Abdul v. Matiyn v. Pataki,* 9:06-CV-1503, 2008 WL 974409, at \*10 (N.D.N.Y. April. 8, 2008) (Hurd, J. and Homer, M.J.) (quoting *Fisk v. Letterman,* 401 F.Supp.2d 362, 374 (S.D.N.Y.2005) (citations omitted). "When a person's liberty interests are implicated, due process requires at a minimum notice and

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

an opportunity to be heard." *Mental Hygiene Legal Service v. Spitzer,* 2007 WL 4115936, at * 5 (citing *Hamdi v. Rumsfeld,* 542 U.S. 507, 533, 124 S.Ct. 2633, 2648, 159 L.Ed.2d 578 (2004)* (plurality opinion)). The Supreme Court has approved the use of involuntary confinement where there has been a determination that the person in question currently suffers from a "mental abnormality" and is likely to pose a future danger to the public. *Abdul,* 2008 WL 974409, at *10 (citing *Kansas v. Hendricks,* 521 U.S. 346, 371, 117S, --- S.Ct. ----, ----, ----S, --- L.Ed.2d ----, ----, ----S.Ct. 2072, 2086(1997)).

**\*9** Plaintiff was committed to CNYPC by way of the procedures set out in MHL § 9.27, rather than Correction Law § 402. Lane was not afforded notice and an opportunity to be heard before, or even after, his transfer to that facility. In light of these facts, and for the reasons underpinning the Court of Appeals' decision in *Harkavy,* it appears that plaintiff's due process rights were violated in connection with his commitment. *Abdul,* 2008 WL 974409, at *10; *see also Wheeler v. Pataki,* No. 9:07-CV-0892, 2009 WL 674152, at *6-7 (N.D.N.Y. March 11, 2009)* (McAvoy, S.J. and Lowe, M.J.). I therefore recommend denial of defendants' motion for summary judgment dismissing plaintiff's due process claim to the extent that defendants' basis for dismissal is addressed to the merits of that cause of action.[FN14]

FN14. It is worth noting that the only named defendant who was even remotely involved in plaintiff's civil commitment was defendant Sawyer, to the extent that he signed the certification of service of a "Notice of Application for Court Authorization to Retain a Patient" on October 26, 2006, forty-four days after plaintiff was committed to CNYPC. *See* Higgins Decl. (Dkt 79-4) Exh. D, p. 391. Plaintiff has not named as defendants in this action any prison official who was involved in his commitment under the MHL. Because I ultimately recommend that such a claim against prison officials would be subject to dismissal based upon qualified immunity, I find that any attempt by plaintiff to amend his complaint to name such defendants would not cure this fatal substantive defect, and would therefore be futile. *Cuoco v. Mohtsugu,* 222 F.3d 99, 112 (2d Cir.2000).

4. *"Fruit of the Poisonous Tree"*

In an apparent effort to make a claim for violation of his Fourth Amendment rights, plaintiff next argues that if he had not been committed to CNYPC under the MHL, he would not have been "illegally" confined and therefore would not have threatened defendant Lucenti and violated his parole. In a creative attempt to draw upon principles that do not translate well into this setting, Lane argues that the conduct giving rise to his parole revocation is "tainted" under the "fruit of the poisonous tree" principles.

"The fruit of the poisonous tree doctrine excludes evidence obtained from or as a consequence of lawless official acts." *Townes v. City of New York,* 176 F.3d 138, 145 (2d Cir.1999)* (quoting *Costello v. United States,* 365 U.S. 265, 280, 81 S.Ct. 534, 542, 5 L.Ed.2d 551 (1961)). It does not apply in this context where plaintiff apparently objects to use of evidence of his threats as a basis for a parole violation. *See Rabb v. McMaher,* No. 94-CV-614, 1998 WL 214425, at *7 (N.D.N.Y. Apr.24, 1998)* (Pooler, J.) ("This doctrine applies to evidence that is obtained during a criminal investigation as a result of an unconstitutional search; it does not apply to to prison disciplinary hearings."). Simply stated, the fruit of the poisonous tree doctrine cannot link the conduct allegedly violating plaintiff's Fourth Amendment rights to his return to prison and establish an actionable claim, since this evidentiary doctrine is inapplicable in a civil section 1983 setting. *Townes,* 176 F.3d at145.

C. *Qualified Immunity*

As one of the bases for their summary judgment motion, defendants assert their entitlement to qualified immunity from suit. Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)* (citations omitted). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)); *see also Zellner v. Summerlin,* 494 F.3d 344, 367 (2d Cir.2007); *Iqbal v. Hasty,* 490 F.3d 143,152 (2d Cir.2007), *rev'd on other grounds, sub. nom. Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (May 18, 2009). The law of qualified immunity seeks to strike a balance between overexposure by government officials to suits for violations based upon abstract rights and an unduly narrow view which would insulate them from liability in connection with virtually all discretionary decisions. *Locurto v. Safir,* 264 F.3d 154, 162-63 (2d Cir.2001); *Warren,* 196 F.3d at 332. As the Second Circuit has observed,

> **\*10** [q]ualified immunity serves important interests in our political system, chief among them to ensure that damages suits do not unduly inhibit officials in the discharge of their duties by saddling individual officers with personal monetary liability and harassing litigation.

*Provost v. City of Newburgh,* 262 F.3d 146, 160 (2d Cir.2001) (internal quotations omitted) (citing, *inter alia, Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir.1972)).

Until recently, it was generally agreed that a proper qualified immunity analysis entailed a three step inquiry. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211-12 (2d Cir.2003). As a threshold matter a court considering the issue was charged with first determining whether, based upon the facts alleged, the plaintiff had facially established a constitutional violation. *Id .; Gilles v. Repicky,* 511 F.3d 239, 243-44 (2d Cir.2007). If the answer to this inquiry was in the affirmative, then the focus turned to whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132-33 (2d Cir.2002). Finally, upon determining that the plaintiff had a clearly established, constitutionally protected right which was violated, the court next considered whether it was nonetheless objectively reasonable for the defendant to believe that his or her action did not abridge that established right.

*Harhay,* 323 F.3d at 211; *Poe,* 282 F.3d at 133 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (quoting, in turn, *Salim,* 93 F.3d at 89)).

The United States Supreme Court recently had the opportunity to reconsider the analysis prescribed by *Saucier,* holding that while the sequence of the inquiry set forth in that case is often appropriate, it should no longer be regarded as compulsory. *Pearson v. Callahan,* 555 --- U.S. ----, 129 S.Ct. 808, 820, 172 L.Ed.2d 565 (Jan. 21, 2009). In *Pearson,* the Court reasoned that while the *Saucier* protocol promotes the development of constitutional precedent and is "especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable," the rigidity of the rule comes with a price. *Id.* at 818. The inquiry often wastes both scarce judicial and party resources on challenging questions that have no bearing on the outcome of the case. *Id.* Given that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Court opined that the algorithm prescribed by Saucier may serve to defeat this goal by requiring the parties "to endure additional burdens of suit-such as the cost of litigating constitutional questions and delays attributable to resolving them-when the suit otherwise could be disposed of more readily." *Id.* (quotations and citations omitted).

**\*11** As a result of its reflection on the matter, the *Pearson* Court concluded that because "the judges of the district courts and courts of appeals are in the best position to determine the order of decision making [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Id.* at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

violation at all.' " *Id.* (quoting *Pearson,* 129 S.Ct. at 818).

The question is whether "upon viewing the allegations of the complaint in the light most favorable to the plaintiff and drawing all inferences favorable to the plaintiff, [a] reasonable jury *could* conclude that it was objectively unreasonable for the defendants to believe that they were acting in a fashion that did *not* violate an established federally protected right," in which case the motion to dismiss must be denied. *Quartararo v. Catterson,* 917 F.Supp. 919, 959 (E.D.N.Y.1996) (quoting *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d. Cir.1993); *see also Schwartz v. Dennison,* 518 F.Supp.2d 560, 571 (S.D.N.Y.2007), *aff'd* 2009 WL 2172510 (2d Cir. July 22, 2009).

Although I have determined that plaintiff's right to due process was violated when he was involuntarily committed to CNYPC, I also find that the inability of state officials, including defendants and any DOCS official that may have been involved, to rely on MHL § 9.27 was not clearly established at that time. At the time of plaintiff's commitment the Court of Appeals had not yet decided *Harkavy.* Indeed, before plaintiff's commitment, the New York State Supreme Court Appellate Division, First Department, in that case had endorsed the DOCS' ability to utilize MHL § 9.27, finding that provision to be consonant with the petitioners' Fourteenth Amendment rights to due process. *Harkavy v. Consilvio,* 29 A.D.3d 221, 812 N.Y.S.2d 496 (1st Dep't 2006). In addition to the unsettled state of the law in New York, it appears that no federal court decision had been issued forecasting the ultimate finding in *Harkavy* before plaintiff's confinement to CNYPC. In fact, prior to *Harkavy,* the Second Circuit had generally approved of MHL § 9 .27 as meeting both substantive and procedural due process requirements. *See, e.g., Project Release v. Provost,* 722 F.2d 950, 972-975 (2d Cir.1983). Accordingly, I conclude that the parameters of plaintiff's constitutional right to due process were not clearly established at the time of his commitment and that, as a matter of law, it was objectively reasonable for defendants, as well as the DOCS, to rely on MHL § 9.27 in committing plaintiff to CNYPC. I therefore recommend a finding that, to the extent that any of the defendants were involved in the decision to commit plaintiff to CNYPC on his parole release date, they are entitled to qualified immunity with respect to plaintiff's claims for violation of his Fourteenth Amendment rights to due process, in light

of the fact that it was objectively reasonable for them to believe that they were acting in a manner that did not violate any of plaintiff's protected rights.

D. *Eleventh Amendment*

**\*12** Although not specifically stated, plaintiff's claims in this action appear to be asserted against defendants both individually and in their official capacities as state employees. Complaint (Dkt. No. 1) ¶ 3. Defendants contend that plaintiff's claims against them in their official capacities are subject to dismissal on the basis of the immunity that the Eleventh Amendment affords.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58, 57 L.Ed.2d 1114 (1978). This absolute immunity, which states enjoy under the Eleventh Amendment, extends both to state agencies and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[FN15] *Richards v. State of New York Appellate Div., Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89-91, 102 S.Ct. 2325, 2328-29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. *See Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991). Eleventh Amendment immunity does not extend, however, to employees who are sued in their personal or individual capacity. *Schwartz,* 518 F.Supp.2d at 570 (citing *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988)).

FN15. In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the state. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367 (2006).

Since plaintiff's damage claims against the named defendants in their official capacities are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, they are subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798-99 (N.D.N.Y.1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted, in part, and that all damage claims, except for those asserted against the defendants in their official capacities under the ADA, be dismissed.[FN16]

> FN16. As will be seen, defendants' Eleventh Amendment argument relating to plaintiff's claims under the ADA against defendants in their official capacities are not so easily discounted. *See* pp. 38-43, post.

E. *Failure to Provide Reasonable Accommodations Under the ADA*

Plaintiff asserts that defendants knew, or should have known, that he is legally blind and that their refusal to provide him with reasonable accommodations for this alleged disability was in contravention of the ADA. Lane now moves for summary judgment in his favor on this claim, apparently on the grounds that his legal blindness constitutes a disability as a matter of law and that he has sufficiently demonstrated defendants' denial of reasonable accommodation for this disability. Defendants respond that they are entitled to dismissal of this claim because plaintiff has failed to allege that his legal blindness substantially limits a major life activity and also has failed to prove that he was excluded from participation in, or denied benefits of, some service or program. Defendants argue further that the taking of plaintiff's cane was not motivated by discriminatory animus. Finally, defendants contend that plaintiffs' claims against them in their individual capacities are not permitted under the ADA and damages against them in their official capacities are barred by the Eleventh Amendment.

*13 The ADA provides that

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (1990). CNYPC, operated by the New York OMH, is considered a public entity for the purposes of the ADA, and as such is required to provide "reasonable modifications to rules, policies, or practices ..." *See* 42 U.S.C.A. § 12131(1)(B) & 42 U.S.C.A. § 12131(2). Public entities are not required to provide substantively different services to the disabled under the disability statutes, but instead must provide " 'reasonable accommodations' to enable 'meaningful access' to such services as may be provided, whether such services are adequate or not." *Wright v. Giuliani,* 230 F.3d 543, 548 (2d Cir.2000).

It is well established that under the ADA, suits against defendants in their individual capacities as state officials are barred. *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001) (collecting cases). Accordingly, I recommend dismissal of plaintiff's ADA claim to the extent that it seeks recovery of damages against defendants as individuals. The issue of whether defendants are immune in their official capacities is significantly more complicated.

1. *Eleventh Amendment: ADA Claims*

In *Henrietta D. v. Bloomberg,* the Second Circuit held that under *Ex Parte Young* an ADA plaintiff can assert a prospective claim for injunctive relief against a state official in his or her official capacity, as opposed to against the state directly. 331 F.3d 261, 287 (2d Cir.2003), *cert denied.,* 541 U.S. 936, 124 S.Ct. 1658, 158 L.Ed.2d 356 (2004) (citing *Ex Parte Young,* 209 U.S. 123, 155-56, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908)). That court has not explicitly held likewise for ADA plaintiffs who seek money damages. Nonetheless, a request for monetary damages from state officials in their official capacities is the functional equivalent of a claim for damages directly

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

from the State of New York, and Eleventh Amendment sovereign immunity therefore ordinarily protects a defendant in his or her official capacity to the same extent that it protects the State. *See, e.g., Garcia,* 280 F.3d at 107 (citing *inter alia, Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989)).

It is well settled under Eleventh Amendment jurisprudence that neither a state nor one of its agencies can be sued without either express or implied consent, or an express abrogation by Congress of the state's sovereign immunity. *See, e.g., Kilcullen v. N.Y. State Dep't of Labor,* 205 F.3d 77, 79 (2d Cir.2000), *implicitly overruled on other grounds by Bd. of Trustees of Univ. of Ala. v. Garrett,* 531 U.S. 356, 368, 121 S.Ct. 955, 965, 148 L.Ed.2d 866 (2001); *Hallett v. N.Y. State DOCS,* 109 F.Supp.2d 190, 197 (S.D.N.Y.2000) (citations omitted). In this respect, the Eleventh Amendment, while not directly controlling, confirms the broader, " 'background principle of sovereign immunity[.]' " *Garcia,* 280 F.3d at 107 (quoting *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 72, 116 S.Ct. 1114, 1131, 134 L.Ed.2d 252 (1996)). When abrogating sovereign immunity, Congress must both unequivocally intend to do so and act pursuant to a valid grant of constitutional authority. *Garrett,* 531 U.S. at 363, 121 S.Ct. at 962 (citing, *inter alia, Seminole Tribe,* 517 U.S. at 54, 116 S.Ct. at 1122); *Garcia,* 280 F.3d at 108 (citations omitted). The pivotal question, in determining whether defendants are entitled to protection under the Eleventh Amendment when sued in their official capacities, is whether, and if so to what extent, that amendment protects the states from liability under Title II of the ADA.[FN17]

> FN17. In making my analysis I have assumed, without deciding, that plaintiff's failure to include the state the OMH, and/or the CNYPC as a named defendant is not fatal to his claims.

**\*14** The question of whether the Eleventh Amendment bars ADA claims under Title II against a state is an unsettled question among the circuits. In *Garrett,* the Supreme Court held that Congress failed to validly abrogate state sovereign immunity under Title I of the ADA. 531 U.S. at 374, 121 S.Ct. at 967-68. In doing so, the Court was careful to distinguish Title II from its

analysis, inasmuch as the issue had not been briefed by the parties, but did note that the remedial scheme of Title II is very different from that of Title I. *Id,* at 360 n. 1, 121 S.Ct. at 960 n. 1. The courts appear to be divided as to whether *Garrett* should extend to Title II of the ADA, especially since *Pennsylvania Dep't of Corr. v. Yeskey*-which had been decided in the term previous to *Garrett,* but did not address sovereign immunity. 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998); *compare, e.g., Popovich v. Cuyahoga Cty. Ct. of Common Pleas,* 276 F.3d 808, 813-16 (6th Cir.2002) (holding that sovereign immunity validly abrogated by Congress as to the Due Process Clause), *cert. denied,* 537 U.S. 812, 123 S.Ct. 72 (2002), with *Alsbrook v. City of Manuelle,* 184 F.3d 999, 1007 (8th Cir.1999), *cert. dismissed* 529 U.S. 1001, 120 S.Ct. 1265, 146 L.Ed.2d 215 (2000) (finding that Congress exceeded authority by extending Title II of the ADA to the states and therefore did not validly abrogate sovereign immunity).

The Second Circuit has taken a slightly different approach than various other federal courts in addressing this question. In *Muller v. Costello,* decided before the Supreme Court issued its opinion in *Garrett,* the Second Circuit found that Congress had validly abrogated sovereign immunity within its authority under section five of the Fourteenth Amendment, subjecting states to potential monetary liability under the ADA.[FN18] 187 F.3d 298, 310 (2d Cir.1999). More recently, however, in *Garcia v. S.U.N.Y. Health Sciences Ctr.,* the Second Circuit found that *Garrett* had *implicitly abrogated* its prior position that the states were not immune from ADA claims. 280 F.3d at 113 n. 3.

> FN18. That section provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend XIV, § 5.

In *Garcia,* the Second Circuit found that Congress could not validly abrogate sovereign immunity under the Commerce Clause, one of the two empowering provisions cited in support of its enactment of Title II. *Garcia,* 280 F.3d at 108. The circuit court went on to find, however, that Congress could exercise its authority under section five of the Fourteenth Amendment-the "sweep of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

congressional authority" allowing Congress to "enforce the [F]ourteenth [A]mendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities"-when enacting Title II of the ADA, as a whole, though it found the power to have been exceeded through enactment of Title II, since that provision conferred upon Congress the right to abrogate sovereign immunity and allow for private parties to sue non-consenting states for money damages. *Garcia, 280 F.3d at 108-10*.

**\*15** Turning to the specific question of whether Congress, through proper invocation of its section five powers, effectively abrogated sovereign immunity in the case of private damage suits under Title II, however, the Second Circuit found that the ADA's broad remedial scheme, borrowed from the Rehabilitation Act and Title VI of the Civil Rights Act of 1964, included a judicially implied private cause of action, thus allowing that court latitude to shape a remedy. *Id. at 110-112*. Specifically, in *Garcia* the Second Circuit concluded that Title II claims against the states for monetary damages and injunctive relief could be reconciled with the prohibitions of the Eleventh Amendment if permitted in limited circumstances-that is, in cases where a plaintiff establishes that a Title II violation was motivated by discriminatory animus or ill will based on disability. *Garcia, 280 F.3d at 111; see Doe v. Goord, No. 04-CV-0570, 2004 WL 2829876, at \*15 (S.D.N.Y. Dec. 10, 2004); Lighthall v. Vadlamudi, No. 9:04-CV-0721, 2006 WL 721568, at \*18 (N.D.N.Y. Mar.17, 2006)* (Mordue, C.J.). In other words, defendants' conduct must be "based on irrational prejudice or wholly lacking a legitimate government interest." *Garcia, 280 F.3d at 111*. Since I find defendants' are not immune from suit under the Eleventh Amendment in their official capacities for alleged violations of the ADA, it is necessary to evaluate the merits of plaintiff's claim under that provision.

2. *McDonnell Douglas Analysis*

The court in *Garcia* conceded that it may be a difficult burden for a plaintiff to establish that an ADA violation resulted from discrimination, or ill will, and held that a plaintiff can rely on the *McDonnell Douglas* burden-shifting technique, or a motivating factor analysis under *Price Waterhouse,* to establish such a claim. *Garcia,*

*280 F.3d at 112*.

Under the *McDonnell Douglas* protocol, a plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 76 (2d Cir.2001)* (citing *Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 142, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000)*). Upon establishment of a *prima facie* case, the burden of production shifts to the defendant, who at that juncture must come forward and articulate a legitimate, non-discriminatory reason for the adverse action in issue. *McDonnell Douglas Corp., 411 U.S. at 802, 93 S.Ct. 1817, 36 L.Ed.2d 668; Holtz, 258 F.3d at 77* (quoting *James v. New York Racing Ass'n, 233 F.3d 149, 154 (2d Cir.2000)); Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir.2003)*. Once the defendant has successfully shouldered this burden, the focus then reverts to the plaintiff, who must establish that the alleged, non-discriminatory rationale offered did not genuinely prompt the adverse action, but instead is a mere pretext for discrimination. *McDonnell Douglas Corp., 411 U.S. at 804, 93 S.Ct. 1817, 36 L.Ed.2d 668; Graham v. Long Island R.R., 230 F.3d 34, 43 (2d Cir.2000)* (citing *Hargett v. Nat'l Westminster Bank, USA, 78 F.3d 836, 839 (2d Cir.1996), cert. denied, 519 U.S. 824, 117 S.Ct. 84, 136 L.Ed.2d 41 (1996)*). While under the *McDonnell Douglas* paradigm the burden of production alternates back and forth between the parties, a plaintiff claiming intentional discrimination is tasked ultimately with establishing discrimination by a preponderance of the evidence. *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); Holcomb v. Iona College, 521 F.3d 130, 138 (2d Cir.2008)*.

**\*16** Under *Price Waterhouse,* if the plaintiff can establish that the prohibited discrimination played "a motivating part" in the adverse action, the defendant must then demonstrate that he or she "would have made the same decision in the absence of discrimination ." *Price Waterhouse v. Hopkins, 490 U.S. 228, 252-53, 109 S.Ct. 1775, 1792, 104 L.Ed.2d 268 (1989)*. A party seeking the benefit of this defense bears the burden of establishing by a preponderance of the evidence that it would have taken the same action, irrespective of the plaintiff's disability. *See Bookman v. Merrill Lynch, No. 02 CIV. 1108, 2009*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

WL 1360673, at *10-16 (S.D.N.Y. May 14, 2009).

To state a valid violation of the ADA, a plaintiff must show "1) [he is a] 'qualified [individual]' with a disability; 2) that the defendants are subject to the ADA; and 3) that [plaintiff was] denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiff's disabilities." *Henrietta D. v. Bloomberg,* 331 F.3d at 272 (citing *Doe v. Pfrommer,* 148 F.3d 73, 82 (2d Cir.1998)).

a. *Plaintiff's Disability*

A person is considered to have a disability if he or she has "a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; B) a record of such an impairment; or C) [is] regarded as having such impairment." 42 U.S.C. § 12102(2). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating and working." 42 U .S.C. § 12102(2)(A).

In support of his motion, plaintiff has presented evidence of an eye examination performed on July 22, 2005, while Lane was incarcerated at Sullivan Correctional Facility, diagnosing him as having a prosthesis of the left eye and glaucoma and increasing myopia in the right eye. Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57-4) Exh. B. Defendants admit their awareness of plaintiff's sight limitations, though they question his allegations regarding the severity of the vision impairment of his right eye. Notably, in and of itself, "monocular vision" is not a *per se* disability within the meaning of the ADA. *Hoehn v. Int'l Sec. Services & Investigations, Inc.,* 244 F.Supp.2d 159, 167 (W.D.N.Y.2002) (citing *Albertson's, Inc. v. Kirkingbur,* 527 U.S. 555, 556, 119 S.Ct. 2162, 2169, 144 L.Ed.2d 518 (1999). "[R]ather, whether monocular vision substantially limits a major life activity of a particular individual is to be determined on a case by case basis and in terms of the impairment's impact on the individual." *Id.; see also Ditullio v. Village of Massena,* 81 F.Supp.2d 397, 405 (N.D.N.Y.2000). To determine the particular impact of monocular vision upon

a plaintiff, for purposes of the ADA disability calculus, the court should consider "1) the degree of visual acuity in the weaker eye; 2) the age at which the vision loss occurred; 3) the extent of the individual's compensating adjustments in visual techniques; and, 4) the ultimate scope of the restrictions on the individual's abilities ." *Hoehn,* 244 F.Supp.2d at 167 (citing *Kirkingburg,* 527 U.S. at 566, 119 S.Ct. at 2169). Even though most people with monocular vision will meet the ADA'S definition of disability, they are still required to prove their loss is substantial. *Id.; see also, Gibbs v. City of New York,* No. 02-CV-2424-LB, 2005 WL 497796, at *5 (S.D.N.Y. Jan.21, 2005). Moreover, the fact that one can be characterized as "legally blind" does not, as a matter of law, establish a disability within the meaning of the ADA. *See Rivera v. Apple Indus. Corp.,* 148 F.Supp.2d 202, 207, 213 (E.D.N.Y.2001); *Hoehn,* 244 F.Supp.2d at 162, 171; *EEOC v. United Parcel Serv., Inc.,* 306 F.3d 794, 799, 803 (9th Cir.2002).

**\*17** Plaintiff has failed to come forward with sufficient evidence to establish that he is disabled as a matter of law. While plaintiff states that, in addition to a left eye prosthesis, he has glaucoma and increasing myopia of the right eye, the evidence as to the actual restrictions that he suffers and whether such restrictions affect a major life activity is equivocal, at best. Plaintiff contends that he is unable to read without the use of a magnifier and cannot participate in recreation without sports goggles and ankle braces. Defendants, on the other hand, assert that while housed at CNYPC, plaintiff demonstrated no signs of difficulty relating to his ability to write, read, or use a calculator without any supplemental aids or services, and that he was able to fully participate in his treatment programs. Affording defendants the benefit of all inferences, it appears that material questions of fact exist as to whether plaintiff is disabled within the meaning of the ADA, thus precluding the entry of summary judgment in his favor on the ADA cause of action set forth in his complaint.

b. *Plaintiff's Participation*

Even assuming that plaintiff sufficiently established that he suffers from a cognizable disability, his motion for summary judgment on his ADA claim nonetheless must fail. Plaintiff easily satisfies the second applicable

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

requirement; since CNYPC and OMH are agencies of the State, defendants are required to adhere to the ADA. *See* 42 U.S.C. § 12131(1)(B). The third prong of the ADA analysis, however, entails analysis of whether Lane was denied the opportunity to participate in services, programs, or activities as a result of his alleged disability; again, this issue presents questions of fact not susceptible to resolution on the motion for summary judgment. Plaintiff argues that as a result of not receiving reasonable accommodations, he was unable to participate in recreation without his requested sport goggles and ankle braces, and he was unable to read until his family provided him with a magnifier. Tr. p. 62-63. Plaintiff also claims that after his mobility cane was taken upon admittance to CNYPC, he was never offered another means of assistance and instead was told to by defendant Coppola to "crawl or feel his way". Lane Aff. (Dkt. No. 84-2) ¶ 6. In contrast, defendants contend that throughout plaintiff's stay at CNYPC, he demonstrated no signs of difficulty in his ability to write, read, or use a calculator without any supplemental aids or services and that he was able to fully participate in his treatment groups. Nowicki Aff. (Dkt. No. 79-5) ¶¶ 11, 12, 14. From these competing claims, it is readily apparent that questions of fact preclude a finding in favor of plaintiff on the issue of whether he was denied reasonable accommodations.

c. *Discriminatory Animus*

If the plaintiff is able to establish a *prima facie* claim under the ADA at trial, the burden will shift to defendants to come forward with a legitimate non-discriminatory reason for their conduct. While denying their awareness that plaintiff required accommodations for his visual impairment, defendant Nowicki asserts that upon being admitted to CNYPC, plaintiff's mobility cane was confiscated for safety and security purposes, and that plaintiff was immediately offered a wheelchair or walker, both of which he refused. Nowicki Aff. (Dkt. No. 79-5) ¶¶ 7-8. Defendants contend further that plaintiff's records did not indicate that he experienced mobility problems, and that he indicated that he could read and write, a fact that became evident to them as result of Lane's active participation in the program. *Id.* at ¶¶ 9-12.

**\*18** Defendants have thus articulated legitimate non-discriminatory reasons for their actions. In response,

plaintiff has neither offered evidence of pretext, nor has he produced evidence of discriminatory animus. Indeed, plaintiff's complaint is devoid of any allegation that defendants actions were motivated by irrational discriminatory animus or ill will based upon his visual impairment, and Lane has produced no evidence that would support such a claim. *See* Garcia, 280 F.3d at 112.

In view of the foregoing, I recommend denial of plaintiff's motion for summary judgment on his ADA claim. And, based upon plaintiff's failure to produce any evidence of discriminatory animus, I further recommend that defendants' motion for summary judgment dismissing plaintiff's ADA claim against defendants in their official capacities be granted.

F. *Fourteenth Amendment Substantive Due Process Claims*

Several claims alleged in plaintiff's complaint are predicated upon alleged violations of the Eighth Amendment, although plaintiff also makes reference to the Fourteenth Amendment throughout his complaint. When plaintiff was released by the DOCS to CNYPC, he had served his prison term, subject to release on parole, and was no longer a prison inmate. The Eighth Amendment, prohibiting cruel and unusual punishment of those convicted of crimes, is therefore not applicable under the circumstances. Youngberg v. Romeo, 457 U.S. 307, 312, 102 S.Ct. 2452, 2456, 73 L.Ed.2d 28 (1982). Because plaintiff was not a prison inmate at the time of the alleged deprivation of his federal rights, any claim arising from his confinement must be asserted and evaluated under the Due Process Clause of the Fourteenth Amendment. Dove v. City of New York, No. 03-CV-5052, 2007 WL 805786, at * 7 (S.D.N.Y. March 15, 2007) (citing cases).

Patients who are involuntarily committed unquestionably are entitled to certain rights under the Fourteenth Amendment; as the Supreme Court has noted, "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed ... in unsafe conditions." Youngberg, 457 U.S. at 315-16, 102 S.Ct. at 2458. "The Supreme Court has explained that 'when the State takes a person into its custody and holds [her] there against [her]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

will, the Constitution imposes upon it a corresponding duty to assume responsibility for [her] safety and general well-being.' " *Beck v. Wilson,* 377 F.3d 884, 889 (8th Cir.2004) (quoting *DeShaney v. Winnebago Couty Dep't of Soc. Servs.,* 489 U.S. 189, 199-200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)). Plaintiff's claims of failure to protect, excessive force, and medical indifference, all framed as arising under the Eighth Amendment, relate to allegedly unsafe conditions while he was involuntarily confined at CNYPC, and must be analyzed within the framework of the Fourteenth Amendment.

### 1. Failure to Protect

The Second Circuit has yet to address the correct standard to be applied when evaluating a failure to protect claim arising out of an involuntary commitment, and there appears to be some uncertainty regarding the matter. The Supreme Court "established [in *Youngberg* ] that involuntarily committed mental patients have substantive due process rights, ... [and] ... held that only an official's decision that was a 'substantial departure from accepted professional judgment, practice or standards' would support a substantive due process claim brought by an involuntarily committed mental patient." *Vallen v. Carrol,* No. 02 Civ. 5666(PKC), 2005 WL 2296620, at * 8 (S.D.N.Y. Sept.20, 2005) (quoting *Youngberg,* 457 U.S. at 323). In *Vallen,* the court examined *Youngberg* and whether the substantial departure standard evolving from that decision should be applied where the plaintiff, who was a patient involuntarily committed to the Mid-Hudson Forensic Psychiatric Facility, alleged that he was subjected to violence and that the defendants, security hospital treatment assistants, failed to prevent those incidents. Distinguishing *Youngberg,* the court stated that

**\*19** [u]nlike the defendants in *Youngberg,* the defendants here are low-level staff members. The nature of such an employee immediately addressing patient-on-patient assault or theft differs significantly from higher-level decisions like patient placement and the adequacy of supervision. For the latter decisions, it is readily possible to apply a test based on professional judgment, practice or standards. In this case, professionals made none of the challenged decisions, and thus the "substantial departure" test has no applicability.

*Vallen,* 2005 WL 2296620, at \*8. The court went on to acknowledge that the general approach to substantive due process claims asserted under section 1983 requires that a plaintiff show that the defendants' actions, taken under color of state law, involved "conduct intended to injure [plaintiff] in some way unjustified by [any] ... governmental interest and most likely rise to the conscience-shocking level". *Id.* (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 849, 118 S.Ct. 1708, 1718, 140 L.Ed.2d 1043 (1998)). Ultimately, however, the court suggested that this test would result in an unduly heavy burden being placed upon a plaintiff and also would be inconsistent with the state's central role in supervising and caring for the involuntarily committed. *Vallen,* 2005 WL 2296620, at \*9. Instead, citing *Lewis* and analogizing the plaintiff's rights to those of pre-trial detainees, the court suggested its agreement with the "deliberate indifference" standard employed in such circumstances by the Eighth Circuit. *Id* . at \*9 (citing *Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004)).[FN19]

> **FN19.** While the court stated that it was "inclined to agree with the Eighth Circuit," it did not resolve the issue of the appropriate standard to be applied, finding in that case that "whether the defendants' actions are measured under the 'conscience shocking,' the 'substantial departure' or the 'deliberate indifference' standard, the result is the same .... " *Vallen,* 2005 WL 2296620, at \* 9.

In *Dove v. City of New York,* a claim similar to that raised by Lane was interposed by the plaintiff, another involuntarily committed individual, arising out of altercations with other patients. Rejecting the applicability of the Eighth Amendment to the plaintiff's circumstances, the court likewise acknowledged the lack of certainty as to whether the claim against the defendants should be measured by a "substantial departure" or "deliberate indifference" standard. *Dove,* 2007 WL 805786, at \*8. Citing *Vallen,* the court failed to reach the issue of which standard would apply, finding that under either no reasonable factfinder could conclude that defendants violated plaintiffs constitutional rights. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

I tend to agree with the *Vallen* court's conclusion that the "standard of 'deliberate indifference' " best accommodates constitutional concerns in connection with section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them in violation of their substantive due process rights.[FN20] *Vallen,* 2005 WL 2296620, at * 9. Deliberate indifference, under the Eighth Amendment, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970 1979, 128 L.Ed.2d 811 (1994); *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (same). "In *Lewis,* the Court equated deliberate indifference for substantive due process and Eighth Amendment purposes." *Moore,* 381 F.3d at 774 (citing *Lewis,* 523 U.S. at 849-40, 118 S.Ct. 1708, 140 L.Ed.2d 1043).

> FN20. Though endorsing *Vallen,* I respectfully disagree, to some extent, with the court's reasoning in that case. At its core the concept of due process is intended to protect against the arbitrary exercise of the powers of government. *Lewis,* 523 U.S. at 845, 118 S.Ct. at 1716. Determining whether the right to due process has been violated requires a balancing of an individual's interest in liberty against the state's asserted reasons for restraining individual liberty. *Youngberg,* 457 U.S. 320, 102 S.Ct. 2460. To this end, the Supreme Court has "spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Lewis,* 523 at 846, 118 S.Ct. at 1717. "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849, 118 S.Ct. at 1718. Negligence is "categorically beneath the threshold of constitutional due process." *Id.* Deliberately indifferent conduct may suffice depending on the context. *Id.* at 850, 118 S.Ct. at 1718. As the Lewis court explained,

[d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking.

*Id.* Thus, as I interpret Supreme Court precedent, deliberate indifference is not a standard that differs from but falls within the concept of conscience-shocking when one considers the circumstances presented.

The Eighth Circuit's decision in *Moore v. Briggs* appears consistent with this understanding. In *Moore,* the involuntarily committed plaintiff alleged that the defendants had violated his right to substantive due process by failing to protect him from the sexual assaults of another patient. In addressing the plaintiff's claims, the Eighth Circuit did not specifically discuss the applicability of *Youngberg,* or engage in an analysis of the potentially applicable due process standards. *See generally, Moore v. Briggs,* 381 F.3d 771. Instead, the court recognized that "[a] substantive due process violation requires proof that a government official's conduct was conscience-shocking and violated one or more fundamental rights." *Moore,* 381 F.3d at 773. In addition, the court found that under the facts presented "the defendants acted under circumstances in which actual deliberation was practical ... [and] ... [t]herefore their conduct *may* shock the conscience of federal judges only if they acted with 'deliberate indifference.' " *Id.* (emphasis in original) (quoting *Lewis,* 523 U.S. at 851-52, 118 S.Ct. 1708, 1719, 140 L.Ed.2d 1043). In discussing the concept of deliberate indifference in Lewis, the Supreme Court noted that "in the custodial situation of a prisoner, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." *Lewis,* 523 U.S. at 851, 118 S.Ct. at 1719.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

Analogizing to *Youngberg,* the Court stated, "[t]here, we held that a severely retarded person could state a claim under § 1983 for a violation of substantive due process if the personnel at the mental institution where he was confined failed to exercise professional judgment when denying him training and habilitation. The combination of the patient's involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient's welfare." *Id.* at 852 n. 12, 118 S.Ct. 1719 n. 12 (internal citations omitted). In view of the foregoing, I would interpret *Youngberg* narrowly, not as identifying a separate standard to be applied when measuring due process violations, but instead addressing a concept applicable in circumstances involving professional decision-making regarding an involuntarily committed plaintiff who relies on such professionals for his or her well being, and one that aids in the determination of whether the conduct at issue rises to the level of conscience-shocking in that environment.

**\*20** As in *Vallen* and *Dove,* however, I find it unnecessary to resolve the issue of which standard may here be appropriate since under any of the potentially applicable standards plaintiff's claim of failure to protect must fail. Plaintiff's complaint describes two occasions on which he was allegedly assaulted or attacked by other patients during his commitment at the CNYPC. The first incident occurred on September 18, 2006, shortly after plaintiff was admitted. Complaint (Dkt. No. 1) p. 7. Lane concedes that he was first struck by a football and then became involved in an altercation with a fellow patient, as a result of which he claims to have suffered injury to his face, nose and jaw. Complaint (Dkt. No. 1) p. 7; Tr. pp. 27-33. Plaintiff also admits that he is unable to distinguish between the injuries that he received from being hit by the football and those resulting from the ensuing altercation. *See* Plaintiff's Response to Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 84). The only treatment that was required for plaintiff's resulting injuries was pain medication for his discomfort.

According to plaintiff's CNYPC records, upon observing

the altercation defendant Crociata attempted to intervene by getting between the two patients and preventing further contact. Higgins Decl. (Dkt. No. 75-4) Exh. D, p. 114. Immediately after the other patient was escorted away from the area, Crociata approached plaintiff to see if he was hurt. *Id.* Plaintiff told Crociata that he had not been touched, and refused to let Crociata speak to him any further. *Id.* While plaintiff disputes telling Crociata that he was not touched, he does admit that after the incident Crociata approached him and asked him what had happened; Lane claims, however, that Crociata saw everything and states that he was angered by Crociata's question, apparently interpreting it as racist. Complaint (Dkt. No. 1) p. 7; *see also* Tr. pp. 31-32. Plaintiff also admits that Crociata saw him for his injuries, but alleges Crociata did not examine him. Tr. pp. 27-33.

Significantly, plaintiff does not allege that he had any previous difficulties with the patient with whom he was involved in the altercation, or that the defendants had reason to know of the danger in exposing the two to each other. In fact, plaintiff states that he had "absolutely no" prior interaction with that patient. Tr. p. 28. Additionally, plaintiff has failed to allege that any other defendant had any involvement in this incident. Based on these facts, no reasonable factfinder could conclude that any of the defendants engaged in conduct that shocked the conscience, substantially departed from accepted professional judgment, practices or standards, or was deliberately indifferent to plaintiff's safety. Simply stated, the record discloses that the September 18, 2006 encounter stemmed from an unforseen accident that escalated into an altercation and that CNYPC staff immediately intervened and took appropriate action to secure both individuals involved.

**\*21** The second alleged incident occurred somewhere in the beginning of October, when plaintiff claims he was "attacked" by another patient. Complaint (Dkt. No. 1) p. 9. Plaintiff does not identify a specific date or recount the circumstances surrounding the alleged attack, nor does he claim to have suffered any injury. The record suggests an incident occurred between plaintiff and another patient on October 3, 2006 in which he and the other patient "had words." Higgins Decl. (Dkt. No. 75-4) Exh. D, p. 214. There is no evidence in the record that plaintiff was physically touched or in any way injured as a result of this incident. To the contrary, plaintiff admits that the only

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

incident in which he received physical injury occurred on September 18. Tr. p. 44. With regard to the October instance, I find that plaintiff has failed to establish a sufficiently serious deprivation to show that he was subjected to an unreasonably unsafe condition and trigger the Fourteenth Amendment's protections.

In view of the foregoing, I find that plaintiff has failed to establish a Fourteenth Amendment claim for failure to protect and/or intervene and, accordingly, I recommend defendants' motion for summary judgment relating to this claim be granted.

2. *Medical Care*

"Courts have consistently held, in a variety of contexts, that the due process rights of persons in a nonpunitive detention are greater than the Eighth Amendment protections afforded to convicted prisoners." *Haitian Centers Council, Inc. v. Sale,* 823 F.Supp. 1028, 1043 (E.D.N.Y.1993) (citing cases); *Owens v. Colburn,* 860 F.Supp. 966, 974 (N.D.N.Y.1994), *aff'd* 60 F.3d 812 (2d Cir.1995) (citing cases). "Persons in nonpunitive detention have a right to 'reasonable medical care,' a standard demonstrably higher than the Eighth Amendment standard that protects prisoners: 'deliberate indifference to serious medical needs.' " *Owens,* 860 F.Supp. at 974 (quoting *Haitian Centers Council,* 823 F.Supp. at 1043-44). At a minimum, due process forbids conduct that is deliberately indifferent to one that is involuntarily committed. *Haitian Centers Council,* 823 F.Supp. at 1044.

Plaintiff's medical indifference claim has as it genesis the now familiar September 18, 2006 incident. Plaintiff claims that after being struck by a football and subsequently attacked by a fellow patient on that date, he sought medical treatment from defendant Crociata; Lane also alleges that he suffered back pain as a result of the events of that day. Complaint (Dkt. No. 1) p. 7; Tr. pp. 27-33. As was previously noted, plaintiff was unable to distinguish the injuries sustained from being hit by the football from those allegedly resulting from the altercation, if any. Tr. pp. 29-30. Lane alleges that when defendant Crociata saw him, Crociata told him, "[t]here's nothing wrong with you" and failed to perform an actual examination. Complaint (Dkt. No. 1) p. 7.

Plaintiff's CNYPC records contradict plaintiff's version, revealing that Crociata approached plaintiff immediately after the altercation to see if he was hurt, at which time plaintiff told him "I wasn't touched," and refused to let Crociata speak to him any further. Higgins Decl. (Dkt. No. 79-4) Exh. D, p. 114. Later in the day, plaintiff apologized to Crociata for his behavior, and complained of general discomfort. *Id.* As a result, Crociata promptly prescribed 600 milligrams of Motrin for plaintiff's pain. *Id.* A follow-up note by Nurse Jane Helfert shows that after receiving the Motrin plaintiff slept through the night, and made no further complaints about his pain. *Id.* p. 115.

**\*22** Plaintiff himself acknowledges that he did not report his injuries to Crociata, never complained to anyone that his back was hurting, and did not request any sort of pain medication for his alleged injuries. Tr. pp. 32-33, 35-36. Plaintiff also concedes that he was provided with ibuprofen and other pain medication when requested, including the day after the altercation. Tr. p. 34. Moreover, plaintiff is unable to articulate what follow up treatment he believes was constitutionally required.[FN21] *Id.* at 38.

> FN21. Plaintiff testified at his deposition that other than the particular day in question, whenever he asked for medical treatment it was provided, and "[i]n fact, I would give them credit, that their attentiveness to patients' conditions, medical conditions is good." Tr. p. 36.

Based upon these facts, I have determined that no reasonable factfinder could conclude that there was an unreasonable or deliberately indifferent "denial" or delay in treatment of plaintiff on September 18, 2006. I therefore recommend that defendants' motion to dismiss plaintiff's medical indifference claim be granted.[FN22]

> FN22. Plaintiff further alleges in his complaint, upon information and belief, that defendant Crociata "deliberately falsified official state documents with regards to plaintiffs [sic] request for medical attention." Complaint (Dkt. No. 1) p.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

7, 11. To create a factual issue, the complaint must be based on personal knowledge, not on "mere 'information and belief or hearsay." *Cabassa v. Gummerson,* No. 01-CV-1039, 2006 WL 1559215, at *2 (N.D.N.Y. Mar.30, 2006) (Lowe, M.J.). Since plaintiff's speculative allegation is not supported by any evidence, and indeed, contradicts his own testimony that he saw Crociata and did not request treatment, the court has no reason to doubt the authenticity of CNYPC records.

3. *Excessive Force*

Plaintiff claims that on September 22, 2006, as a result of his refusal to talk to defendant Nowicki, he was beaten and held in restraints and thereby subjected to excessive force. Complaint (Dkt. No. 1) p. 8. As with plaintiff's failure to protect claim, the proper framework for analysis of this claim is the Fourteenth, and not the Eighth, Amendment. *Youngberg,* 457 U.S. at 312, 102 S.Ct. at 2456. "It bears remembering ... that not all bodily harm caused by a government actor is actionable as a constitutional violation." *West v. Whitehead,* No. 04-CV-9283, 2008 WL 4201130, at * 14 (S.D.N.Y. Sept. 11, 2008) (citations omitted). "Only when bodily harm is caused by government action 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience,' will a constitutional violation result." *Id.* (quoting *Lombardi v. Whitman,* 485 F.3d 73, 81 (2d Cir.2007)).

In the Second Circuit, it is recognized that individuals in the non-seizure, non-prisoner environment have a substantive due process right to be free from the use of excessive force by their custodians. *See Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 253 (2d Cir.2001) (citing *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995)). Factors to be considered in examining excessive force claims include: "the need for the application of force, the relationship between the need and amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 251-52 (quoting *Metzger v. Osbeck,* 841 F.2d 518, 520 (3d Cir.1988)). With respect to the last factor, the Second Circuit has explained that

[i]f the force was 'maliciously or sadistically [employed] for the very purpose of causing harm in the absence of any legitimate government objective and it results in substantial emotional suffering or physical injury, the conduct is presumptively unconstitutional .... [M]alicious and sadistic abuses of government power that are intended only to oppress or to cause injury, and serve no legitimate purpose unquestionably shock the conscience ... [C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

**\*23** *Id.* at 252 (citations omitted). "Whether conduct rises to the level of unconstitutional excessive force depends on the totality of circumstances." West, 2008 WL 4201130, at * 15 (citing *Johnson,* 239 F.3d at 254). [FN23] This analysis was found applicable by the court in *West* to an excessive use of force claim asserted under section 1983 by a profoundly mentally retarded individual committed to a state-operated facility for developmentally disabled individuals. *West,* 2008 WL 4201130, at *14-15.

FN23. Plaintiff claims that defendants violated 14 N.Y.C.R.R. § 27.7(a), a New York regulation regarding use of restraint and seclusion in institutional care. Review of this provision and the record before the court suggests that defendants fully complied with this regulatory provision. Even if they did not, however, "[a] violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases).

Plaintiff claims that on September 22, 2006 he was called from the day room by Nowicki, who said that he wanted to talk to plaintiff in the side room. Tr. p. 45. Plaintiff responded by stating that he did not have anything to say to Nowicki, at which point, plaintiff claims, Nowicki directed the twenty treatment assistants that were standing there to "take him down." Tr. p. 46. Plaintiff claims that he was then kicked and struck about his body, placed in restraints and transported by gurney to some other location

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

where he was kept without being given food for two to three days, except for a sausage sandwich; plaintiff admits being offered drinks but states that he refused. Tr. pp. 45-61.

According to defendants, on the day of the alleged incident plaintiff had been hostile toward staff and residents, threatened to start a riot, and refused counseling by Nowicki in the side room. Nowicki Aff. (Dkt. No. 79-5) ¶¶ 22-23. Plaintiff was recorded as saying "[d]on't try to take me to take counsel or try to shoot me up, because when I come out of it, there will be trouble. That's a promise, not a threat." Higgins Decl. (Dkt. No. 79-4) Exh. D, p. 146. Because plaintiff attempted to return from the hallway to the day room, he was placed into a four point restraint for seven minutes, pursuant to doctor's orders, and transported to the side room "without injury or physical altercation". Nowicki Aff. (Dkt. No. 79-5) ¶¶ 24-25; Higgins Decl. (Dkt. No. 79-4), Exh. D, p. 146.

Nowicki states that after being restrained plaintiff continued to make threats and, consistent with hospital policy, remained in the side room with one-to-one supervision from 1:00 p.m. September 22, 2006 until 9:30 a.m. on September 25, 2006, during which time he was provided food and a mattress, slept and ate, and attended to his own daily self-care activities. Nowicki Aff. (Dkt. No. 79-5) ¶¶ 24-29. Plaintiff's CNYPC records also indicate that plaintiff's activity was monitored at fifteen minute intervals and that plaintiff was provided meals, saw a psychiatrist and was permitted to meet with his parole officer. Higgins Decl. (Dkt. No. 79-4) Exh. D, pp. 146-80. The record also reveals, and plaintiff admits, that at various times over this three-day period Lane refused to interact with staff, and plaintiff acknowledges that the purpose in putting him in isolation was behavior modification. Tr. pp 53-55, 60.

While the parties' versions of the events of September 22, 2006 vary, I do not find the differences material to the determination of this claim. Plaintiff does not dispute that he refused to go to the side room to speak with Nowicki, nor does he deny making threats in the day room. The decision to put plaintiff in a four point restraint was made by a physician in light of plaintiff's history, his serious threats, and his refusal to follow staff direction. Plaintiff does not claim to have been restrained for a period longer

than that necessary to transport him. Plaintiff has produced no evidence that the force that was used was malicious or sadistic, for the very purpose of causing him harm.

**\*24** Although plaintiff generally alleges that he sustained injury to his back, shoulders and neck and was denied medical treatment as a result of the incident, plaintiff does not specifically identify any injury or treatment that was needed with specificity, and he does not allege that he has suffered any continuing problems. There is no evidence of any relevant injury noted in plaintiff's CNYPC records. The record indicates, and plaintiff admits, that within two hours of being placed in the side room, he was seen by a doctor, with whom he refused to speak. Significantly, plaintiff's allegation that he was denied medical treatment on that date directly contradicts his deposition testimony to the effect that the only time he was denied treatment was on September 18, 2006. Tr. p. 36.

Based upon the record now before the court, no reasonable factfinder could find defendant's conduct conscience-shocking. Rather, the record establishes that defendants were attempting in good faith to discipline plaintiff and restore order as a result of his failure to follow directions and his continuous threats to patients and staff at the facility. I therefore recommend that defendants' motion for summary judgment as to this claim be granted, and that plaintiff's excessive force claim be dismissed.[FN24]

> **FN24.** To the extent that plaintiff also challenges the conditions experienced while in isolation, I find that such a claim would fall squarely within the test enunciated in *Youngberg*. The record shows that the decisions to place plaintiff in four point restraints, to isolate him and to release him were all made by a physician and effectuated in accordance with hospital policy. These decisions are entitled to deference, and are therefore presumptively valid. *Youngberg,* 457 U.S. at 322-23, 102 S.Ct. at 2461-62. While plaintiff disputes being provided with regular meals, he admits being provided at least one meal and offered liquids, and he has failed to come forward with any evidence demonstrating that the conditions of his confinement were a substantial departure from accepted professional judgment, practice or standards. *Id.* at 323, 102 S.Ct. at

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

2462; *Zigmund v. Foster,* 106 F.Supp.2d 352, 361-62 (D.Conn.2000). Accordingly, any claim by plaintiff that he was denied due process by the conditions of his isolation should also be dismissed as a matter of law.

G. *First Amendment*

"The First Amendment Guarantees the right to 'petition the Government for a redress of grievances.' " *McKithen v. Brown,* 565 F.Supp.2d 440, 458 (E.D.N.Y.2008) (quoting U.S. Const. amend. I). Out of the Petition Clause of that amendment arises the right of access to courts, *City of New York v. Beretta U.S.A Corp.,* 524 F.3d 384, 397-98 (2d Cir.2008), *cert. denied* --- U.S. ----, 129 S.Ct. 1579, 173 L.Ed.2d 675 (2009), as well the right to petition for redress for grievances without retaliation. *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988).

1. *Access to the Courts*

Although not specifically stated in his complaint, defendants suggest that when liberally construed in light of his deposition testimony plaintiff's complaint makes a claim of denial of access to the courts.[FN25]

> FN25. Plaintiff testified that prior to his family providing him a magnifier in mid-October he was unable to litigate and challenge his illegal commitment. Tr. p. 62.

Without question, an inmate's constitutional right to "meaningful" access to the courts is firmly established.[FN26] *Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977) (citations and internal quotation marks omitted). "However, this right is not an abstract, freestanding right to a law library or legal assistance and cannot ground a Section 1983 claim without a showing of actual injury." *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (internal quotations omitted). Thus, "[t]o survive a motion for summary judgment, plaintiff must present evidence showing that he has suffered actual injury." *Jarecke v.*

*Hensley,* No. 3:07-cv-1281, 2009 WL 2030394, at *9 (D.Conn. July 9, 2009) (citing *Lewis v. Casey,* 518 U.S. at 351-52). To prove an actual injury, a plaintiff must show that a non-frivolous legal claim was frustrated or impeded due to the actions of the defendants .[FN27] *Abdul-Matiyn,* 2008 WL 974409, at * 13.

> FN26. Although plaintiff was not a prisoner but involuntarily committed at CNYPC at all times relevant to this claim, the right of access to court evolves from the First Amendment and thus the analysis is the same in either context. *See Lombardo v. Holanchock,* No. 07 Civ. 8674, 2008 WL 2543573, at *7 n. 6 (S.D.N.Y. June 25, 2008); *see also Samuels v. Stone,* No. 98 Civ. 776, 1999 WL 624549, at *4 (S.D.N.Y. Aug. 17, 1999).

> FN27. In apparent recognition of some level of constraint necessarily imposed in institutional environments, courts have applied the standard applied to prison inmates to circumstances involving the involuntarily committed in claims relating to access to courts as well as retaliation. *See Lombardo,* 2008 WL 2543573, at * 6 n. 6; *Zigmund,* 106 F.supp.2d at 358.

*25 Plaintiff has failed to prove his claim that defendants' failure to provide him with a laptop computer with zoom text, a scanner and inkjet color printer, 7x magnifier, books on tape, high intensity lamp and 20/20 pens as requested in his letter to defendant Sawyer on October 13, 2006, resulted in his inability to pursue any legal action. *See* Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57-4), Exh. C. In fact, plaintiff admits he was able to file all of the legal proceedings that he desired. Tr. p. 67. Moreover, as defendants explain in their motion for summary judgment, CNYPC patients are afforded access to the Mental Hygiene Legal Services ("MHLS"), which provides "legal services, advice and assistance, including representation, with regards to the resident's hospitalization." Dkt. No. 79-3, p. 12. Plaintiff admits that he was familiar with the services MHLS provides, and actually attempted to bring an action with the assistance of that agency, but was transferred from CNYPC before the proceeding could move forward. Tr. p. 10. Because there is no evidence that plaintiff suffered actual injury due to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

defendants' alleged interference with his access to the courts, I recommend that any claim by plaintiff that he was denied such access be dismissed.

2. *Retaliation*

In his complaint plaintiff alleges that defendants retaliated against him because he and his family complained to various governmental agencies and officials, and he insisted on filing criminal charges against another patient. Complaint (Dkt. No. 1) p. 11. "[C]riticism of governmental agencies is protected speech under the First Amendment." *Olesen v. Morgan,* No. 1:06-CV-959, 2008 WL 5157459, at *4 (N.D.N.Y. Dec.8, 2008) (quoting *Economou v. Butz,* 466 F.Supp. 1351, 1361 (S.D.N.Y.1979)* (footnote omitted)). When adverse action is taken by governmental officials against a person being held in custody, motivated by his or her exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. See *Franco,* 854 F.2d at 588-90.

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there exists a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*26** Analysis of retaliation claims thus requires thoughtful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiffs retaliation claims. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

The right to file a grievance and petition the government for redress is "among the most precious of the liberties safeguarded by the Bill of Rights." *Franco,* 854 F.2d at 589 (quoting *United Mine Workers v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967)). Plaintiff therefore easily meets the first prong of the governing test by demonstrating that he engaged in protected activity.

It is in connection with the requirement that the two be linked that plaintiff's retaliation claim falls short. Plaintiff first claims that defendants retaliated against him by falsifying documents in order to have him removed from the facility. Complaint (Dkt. No. 1) p. 11. Lane has failed to offer proof, however, showing that any document was falsified by defendants with the intent to have plaintiff removed from CNYPC. As District Judge David N. Hurd recognized in his decision in *Barclay v. New York,* 477 F.Supp.2d 546 (N.D.N.Y.2007), in cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay,* 477 F.Supp.2d at 558. More than conclusory allegations are required to survive a summary judgment motion; the "types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

Here, the evidence in the record overwhelmingly

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

demonstrates that from the outset and repeatedly throughout his confinement at CNYPC, plaintiff voiced both his discontent with being placed at the facility and his desire to return to prison. There is ample evidence in the record demonstrating that while confined at CNYPC plaintiff was involved in more than one altercation and made repeated threats to the safety of staff and other patients, including threats to start a riot and to kill another patient; the event finally precipitating his removal was his threat to cut the throat of a treatment assistant. Conversely, there is no evidence in the record that suggests that any document authored by any defendant was false, let alone that falsification of such document was motivated by a desire to retaliate against the plaintiff for his written complaints to various governmental agencies. Moreover, the incident that caused plaintiff's removal from CNYPC also formed the basis for the parole violation that precipitated plaintiffs return to prison, for which he was afforded a hearing, was represented by counsel, and was permitted to cross-examine witnesses and present his own evidence, and he was ultimately found guilty.

*27 The second incident that plaintiff attributes to retaliatory animus relates to his September 22-26, 2006 confinement in an isolated room after he insisted on filing criminal charges against a fellow patient who assaulted him. Complaint (Dkt. No. 1) p. 11. On this count, plaintiff fails to demonstrate that the alleged adverse action was prompted by protected conduct. Preliminarily, it should be noted that plaintiff has repeatedly complained that he was prevented from filing any criminal charges, yet admits that following the September 18, 2006 altercation he participated in mediation with the other patient, leading to resolution of the matter. Even assuming that plaintiff pursued criminal charges, his claim would fail as it is well established that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.,* 410 U.S. 614, 619, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973). Accordingly, plaintiff had no constitutionally protected right to file a criminal complaint. Finally, even if plaintiff had sufficiently established that he engaged in protected activity, he has failed to adduce any evidence demonstrating that his confinement in isolation was in any way related to his effort to pursue criminal charges in regard to the attack that occurred several days prior, or that it was maliciously motivated by a retaliatory animus.

Because plaintiff has failed to produce any evidence to support his retaliation claims, I recommend that this portion of defendants' motion for summary judgment be granted, and that those claims be dismissed.

3. *Investigation of Complaints*

Plaintiff's tenth cause of action purports to allege a claim for the acts or omissions of defendant Beebe in failing to investigate plaintiff's complaints regarding the conditions of confinement at the CNYPC. Complaint (Dkt. No. 1) p. 8, 12. Although the right to petition government is well established, there is no corresponding duty on the part of the government to act. *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 375 (N.D.N.Y.2003) (citations omitted), *aff'd* 83 Fed. Appx. 363 (2d Cir.2003); *Wolf v. Town of Mount Pleasant,* No. 06 Civ. 3864, 2009 WL 1468691, at *6 (S.D.N .Y. April 27, 2009) (citing *Bernstein v. New York,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008)). Plaintiff has, therefore, failed to allege a cognizable claim.[FN28]

FN28. Moreover, the record belies plaintiff's assertion that defendant Beebe failed to properly investigate the complaints made by plaintiff and his wife relating to plaintiff's treatment while committed at CNYPC. Defendant Beebe was assigned to investigate the complaints made by plaintiff and either engaged in personal phone calls or exchanged voice mail messages with plaintiff's wife on October 1, 2006, October 23, 2006, November 1, 2006, November 3, 2006 and November 7, 2006. Defendants' Response to Request for Admissions (Dkt. No. 62-3) ¶¶ 8-9. The record also shows that Beebe's investigation included a personal visit to CNYPC on November 21, 2006. Higgins Decl. (Dkt. No. 79-4) Exh. E, pp. 32-33.

I therefore recommend that all claims against defendant Beebe be dismissed.

H. *Personal Involvement*

Defendants move to dismiss all claims asserted by Lane

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

against defendants Carpinello and Sawyer based upon their lack of personal involvement in the allegedly offending conduct. At the outset, because the court has determined that plaintiff was not denied a constitutional right, his supervisory claims against Carpinello and Sawyer should be dismissed. See *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983). Even if there were a cognizable claim, however, the claims against Carpinello are subject to dismissal based upon a lack of personal involvement.

**\*28** Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. See *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). A supervisor can be found to have personal involvement in a constitutional violation if the evidence shows:

> 1) the defendant participated directly in the alleged constitutional violation, 2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, 3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowing the continuance of such a policy or custom, 4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or 5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (1995) (quoting Wright, 21 F.3d at 501).

Plaintiffs claims against defendant Carpinello, Commissioner of the New York State OMH, and defendant Sawyer, the director of CNYPC, are premised exclusively upon their roles as supervisors. Plaintiff

alleges that Carpinello was involved in the refusal of plaintiff's requests for accommodations under the ADA, refused to hire a disabilities rights coordinator, demonstrated deliberate indifference to his needs, failed to supervise employees at the facility, and instituted policies and procedures that she knew, or should have known, were unlawful. Complaint (Dkt. No. 1) pp. 9-12. For this claim plaintiff relies on a letter that he wrote to Carpinello in mid-October asking to be placed in protective custody and transferred from CNYPC. Complaint (Dkt. No. 1) p. 9. Plaintiff admits that he never received a response to his letter. Complaint (Dkt. No. 1) p. 9.

Plaintiffs allegations against Sawyer are similar. On October 13, 2006 plaintiff sent defendant Sawyer a letter requesting certain accommodations under the ADA, including such things as a laptop computer, a magnifier and books on tape. Dkt. No. 57-4, Exh. C. Additionally, plaintiff alleges that Carpinello and Sawyer should have been aware of his complaints by virtue of the letters that he and his wife had written to various state agencies and public officials. The mere receipt of a letter of complaint alone, however, is insufficient to establish personal involvement and liability under section 1983. *Porter v. Goord,* No. 04-CV-0506F, 2009 WL 2386052, at \*5 (W.D.N.Y. July 20, 2009) (citations omitted); *Lyerly v. Phillips,* No. 04 Civ. 3904(PKC), 2005 WL 1802972, at \*7 (S.D.N.Y. July 29, 2005) (Castel, J.) (citing *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002)).[FN29]

> **FN29.** Plaintiff's conclusory allegations that Carpinello and Sawyer were also made aware by repeated telephone calls are also insufficient. He fails to identify when and by whom such alleged telephone calls were made, whether he or someone on his behalf spoke to Carpinello or Sawyer, and if so, the substance of such alleged conversations.

**\*29** Plaintiff also claims that there existed an unwritten policy and custom of patient abuse and assault at CNYPC, which had been in place for many years. Yet, plaintiff has produced no evidence of instances of alleged assault or abuse of patients, aside from the incident on September 22, 2006, of which he now complains. In opposition to defendants' motion, Lane offers the affidavit of John Palombo (Dkt. No. 84-6), a former patient confined at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

CNYPC from July, 2006, until November of 2007. The Palombo affidavit, however, is fatally conclusory. Palombo states that he personally witnessed staff members attack and beat patients at CNYPC on a least six different occasions, but fails to identify with any specificity the dates on which such beatings allegedly occurred, the patients that were involved, or the circumstances surrounding the alleged beatings. *Id.* ¶ 13. Nor does Palombo allege that supervisors were notified or aware of the matter, or that complaints were made about these incidents. In fact, plaintiff has produced no evidence of any complaints of abuse made by or on behalf of patients, other than his own. In view of the foregoing, I conclude that the evidence in the record is insufficient to permit a reasonable juror to find the existence of an unwritten policy or custom of patient abuse at CNYPC. *See Upton v. County of Orange,* 315 F.Supp.2d 434, 447 (S.D.N.Y.2004).

For the foregoing reasons, I recommend that defendants' motion for summary judgment dismissing the claims against Carpinello and Sawyer for lack of personal involvement be granted.[FN30]

> **FN30.** Although defendants do not move to dismiss the claims against defendant Barboza, Director of the SOTP, for lack of personal involvement, it appears that the only basis for plaintiff's claims against her result from her supervisory role. The sole allegations made by the plaintiff relating to defendant Barboza are that he wrote two separate letters to her complaining of his circumstances at CNYPC. As noted above, these allegations, even if true, are insufficient to support liability against Barboza, *Porter,* 2009 WL 2386052, at *5, and I find that all claims against her should be dismissed for lack of personal involvement.

I. *Conspiracy*

Embedded within plaintiff's complaint, though not separately stated, is a conspiracy claim asserted under 42 U.S.C. §§ 1983 and 1985.[FN31] Defendants also seek dismissal of that claim.

> **FN31.** Plaintiff's complaint additionally alleges violation of 42 U.S .C. § 1984. No such provision exists.

1. *Section 1983*

To sustain a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that a defendant "acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights ... secured by the Constitution or the federal courts." *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995) (citations and internal quotation marks omitted). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983. *See Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983), (per curiam) *cert. denied,* 464 U.S. 857, 104 S.Ct. 177, 78 L.Ed.2d 158(1983). In order to support a claim of conspiracy to commit a civil rights violation, a plaintiff must establish the existence of such a deprivation; a claim of conspiracy, standing alone, is insufficient to support a finding of liability under section 1983. *Britt v. Garcia,* 457 F.3d 264, 269-70 (2d Cir.2006); *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993) (collecting cases).

Plaintiff's conspiracy claim, if existing at all, appears to rest entirely upon an e-mail from defendant Babula, a treatment assistant, to defendant Barboza, the director of the SOTP at CNYPC, dated October 20, 2006, which plaintiff construes as a concerted effort to have plaintiff's parole violated. Lane Aff. (Dkt. No. 84-2) Exh. C, p. 12. In the e-mail Babula expresses his concerns relating to plaintiff's continuing threatening conduct and goes on to say, "Sharon if there is a way to get this man violated, and you could do it, you need to ..." *Id.* While this e-mail reflects defendant Babula's safety concerns about plaintiff's continued presence at CNYPC, it is not sufficient to raise a question of fact precluding summary judgment dismissing plaintiff's claim of conspiracy.

**\*30** I note that because I have not found that plaintiff's complaint states a sustainable claim for deprivation of a constitutional right, his conspiracy claim is likewise subject to dismissal for failure to state a cause of action. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

Moreover, plaintiff has offered only conclusory allegations that defendants acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, to violate plaintiffs rights, and for this reason as well his claim of conspiracy fails.

2. *Section 1985*

Plaintiff's complaint also alleges violation of 42 U.S.C. § 1985. To sustain a cause of action for conspiracy to violate civil rights under section 1985(3), a plaintiff must allege and demonstrate that defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his or her equal protection of the laws, or of equal privileges and immunity secured by law. *United Brotherhood of Carpenters & Joiners, Local 610, AFL-CIO v. Scott,* 463 U.S. 825, 834-39, 103 S.Ct. 3352, 3359-61, 77 L.Ed.2d 1049 (1983); *Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir.1994); *Gleason v. McBride,* 869 F.2d 688, 694 (2d Cir.1989); *Patterson v. County of Oneida,* No. 5:00-CV-1940, 2002 WL 31677033, at *4 (N.D.N.Y. Oct.30, 2002) (Hurd, J.), *aff'd in relevant part,* 375 F.3d 206 (2d Cir.2004); *Benson v. United States,* 969 F.Supp. 1129, 1135-36 (N.D.III.1997) (citing, *inter alia, United Brotherhood,* 463 U.S. at 434-37); *see also LeBlanc-Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir.1995). A plaintiff asserting a claim under section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can, in the alternative, be evidenced circumstantially, through a showing that the parties had a " 'tacit understanding to carry out the prohibited conduct.' " *LeBlanc-Sternberry,* 67 F.3d at 427 (quoting *United States v. Rubin,* 844 F.2d 979, 984 (2d Cir.1988)). This notwithstanding, in order to properly plead such a claim, a plaintiff must make more than "conclusory, vague, or general allegations of conspiracy." *Sommer v. Dixon,* 709 F.2d at 175; *Williams v. Reilly,* 743 F.Supp. 168, 173 (S.D.N.Y.1990) ("[u]nsubstantiated, conclusory, vague or general allegations of a conspiracy to deprive constitutional rights are not enough to survive [even] a motion to dismiss"). "[D]iffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002) (quoting *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993)). Moreover, it is well settled that a plaintiff attempting to establish a claim under section 1985(3) must demonstrate that the defendant under consideration acted with

class-based, invidiously discriminatory animus. *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 266-68, 113 S.Ct. 753, 758-759, 122 L.Ed.2d 34(1993).

**\*31** Plaintiff's claim of conspiracy under section 1985 fails for the same reasons that require dismissal of his conspiracy claim alleged under section 1983. Plaintiff's section 1985 claim is also subject to dismissal based upon the fact that plaintiff has produced no evidence of any class-based discriminatory animus.

In view of the foregoing, I recommend that defendants' motion as to plaintiff's conspiracy claims be granted, and that plaintiff's conspiracy claims be dismissed.[FN32]

> FN32. Plaintiff's conspiracy claim, as alleged in his sixth cause of action, names Nowicki, Lucenti, Crociata, Menz, Coppola and Babula, all of whom were employed at the CNYPC. In a doctrine rooted in the conspiracy provision of section one of the Sherman Antitrust Act, 15 U.S.C. § 1, and which, although developed in the context of business entities, since inception has been expanded to apply to business corporations and public entities as well, the intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances. *See, e.g., Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 75-76 (E.D.N.Y.2002); *Griffin-Nolan v. Providence Washington Ins. Co.,* No. 5:05CV1453, 2005 WL 1460424, at *10-11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.). Plaintiff's conspiracy claim is thus also subject to dismissal on this basis.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff asserts a variety of claims in his complaint relating to his involuntary commitment to CNYPC in September and October of 2006. Having carefully reviewed the extensive record before the court and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3074344 (N.D.N.Y.)
(Cite as: 2009 WL 3074344 (N.D.N.Y.))

considered both plaintiffs motion for partial summary judgment and defendants' cross motion for summary judgment, I find that defendants are entitled to qualified immunity with regard to plaintiff's claim that he was committed to CNYPC in violation of his right to procedural due process [FN33] and that defendants are entitled to immunity under the Eleventh Amendment for all of plaintiff's claims against them in their official capacities and for alleged violations of the ADA in their individual capacities, and that such claims should therefore be dismissed. As to plaintiff's remaining claims under the ADA, I conclude that he has failed to prove any violation of his rights under Title II of that statute, and that these claims should also be dismissed on the merits, as a matter of law. In addition, I find that plaintiff cannot state a claim under the Eighth Amendment for conditions arising out of his confinement in CNYPC, and that he has failed to establish claims under the Fourteenth Amendment for failure to protect and/or intervene, medical indifference, or excessive use of force, and that these claims therefore are similarly subject to dismissal. Likewise, I have determined that plaintiff has failed to establish that he was denied access to the courts, that defendants' retaliated against him, or that he was otherwise denied his First Amendment rights, including by defendant Beebe's alleged failure to investigate, and accordingly recommend that all First Amendment claims asserted by Lane be dismissed. Because I find that plaintiff has failed to establish a constitutional violation or violation of the ADA, plaintiff's claims of conspiracy as well as those for supervisory liability against defendants Carpinello, Sawyer and Barboza are also subject to dismissal. Additionally, I find that plaintiff has failed to produce any evidence of a conspiracy, or of the personal involvement of Carpinello, Sawyer and Barboza, and therefore recommend dismissal of plaintiff's conspiracy claims and those against Carpinello, Sawyer and Barboza on this basis as well. Accordingly, it is hereby respectfully

FN33. Because I have already concluded that plaintiff has failed to allege any other constitutional violations during plaintiff's commitment at CNYPC, I have declined to address the defense of qualified immunity with respect to plaintiff's remaining claims.

RECOMMENDED that plaintiff's motion for partial summary judgment (Dkt. No. 57) be DENIED, defendants'

cross motion for summary judgment (Dkt. No. 79) be GRANTED, and plaintiff's complaint be DISMISSED in its entirety.

**\*32** NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a) and 6(d), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2009.
Lane v. Carpinello
Slip Copy, 2009 WL 3074344 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 2519121 (N.D.N.Y.)
(Cite as: 2010 WL 2519121 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Donald CARNEY, Plaintiff,
v.
Michael F. HOGAN, Commissioner, NYS Office of
Mental Health; Donald Sawyer, Executive Director,
CNYPC, Defendants.
Donald Carney, Plaintiff,
v.
Michael F. Hogan, Commissioner, NYS Office of
Mental Health; Donald Sawyer, Executive Director,
CNYPC; Terri Maxymillian, Director, Sex Offender
Treatment Program; Valerie Colasante, Psychologist
Assistant, Defendants.
**Nos. 9:08-CV-1251 (DNH/ATB), 9:08-CV-1280
(DNH/ATB).**

March 30, 2010.

Donald Carney, pro se.

Aaron M. Baldwin, Asst. Attorney General, for
Defendants.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred to Magistrate Judge Gustave
J. Di Bianco for Report and Recommendation pursuant to
28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).
Upon Magistrate Judge Di Bianco's retirement on January
4, 2010, the case was referred to me by the Honorable
Norman A. Mordue, Chief United States District Judge.
(Dkt. No. 20).

Plaintiff filed two complaints in separate cases pursuant to
42 U .S.C. § 1983, challenging the constitutionality of the
Sex Offender Treatment Program ("SOTP") administered
at the Central New York Psychiatric Center ("CNYPC")
by the New York State Office of Mental Health ("OMH").
Magistrate Judge Di Bianco issued an order on December
10, 2008, consolidating the cases. (Dkt. No. 5). Plaintiff
alleges that the SOTP violates the United States
Constitution in four ways: (1) the SOTP violates plaintiff's
First Amendment right to abstain from religious practices;
(2) the SOTP violates plaintiff's Fifth Amendment right
against self-incrimination through use of a penile
plethysmograph FN1 ("PPG") examination; (3) the SOTP
violates plaintiff's Fifth Amendment right against
self-incrimination by requiring a polygraph examination;
and (4) the SOTP violates plaintiff's Fifth Amendment
right against self-incrimination by requiring him to
complete an "autobiography" and a "sexual offense
history" that includes uncharged crimes or dismissed
charges.FN2 Plaintiff seeks injunctive relief and monetary
damages.

> FN1. A plethysmograph is an "instrument for
> measuring variations in the size of an organ or
> body part on the basis of the amount of blood
> passing through or present in the part."
> W E B S T E R ' S   I I   N E W   C O L L E G E
> DICTIONARY 847 (Margery S. Berube et al.
> eds., 1995.).

> FN2. Plaintiff's complaint filed in the lead case
> (08-CV-1251) ("Lead Complaint") relates to
> claims (1) through (3) and plaintiff's complaint
> filed in the member case (08-CV-1280)
> ("Member Complaint") relates to claim (4).

Defendants move to dismiss plaintiff's claims for failure to
state a claim upon which relief can be granted pursuant to
FED.R.CIV.P. 12(b)(6). (Dkt. No. 15). Plaintiff responded
in opposition to defendants' motion, and defendants filed
a reply. (Dkt.Nos.16, 18). For the following reasons, this
court will recommend that defendants' motion be granted
in part and denied in part.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2519121 (N.D.N.Y.)
(Cite as: 2010 WL 2519121 (N.D.N.Y.))

## DISCUSSION

### I. *Facts*

Plaintiff was placed under civil confinement at CNYPC on July 11, 2008. (Lead Compl. at 2).[FN3] As part of his treatment regimen, plaintiff has been enrolled in the SOTP, which he alleges incorporates components that violate his constitutional rights. In particular, plaintiff has been directed to complete an "autobiography" and a "sexual offense history." (Member Compl. at 4, 9). Plaintiff alleges that his autobiography and sexual offense history are to include "uncharged crimes and/or charges that were dismissed." (Member Compl. at 4). Plaintiff further alleges that defendant Colasante issued an order to photocopy plaintiff's autobiography bi-weekly for placement in his file "for the New York State Attorney General's review to be used as evidence" to further civilly confine plaintiff. (Member Compl. at 4). Because plaintiff refused to have his autobiography photocopied, he was apparently removed from the "autobiography group" and told that he could not progress toward his release until he allowed the photocopying. (Member Compl. at 4).

> FN3. Citations to the Lead Complaint (08-CV-1251) will be cited as "Lead Compl." and a page number. Plaintiff did not number his paragraphs or pages, so the court will number the pages beginning with the first page of the Lead Complaint as page 1. Citations to the Member Complaint (08-CV-1280) will be cited as "Member Compl." and paginated in a like manner.

Plaintiff, a Native American, also complains about specific components of "all program phases," which he alleges subject him to religious practices and rituals based on "Zen Buddhism and Christianity." (Lead Compl. at 2-3). Plaintiff claims that the "Good Lives Model and Boundaries Programs" are unconstitutional because they "teach that you have to believe in something devoted [sic] as spirituality ... [and] ... teach the rituals and practices of Buddhism." (Lead Compl. at 3). In addition, plaintiff alleges that "From the Inside [O]ut[:] Growing up Male, problem [s]olving anger management programs are all Hazeldon products which incorporate Christian beliefs and

practices," and violate his constitutional rights. (Lead Compl. at 3).

*2 Finally, plaintiff alleges that he is being coerced to submit to a PPG and polygraph examination, and a new "contract" has changed the two exams from "therapy tools" to "investigate [sic] tools" to obtain information to keep plaintiff civilly confined. (Lead Compl. at 4). Plaintiff again alleges coercion because his advancement in the program is dependent on his compliance with the two examinations. (Lead Compl. at 4).

### II. *Motion to Dismiss*

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v.. Twombly,* 550 U.S. 544, 570 (2007)). *See also Camarillo v. Carrols Corp.,* 518 F.3d 153, 156 (2d Cir.2008) (the plaintiff must provide "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (citation omitted). Plaintiff's factual allegations must be sufficient to give the defendant "fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted). When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations omitted). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia-Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989)). Here, plaintiff attached what appear to be three separate documents to the Member Complaint. The first document, entitled "Sex Offender Treatment Program

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2519121 (N.D.N.Y.)
(Cite as: 2010 WL 2519121 (N.D.N.Y.))

Model," is a bulleted list of criteria for Phases I-III. (Member Compl. at 8). The second document is entitled "Phase Goals" and describes specific assignments for Phases I and II. (Member Compl. at 9). The Phase Goals document appears to be the first page of a multi-page document, because it does not describe assignments for Phase III. The third document is a collection of materials all related to the autobiography component of the SOTP. (Member Compl. at 10-29).

Plaintiff attached nothing to the Lead Complaint, but names specific components of the SOTP, including Dialectical Behavior Therapy ("DBT") and the "Advancement to SOTP Phase II-IV Consent to Participate in Treatment." Defendants have attached these documents to their motion.[FN4] (Defs.' Mot. to Dismiss, App. B, Exs. B, D and E; see also Defs.' Mot. to Dismiss at 3). Because these documents are integral to the complaint and were relied upon by plaintiff in drafting his complaint, the court will consider them in its analysis of defendants' motion.[FN5]

> FN4. The defendants also state that these documents were filed in support of a motion to dismiss an identical section 1983 case, decided in the Northern District of New York. See Pratt v. Hogan, 6:08-CV-1003 (DNH/DEP).

> FN5. In the case of a motion to dismiss involving a pro se plaintiff, the court may look beyond the complaint to plaintiff's opposition papers. See Locicero v. O'Connell, 419 F.Supp.2d 521, 525 (S.D.N.Y.2006) (citation omitted).

### III. First Amendment Claim

**\*3** The Establishment and Free Exercise Clauses of the First Amendment, made applicable to state action by the Fourteenth Amendment, provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. CONST. amend. I. In order to establish a violation of the Free Exercise Clause, a plaintiff must show "direct government compulsion." Engel v. Vitale, 370 U.S. 421, 430 (1962). In addition, a court should sustain a Free Exercise claim

"only if the 'government has placed a substantial burden on the observation of a central religious belief' " that is not otherwise justified by a compelling state interest. Skoros v. City of New York, 437 F.3d 1, 39 (2d Cir.2006) (quoting Jimmy Swaggart Ministries v. Bd. of Equalization, 493 U.S. 378, 384-85 (1990)). The Establishment Clause, by comparison, "prohibits government from officially preferring one religious denomination over another." Id. at 38-39.

In this case, plaintiff alleges that the SOTP requires his participation in faith-based programs as a condition of his release from civil confinement. (Lead Compl. at 3). Further, plaintiff claims that this participation violates his "right to believe or not as [his] conscience dictates." Id. Defendants argue that plaintiff has failed to state a cognizable claim under the First Amendment because he has failed to set forth any facts concerning the beliefs or practices of his religion and explained why the defendants' program would violate those beliefs. (Defs.' Mem. of Law at 18-19).

In Decker v. Hogan, Senior District Judge McAvoy rejected a similar argument made by defendants in a case in which the plaintiff was challenging the SOTP because he was an atheist. See Decker v. Hogan, No. 9:09-CV-0239, 2009 U.S. Dist. LEXIS 89048, at \*8-9; 2009 WL 3165830 (N.D.N.Y. Sept. 28, 2009) (McAvoy, S.J.). Defendants argued, inter alia, that there was no proof of governmental compulsion impacting upon the plaintiff's atheistic beliefs. Id. Senior Judge McAvoy found that the court could not make such a determination on a motion to dismiss because plaintiff's factual allegations must be accepted as true, and plaintiff was alleging that the defendants' program was subjecting him to religious practices based upon Zen Buddhism and Christianity, and that this was forcing plaintiff to engage in practices that were contrary to his atheistic beliefs. Id. at \*9-10.

In this case, plaintiff has identified himself as a "Native American." Although he has not stated a specific "religion," in affording the pro se plaintiff the utmost liberality, the court will assume that his status as a Native American encompasses particular religious beliefs. This plaintiff, like the plaintiff in Decker, claims that components of the SOTP subject him to religious tenets

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2519121 (N.D.N.Y.)
(Cite as: 2010 WL 2519121 (N.D.N.Y.))

that are contrary to his general religious beliefs. Based on *Decker,* Plaintiff Carney has successfully stated a plausible First Amendment Claim, sufficient to withstand defendants' motion to dismiss. As Senior Judge McAvoy stated in *Decker,* it may later become clear on a motion for summary judgment, or at some later stage of the proceedings, that plaintiff's claims are not adequately supported. However, at this stage, the court must accept plaintiff's allegations as true. Accordingly, this court recommends that defendants' motion to dismiss plaintiff's First Amendment claim be denied. [FN6]

> **FN6.** As noted below, this court will recommend that the plaintiff's First Amendment claim for damages be dismissed based on qualified immunity, leaving only the First Amendment cause of action for injunctive relief.

**IV. *Fifth Amendment Claim***

**\*4** The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U .S. CONST. amend. V. However, a violation of this right "occurs only if one has been compelled to be a witness against himself in a criminal case." *Chavez v. Martinez,* 538 U.S. 760, 770 (2003); *see also Higazy v. Templeton,* 505 F.3d 161, 171 (2d Cir.2006). Plaintiff is civilly confined, and has made no allegation that the information in his autobiography, sexual history, or information that would be gained from the polygraph and/or PPG examination is currently being used in a criminal case.[FN7] Any claim that this information might be used against him in the future in a criminal proceeding is not now ripe for adjudication. *Longway v. Jefferson County Bd. of Supervisors,* 24 F.3d 397, 500 (2d Cir.1994).

> **FN7.** If any of this information were used in a future criminal proceeding against him, plaintiff could still challenge the use of the information.

The Second Circuit has held that answering questions during a polygraph examination about past offenses and "with respect to any criminal prosecution unrelated to the

conviction" does not waive a defendant's right against self-incrimination under the Fifth Amendment; the defendant can still challenge the polygraph examination results in court on Fifth Amendment grounds if it were to be used in a criminal proceeding. *United States v. Johnson,* 446 F.3d 272, 275, 280 (2d Cir.2006). The court also explained that polygraph examinations are reasonably related to promoting the sentencing goals of balancing supervised release conditions against restraint of individual liberty, and served to further sex offender treatment. *Id.* at 277.

Furthermore, the use of a PPG examination does not implicate plaintiff's right against self-incrimination under the Fifth Amendment because the results of the test are not "testimonial." Rather, the test provides an "assessment of an individual's physical reactions to various stimuli." *Decker v. Hogan,* No. 09-CV-0239, 2009 U.S. Dist. LEXIS 89048, at \*21 (citations omitted), 2009 WL 3165830 (N.D.N.Y. Sept. 28, 2009). This court also notes that courts often find that PPG examination results inadmissible as evidence. *Id.* (citations omitted).

Use of the polygraph, PPG, autobiography, and/or sexual history as part of the SOTP do not implicate plaintiff's right against self-incrimination because they are not being used against him in a criminal case. *See McChesney v. Hogan,* 9:08-CV-1186/6:08-CV-1290, 2010 U.S. Dist. LEXIS 25705, at \*27-31, 2010 WL 1027443 (N.D.N.Y. March 18, 2010) (Report Recommendation of Peebles, USMJ), *accepted and adopted by* 2010 U.S. Dist. LEXIS 257171, 2010 WL 1037957 (N.D.N.Y. Mar. 18, 2010) (Mordue, CJ).[FN8] Therefore, plaintiff has failed to state a claim upon which relief can be granted, and this court recommends that defendants' motion to dismiss be granted as to his Fifth Amendment claims.

> **FN8.** *McChesney* granted a motion to dismiss a Fifth Amendment claim relating to the SOTP program that was substantially similar to the one asserted in this case.

**V. *Qualified Immunity***

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2519121 (N.D.N.Y.)
(Cite as: 2010 WL 2519121 (N.D.N.Y.))

*5 Defendants argue that they are entitled to qualified immunity from plaintiff's claim for money damages. Because the court is recommending denial of the defendants' motion to dismiss plaintiff's First Amendment claim, the court will proceed to discuss defendants' argument.[FN9]

> FN9. Because the court has determined that there is no Fifth Amendment violation, the court need not discuss qualified immunity with respect to plaintiff's Fifth Amendment claims.

Qualified immunity protects government officials performing discretionary functions in the course of their employment where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). A government actor is entitled to qualified immunity "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001)* (internal quotation marks omitted).

In *Decker,* Senior Judge McAvoy denied defendants the protection of qualified immunity in the context of a motion to dismiss a First Amendment cause of action very similar to the claim alleged in the instant action. He observed that the "objective reasonableness" of defendants' actions sometimes depends on factual issues about what they knew about plaintiff's complaints, making a determination of qualified immunity on the pleadings alone premature. *Decker,* 2009 U.S. Dist. LEXIS 89048 at *22-23. Judge McAvoy denied the motion to dismiss without prejudice, noting that a factual basis for affording defendants qualified immunity could arise during discovery. *Id.* at *22-24.

In determining whether defendants involved in the SOTP program are entitled to qualified immunity, this court would focus, not on the "objective reasonableness" prong of the analysis as Judge McAvoy appeared to do in *Decker,* but on whether "... plaintiff's constitutional rights were not clearly established at the time he alleges his rights were violated." *Pratt v. Hogan,* 631 F.Supp.2d 192, 198 (N.D.N.Y.2009)* (Hurd, J.) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818). When deciding if a constitutional right was "clearly established at the relevant time," a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful.

*African Trade & Information Center, Inc., v. Abromaitis,* 294 F .3d 355, 360 (2d Cir.2002); *see also Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). This court concludes, as have several other judges in this district, that the law remains unclear as to whether the use of treatment materials and modalities peripherally related to religious principles violates the constitutional rights of those individuals treated in the SOTP. *Pratt v. Hogan,* 631 F.Supp.2d at 198; *McChesney v. Hogan,* U.S. Dist. LEXIS 25705, at *37-38.

*6 A review of the case law on this issue shows that with respect to treatment programs requiring an inmate to participate in Alcoholics Anonymous methodology, the law was well-settled as early as 1996, that compelled participation could rise to the level of a First Amendment. *See generally Cox v. Miller,* 296 F.3d 89, 108 (2d Cir.2002) (citing *inter alia Griffin v. Coughlin,* 88 N.Y.2d 674, 692 (holding that "a mandatory, exclusive ASAT addiction treatment program ... incorporating the A.A. Twelve Steps methodology, credo, and meeting practices, violates the Establishment Clause") (1996)). The difference between the A.A. programs in the above-cited cases and the program at issue in this case is that the A.A. programs "placed heavy emphasis on spirituality and prayer," requiring participants to pray to God to overcome their alcohol problems. *Pratt,* 631 F.Supp.2d at 198 (citing *Warner v. Orange County Dep't of Prob.,* 115 F.3d 1068, 1075 (2d Cir.1997)).

As Judge Hurd observed in *Pratt,* a case containing claims identical to the case herein, it "remains unclear whether the 'Good Lives Model and Boundaries Program' and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2519121 (N.D.N.Y.)
(Cite as: 2010 WL 2519121 (N.D.N.Y.))

DBT have non-secular purposes and if the primary purpose of the programs are to promote or prohibit religions." As Magistrate Judge Peebles concluded in a Report Recommendation adopted by Chief District Judge Mordue, "... the law is anything but clear on the question of whether compelled use by officials at the CNYPC of treatment materials peripherally based upon religious principles violates the rights of patients involuntarily committed and subjected to the program." *McChesney v. Hogan,* U.S. Dist. LEXIS 25705, at *37-38 (citing *Pratt, 631 F.Supp.2d at 198).* This court agrees that, because the law on this issue is unsettled, it will recommend that defendants be afforded qualified immunity from damages for any First Amendment violation. Plaintiff's claim for injunctive relief against the defendants in their official capacity, however, may proceed.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss pursuant to FED.R.CIV.P. 12(b)(6) (Dkt. No. 15) be **GRANTED IN PART AND DENIED IN PART,** and it is further

**RECOMMENDED,** and that all plaintiff's claims, with the exception of his First Amendment cause of action seeking injunctive relief against the defendants in their official capacity, be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2010.
Carney v. Hogan
Slip Copy, 2010 WL 2519121 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 2922805 (N.D.N.Y.)
(Cite as: 2009 WL 2922805 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
David STEPHENSON, Plaintiff,
v.
ALBANY COUNTY POLICYMAKERS, et al.,
Defendants.
**Civ. No. 6:09-CV-326 (LEK/RFT).**

Aug. 14, 2009.

David Stephenson, Marcy, NY, pro se.

***REPORT-RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate
Judge.

**\*1** The Clerk has sent to the Court a civil rights Complaint
(Dkt. No. 1), Motion to Proceed *In Forma Pauperis* (IFP)
(Dkt. No. 2), Motion for Joinder of Claims (Dkt. No. 3),
and a Motion to Appoint Counsel and Conduct Discovery
(Dkt. No. 6), filed by *pro se* Plaintiff David Stephenson,
who is currently incarcerated at Marcy Correctional
Facility.[FN1] In his *pro se* Complaint, Stephenson alleges
civil rights violations based upon, *inter alia,* malicious
prosecution, abuse of process, conspiracy, fraud, invasion
of privacy, and attorney malpractice. For a more complete
statement of Plaintiff's claims, reference is made to the
Complaint.

> FN1. In 2006, Stephenson filed a civil rights
> action in this Court, pursuant to 42 U.S.C. §
> 1983, *Stephenson v. Herrick,* Civ. No.
> 1:06-CV-1466 (GLS/DRH), which was
> dismissed by the Court, *sua sponte,* for failure to
> state a claim upon which relief could be granted.

Stephenson's Petition for a Writ of *Habeas
Corpus,* pursuant to 28 U.S.C. § 2254, is also
pending in this Court, *Stephenson v.
Superintendent,* Civ. No. 9:08-CV-1243
(LEK/RFT).

**I. DISCUSSION**

**A. Application to Proceed *In Forma Pauperis***

Plaintiff has submitted an *In Forma Pauperis* Application.
The Prison Litigation Reform Act (PLRA), codified in
part at 28 U.S.C. § 1915(b), provides that an inmate who
seeks *in forma pauperis* status is required to pay over a
period of time the full amount of the filing fee provided
for in 28 U.S.C. § 1914(a), which is currently $350.00 for
most civil actions. After reviewing Plaintiff's Application,
we find that he may properly proceed *in forma pauperis.*

**B. Allegations Contained in the Complaint**

Section 1915(e) of Title 28 of the United States Code
directs that, when a plaintiff seeks to proceed *in forma
pauperis,* "the court shall dismiss the case at any time if
the court determines that ... the action or appeal (i) is
frivolous or malicious; (ii) fails to state a claim on which
relief may be granted; or (iii) seeks monetary relief against
a defendant who is immune from such relief." 28 U.S.C.
§ 1915(e)(2)(B). Thus, it is a court's responsibility to
determine that a plaintiff may properly maintain his
complaint before permitting him to proceed further with
his action.

Moreover, under 28 U.S.C. § 1915A, a court must, as
soon as practicable, *sua sponte* review "a complaint in a
civil action in which a prisoner seeks redress from a
governmental entity or officer or employees of a
governmental agency" and must "identify cognizable
claims or dismiss the complaint, or any portion of the
complaint, if the complaint (1) is frivolous, malicious, or
fails to state a claim upon which relief may be granted; or
(2) seeks monetary relief from a defendant who is immune

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)
(Cite as: 2009 WL 2922805 (N.D.N.Y.))

from such relief." 28 U.S.C. §§ 1915A(a) & (b); see also Carr v. Dvorin, 171 F.3d 115, 116 (2d Cir.1999) (per curiam ).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which "establishes a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." German v. Fed. Home Loan Mortgage Corp., 885 F.Supp. 537, 573 (S.D.N.Y.1995) (quoting Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 508 (1990) & 42 U.S.C. § 1983)); see also Myers v. Wollowitz, 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (stating that " § 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights"). In this action, Plaintiff seeks to hold Defendants liable for various alleged constitutional violations, including, but not limited to:

**\*2** • conspiracy claims against all Defendants;

• claims for malicious prosecution and abuse of process against Defendants Mark Haskins, New York State Bureau of Narcotics, P. David Soares, Albany County District Attorney, and Christopher Baynes, Albany County Assistant District Attorney;

• claims of "undue influence and fraud" against Defendants Haskins, Albany County Task Force, and Albany County Prosecutors;

• claims of "common law fraud" and attorney malpractice against Defendant F. Stanton Ackerman, his court appointed attorney;

• invasion of privacy claims against Defendants Haskins, Andrew Zostant, Town of Colonie Police Detective, Steven Heider, Town of Colonie Police Superintendent, and other members of the Albany County Task Force for interfering with Plaintiff's expectation of privacy and private communications without probable cause; and

• what appears to be a Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978), claim against Albany County for various policies and customs.

See generally Compl.

The initial impediment to Plaintiff's pursuit of this action is aptly summarized in Plaintiff's Complaint: "The Plaintiff has a pending Federal Habeas Corpus Petition in the Northern District of New York Federal Court, Case No. 9:08-CV-1243. **This 1983 action and complaint is intended to supplement that Petition, as these claims for money damages are relevant to the same set of facts.**" Compl. at ¶ 17 (emphasis added). Indeed, as Plaintiff overtly admits, this entire § 1983 action (including state claims for malpractice and fraud) relates to events leading up to and including his guilty plea and sentence in Albany County Court in 2006.[FN2] The Supreme Court has held that

> FN2. A similar *fait accompli* vanquished Stephenson's prior attempt to sue various individuals in this Court, *Stephenson v. Herrick, et al.,* Civ. No. 1:06-CV-1466 (GLS/DRH). Upon information and belief, the core events giving rise to Stephenson's prior § 1983 action are the same events giving rise to the current action. That prior civil rights action was dismissed in light of *Heck v. Humphrey,* 512 U.S. 477 (1994). *See Stephenson v. Herrick, et al.,* Civ. No. 1:06-CV-1466, Dkt. No. 9, Decision and Order, dated Mar. 8, 2007.

in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. *Heck v. Humphrey,* 512 U.S. 477, 486-87 (1994).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)
(Cite as: 2009 WL 2922805 (N.D.N.Y.))

Plaintiff's claims in this action are barred because he has failed to show that his conviction or sentence has been overturned. *See Duamutef v. Morris,* 956 F.Supp. 1112, 1115-18 (S.D.N.Y.1997) (dismissing § 1983 claims of malicious prosecution, false arrest, perjury, retaliation, and civil rights conspiracy under *Heck* where the plaintiff's underlying conviction had not been overturned). Because all of Plaintiff's claims relate to events that gave rise to Plaintiff's conviction and the sentence he is currently serving, many of which are currently interposed in his pending *Habeas Corpus* Petition, [FN3] this action is barred under *Heck* and we recommend dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) and (ii) as it lacks an arguable basis in law. We note that this recommendation is limited to all § 1983 claims asserted by Plaintiff. Plaintiff has also inserted some state law claims sounding in fraud and attorney malpractice. It is not clear whether Plaintiff intended to assert these claims in support of his § 1983 claims, or if he intended them to stand on their own, thereby invoking the Court's pendent jurisdiction to entertain state law claims. To the extent they are part and parcel of the § 1983 claims, then they too suffer the same infirmity and are barred by *Heck.* To the extent, however, that they are purely state law claims, in light of this Court's recommendation of dismissal of the federal claims, we would recommend the Court not exercise pendent jurisdiction of such state law claims, pursuant to 28 U.S.C. § 1367, which authorizes a federal court to decline to exercise supplemental jurisdiction over a state claim if all of the claims over which the court had original jurisdiction were dismissed. 28 U.S.C. § 1367(c)(3).

FN3. Stephenson raises the following grounds, *inter alia,* in support of his *Habeas* Petition:

1) he was denied equal protection and due process in state court when he was denied, *inter alia,* a grand jury and was subjected to an insufficient accusatory process and was victim of an illegal search and seizure;

2) he was a victim of selective prosecution and "Mode of Proceedings error"; and

3) his guilty plea was unknowing and unintelligent due to ineffective assistance of counsel.

*Stephenson v. Superintendent,* Civ. No. 9:08-CV-1243 (LEK/RFT), Dkt. No. 1, Pet.

**C. Other Pending Motions**

**\*3** Presently pending in this matter are Plaintiff's Motions for Joinder of Claims, Appointment of Counsel, and to Conduct Discovery. In light of the Court's recommendation of full dismissal, we find it unnecessary at this juncture to adjudicate such claims. Should the District Judge assigned to this matter accept this recommendation, such Motions would be automatically terminated upon the closing of this case. If, however, the recommendation is not accepted, the Clerk shall forward this file to the undersigned for consideration of these Motions.

**WHEREFORE,** it is hereby

**ORDERED,** that Plaintiff's *In Forma Pauperis* Application (Dkt. No. 2) is **granted;** and it is further

**RECOMMENDED,** that pursuant to the Court's review under 28 U.S .C. § 1915 and § 1915A, Plaintiff's entire Complaint be should be **dismissed** as barred by *Heck v. Humphrey,* 512 U.S. 477, 486-87 (1994), and the Court should decline to exercise pendent jurisdiction over any purported state claims pursuant to 28 U.S.C. § 1367(c)(3); and it is further

**ORDERED,** that in the event the District Court does not adopt the above recommendation, the entire file be returned to the undersigned for consideration of Plaintiff's other Motions (Dkt. Nos. 3 & 6); and it is further

**ORDERED,** that the Clerk serve a copy of this Report-Recommendation and Order on Plaintiff by regular mail.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)
(Cite as: 2009 WL 2922805 (N.D.N.Y.))

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984* F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

This matter comes before the Court following a Report-Recommendation filed on August 14, 2009 by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 7). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff David Stephenson, which were filed on August 24, 2009. Objections (Dkt. No. 8).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

**\*4** Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 7) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that pursuant to the Court's review under 28 U.S.C. § 1915 and § 1915A, Plaintiff's entire Complaint

is **DISMISSED WITHOUT PREJUDICE,** pending the outcome of Plaintiff's pending habeas petition; and accordingly all other pending Motions in this case (Dkt. Nos. 3 and 6) should be **DENIED** and **DISMISSED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2009.
Stephenson v. Albany County Policymakers
Slip Copy, 2009 WL 2922805 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2010 WL 2025613 (C.A.2 (N.Y.)))

**H**

Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.

United States Court of Appeals,
Second Circuit.
Joel MURRAY, Plaintiff-Appellant,
v.
George E. PATAKI, Governor of New York State, Kang Yeon Lee, M.D., Daniel Senkowski, Superintendent of Clinton Correctional Facility, Dr. Melendez, R. Leduc, Corrections Officer, N. Irwin, J. Travers, J. Forth, Corrections Officer, R. Girdich, Superintendent at Franklin Correctional Facility, Glenn S. Goord, Commissioner of N.Y.S. D.O.C.S., Richard Roy, Inspector General, T. Reif, Corrections Officer, CNY Psychiatric Center, S. Jones, Defendants-Appellees.[FN*]
No. 09-1657-pr.

May 24, 2010.

**Background:** Pro se prisoner brought civil rights action against various government defendants. The United States District Court for the Northern District of New York, dismissed certain § 1983 claims, Lawrence E. Kahn, J., 2007 WL 956941, and granted summary judgment in favor of defendants on his remaining § 1983 and § 1985 claims, and dismissed his claim against prison employee defendant, Suddaby, J., 2009 WL 981217. Prisoner appealed.

**Holding:** The Court of Appeals held that United States Marshals' failure to effect service automatically constituted "good cause" for extension of time in which to serve prison employee defendant.
Affirmed in part, and vacated and remanded in part.

West Headnotes

Federal Civil Procedure 170A  417

170A Federal Civil Procedure
    170AIII Process
        170AIII(B) Service
            170AIII(B)1 In General
                170Ak417 k. Time for Making. Most Cited Cases
Pro se prisoner provided information sufficient to identify prison employee defendant, and therefore United States Marshals' failure to effect service automatically constituted "good cause" for an extension of time in which to serve. Fed.Rules Civ.Proc.Rule 4(m), 28 U.S.C.A.

Appeal from a judgment of the United States District Court for the Northern District of New York (Suddaby, J., Treece, M.J.).Joel Murray, pro se, Romulus, NY.

Andrew M. Cuomo, Attorney General of the State of New York; Barbara D. Underwood, Solicitor General; Benjamin N. Gutman, Deputy Solicitor General (Sudarsana Srinivasan, Assistant Solicitor General; Kate H. Nepyeu, of Counsel), New York, NY, for Defendants-Appellees.

Present BARRINGTON D. PARKER, DEBRA ANN LIVINGSTON, and DENNY CHIN, Circuit Judges.

**SUMMARY ORDER**

**\*1 UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED IN PART** and **VACATED AND REMANDED IN PART.**

Plaintiff-Appellant Joel Murray appeals *pro se* from an order of the United States District Court for the Northern District of New York (Suddaby, *J.*), entered March 29,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2010 WL 2025613 (C.A.2 (N.Y.)))

2007, dismissing certain of his 42 U.S.C. § 1983 claims against various of the Defendants-Appellees, and from a second order, entered on April 9, 2009, granting summary judgment in favor of Defendants-Appellees on Murray's remaining claims under 42 U.S.C. §§ 1983 and 1985, and dismissing his claim against Defendant-Appellee Dr. Melendez for failure to timely effect service of process upon her pursuant to Federal Rule of Civil Procedure 4(m). We assume the parties' familiarity with the underlying facts and procedural history of the case, and with the issues presented on appeal.

We review de novo a district court's dismissal of claims pursuant to Fed.R.Civ.P. 12(b)(6), "construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor ." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.2002). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim will have facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). We also review a district court's grant of summary judgment de novo, and determine whether there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir.2003). While we construe the evidence in the light most favorable to the non-moving party, id., "conclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion," Davis v. New York, 316 F.3d 93, 100 (2d Cir.2002).

We have undertaken a de novo review of the record and relevant cases and, except as noted below, we affirm the dismissal of Murray's claims against all defendants for substantially the same reasons set forth in Magistrate Judge Treece's thorough reports and recommendations of March 5, 2007, and March 3, 2009; these reports were adopted by the district court in their entirety.

We vacate the district court's dismissal of Murray's claim against Dr. Melendez for failure to serve process. We review a district court's dismissal pursuant to Federal Rule of Civil Procedure 4(m) for abuse of discretion. Zapata v. City of New York, 502 F.3d 192, 195 (2d Cir.2007). A district court abuses its discretion if it bases its ruling on an erroneous view of the law or clearly erroneous findings of fact, or its decision "cannot be located within the range of permissible decisions." Lynch v. City of New York, 589 F.3d 94, 99 (2d Cir.2009) (quoting Sims v. Blot, 534 F.3d 117, 132 (2d Cir.2008)).

**\*2** Rule 4(m) provides that "[i]f a defendant is not served within 120 days after the complaint is filed, the court-on motion or on its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed.R.Civ.P. 4(m). If the plaintiff shows "good cause for the failure" to serve, the district court is required to grant an "appropriate" extension of time in which to serve. Id. District courts also have discretion to enlarge the 120-day period even in the absence of good cause. See Zapata, 502 F.3d at 196. A pro se prisoner proceeding in forma pauperis, such as Murray, is "entitled to rely on service by the U.S. Marshals." Romandette v. Weetabix Co. ., 807 F.2d 309, 311 (2d Cir.1986). As long as the pro se prisoner provides the information necessary to identify the defendant, the Marshals' failure to effect service automatically constitutes "good cause" for an extension of time within the meaning of Rule 4(m). See, e.g., id.; see also Moore v. Jackson, 123 F.3d 1082, 1085-86 (8th Cir.1997); Byrd v. Stone, 94 F.3d 217, 220 (6th Cir.1996); Dumaguin v. Sec'y of Health & Human Servs., 28 F.3d 1218, 1221 (D.C.Cir.1994); Sellers v. United States, 902 F.2d 598, 602 (7th Cir.1990); Puett v. Blandford, 912 F.2d 270, 275 (9th Cir.1990). A pro se prisoner proceeding in forma pauperis is only required to provide the information necessary to identify the defendant, see, e.g., Sellers, 902 F.2d at 602, and it is "unreasonable to expect incarcerated and unrepresented prisoner-litigants to provide the current addresses of prison-guard defendants who no longer work at the prison," Richardson v. Johnson, 598 F.3d 734, 739-40 (11th Cir.2010).

Here, albeit after receiving a number of extensions of time within which to serve Melendez, Murray provided information that was sufficient to identify Dr. Melendez by full name and as an employee formerly assigned to Clinton Correctional Facility. See Doc. 103, Murray v.

Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2010 WL 2025613 (C.A.2 (N.Y.)))

*Pataki,* 9:03-CV-1263 (N.D.N.Y. Apr. 13, 2007) (letter from Murray to the district court styled "Notification of Defendant"). This was sufficient to satisfy Murray's burden to provide sufficient information for the Marshals to identify the defendant. Although the Marshals subsequently failed to serve Dr. Melendez at the Clinton facility on March 11, 2008, *id.* Doc. 134, they were clearly able to identify her from the information proffered by Murray, and service was unsuccessful merely because Dr. Melendez apparently no longer worked at Clinton. *See id.* As Murray had satisfied his burden, it was an abuse of discretion for the district court to require him to provide additional information regarding Dr. Melendez, and to dismiss Murray's claims against her pursuant to Rule 4(m) for failure to serve process upon her. District courts have a responsibility to assist *pro se* plaintiffs in their efforts to serve process on defendants. *See Valentin v. Dinkins,* 121 F.3d 72, 75-76 (2d Cir.1997) (recognizing district court's obligation to allow *pro se* plaintiff limited discovery to identify defendant for service of process). With the information that Murray provided, the district court here could have ordered the other defendants to contact Dr. Melendez to see if she would accept service or to provide the Marshals with Dr. Melendez's last known address.

**\*3** For the foregoing reasons, the judgment of the district court dismissing the claims against Dr. Melendez for failure to serve process is **VACATED,** and we **REMAND** to the district court for further proceedings in accordance with this decision. The judgment is **AFFIRMED** in all other respects.

FN* The Clerk of the Court is respectfully directed to amend the official caption as it appears above.

C.A.2 (N.Y.),2010.
Murray v. Pataki
Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.